# United States Court of Appeals

### *for the*

# Federal Circuit

Miscellaneous Docket No. _____

———————————

IN RE FOUNDATIONS WORLDWIDE, INC., AND JOSEPH A. LAWLOR,
*Petitioner.*

———————————

*Petition for Writ of Mandamus to the United States District Court
for the Central District of California
in 13-cv-01683 RGK*

———————————

## PETITION FOR WRIT OF MANDAMUS

JAMES W. PAUL
JAMES JUO
FULWIDER PATTON LLP
6060 Center Drive, Tenth Floor
Los Angeles, California 90045
TEL: (310) 824-5555

*Attorneys for Petitioners Foundations Worldwide, Inc., and Joseph A. Lawlor*

July 19, 2013

## CERTIFICATE OF INTEREST

Counsel for Petitioners certifies the following:

1. The full name of every party or amicus represented by me is:

   Foundations Worldwide, Inc.; and Joseph A. Lawlor

2. The above-named is the real party in interest (if the party named in the caption is not the real party-in-interest) represented by us.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or are expected to appear in this court are:

   James W. Paul                Patricia A. Walker
   James Juo                    Ralph E. Jocke
   FULWIDER PATTON LLP          Christopher L. Parmelee
   6060 Center Drive            WALKER & JOCKE CO., LPA
   Tenth Floor                  231 South Broadway
   Los Angeles, CA 90045        Medina, Ohio 44256-2601


   July 19, 2013                _____
   Date                         James Juo
                                Attorneys for Petitioners
                                Foundations Worldwide, Inc.; and
                                Joseph A. Lawlor

# TABLE OF CONTENTS

**Page**

I.   PETITION FOR WRIT OF MANDAMUS AND RELIEF SOUGHT ......................................................................................... 1

II.  INTRODUCTION ............................................................................. 1

III. STATEMENT OF THE ISSUE ..................................................... 3

IV. STATEMENT OF THE FACTS ..................................................... 3

    A.   Patents-In-Suit ........................................................................ 3

    B.   The Accused Product ............................................................. 3

    C.   Events Leading to the Declaratory Judgment Action in Ohio and the Subsequent California Action ............................... 4

    D.   Procedural Background of Motion to Dismiss or Transfer .............. 9

V.   REASONS WHY THE WRIT SHOULD ISSUE ....................... 9

    A.   The Court Failed to Follow First-Filed Rule ................... 11

    B.   Other Convenience Factors Support Transfer ................. 16

        1.   Convenience of the Parties .................................. 16

            (a)   Court Overvalued the Convenience of Coverplay .................................................... 16

            (b)   Court Overlooked Inconvenience to Foundations ..................................................... 18

        2.   Convenience of Witnesses .................................... 19

            (a)   Convenience of Foundations' Employee Witnesses .......................................................... 19

            (b)   Only Foundations has Material Non-Party Witnesses .......................................................... 19

    (c)  Coverplay has not Identified Material Witnesses.......21

   3.  The Interests of Justice.........................................................25

    (a)  Court Undervalued the Location of Physical Evidence ...................................................................25

    (b)  Personal Jurisdiction Over Mr. Lawlor Only in Ohio ...........................................................................26

VI. CONCLUSION .........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Electronics for Imaging, Inc. v. Coyle*
  394 F.3d 1341 (Fed. Cir. 2005) ................................................2, 9. 11, 13, 14, 15

*Hewlett-Packard Co. v. Acceleron LLC*
  587 F.3d 1358 (Fed. Cir. 2009) ........................................................14

*Hope v. Otis Elevator Co.*
  389 F. Supp. 2d 1235 (E.D. Cal. 2005) ...........................................19

*In Re Air Crash Over the Taiwan Straits on May 25, 2002*
  331 F. Supp.2d 1176 (C.D. Cal. 2004) .............................................21

*In re Genentech, Inc.*
  566 F.3d 1338 (Fed. Cir. 2009) ........................................................25

*In re Link_A_Media Devices Corp.*
  662 F.3d 1221 (Fed. Cir. 2011) ...........................................9, 17, 25, 26

*Los Angeles Mem'l Coliseum Com. v. NFL*
  89 F.R.D. 497 (C.D. Cal. 1981) ........................................................16

*Metz v. U.S. Life Ins. Co. in City of New York*
  674 F. Supp. 2d 1141 (C.D. Cal. 2009) .....................................18, 26

*Micron Tech, Inc. v. Mosaid Techs., Inc.*
  518 F.3d 897 (Fed. Cir. 2008) ..........................................................11

*Pacific Car and Foundry Company v. Pence*
  403 F.2d 949 (9th Cir. 1968) ............................................................19

*Piper Aircraft Co. v. Reyno*
  454 U.S. 235, 102 S.Ct 252, 70 L.Ed.2d 419 (1981) ........................21

*Saleh v. Titan Corp.*
  361 F. Supp. 2d 1152 (S.D. Cal. 2005) .......................................19, 24

*Shute v. Carnival Cruise Lines*
  897 F.2d 377 (9th Cir. 1990) ............................................................27

*Szegedy v. Keystone Food Products, Inc.*
  2009 WL 2767683 (C.D. Cal. Aug. 26, 2009) .......................18, 22, 26

*Thomas v. Home Depot, U.S.A., Inc.*
  131 F. Supp. 2d 934 (E.D. Mich. 2001) .....................................21, 22

*Wiener v. U.S.*
  192 F. Supp. 789 (S.D. Cal. 1960) ...................................................21

*Xoxide, Inc. v. Ford Motor Co.*
448 F. Supp. 2d 1188 (C.D. Cal. 2006)........................................................13, 14


**CALIFORNIA CASES**

*Holiday Matinee, Inc. v. Rambus, Inc.*
118 Cal. App. 4th 1413, 13 Cal. Rptr. 3d 766 (Cal. App. Ct. 2004).................23


**FEDERAL STATUTES**

28 U.S.C. § 1404...........................................................................................1, 3, 16

## I.     PETITION FOR WRIT OF MANDAMUS AND RELIEF SOUGHT

The U.S. District Court for the Central District of California abused its discretion when it ignored Federal Circuit law regarding the first-to-file rule in patent cases, and failed to follow Ninth Circuit law regarding the convenience factors of 28 U.S.C. 1404(a), the change of venue statute.

Petitioners Foundations Worldwide, Inc. ("Foundations") and Joseph A. Lawlor ("Mr. Lawlor") petition this Court to issue a Writ of Mandamus directing the U.S. District Court for the Central District of California to either dismiss or transfer this patent infringement suit to the Northern District of Ohio.

The first-filed declaratory judgment action in the Northern District of Ohio (*Foundations Worldwide, Inc. v. Oliver & Tate Enterprises, Inc*., No. 1:13-cv-0506) will be affected by this Court's decision regarding the pending Petition.

No other petition or appeal from the same civil action or proceeding in the district court has previously been before this or any other appellate court.

## II.     INTRODUCTION

On March 7, 2013, Foundations filed a declaratory judgment action against Oliver & Tate Enterprises, Inc. d/b/a Coverplay ("Coverplay") regarding U.S. Patent Nos. 7,401,366 and D572,961 (collectively, the "Coverplay patents" or the "Patents-in-Suit") in Ohio.

On March 8, 2013, Coverplay filed a patent infringement suit against Foundations in California. Coverplay named Mr. Lawlor as an individual defendant in several state tort claims based on patent infringement in the California action.[1]

On June 18, 2013, the Court denied Petitioners' motion to transfer the California action to Ohio, where the first-filed declaratory judgment action against the Patents-in-Suit had been filed. [A1-A10].

The Court failed to follow Federal Circuit precedent for patent declaratory judgment actions, namely *Electronics for Imaging v. Coyle*, which favors the forum of the first-filed case. Instead, the Court found that Foundations' three emails sent over two days requesting additional time were a pretext which allowed the Court to ignore the first-to-file rule. [A4].

The Court did not find that the convenience factors weighed in favor of California, even though the Court gave undue weight to Coverplay's alleged non-party witnesses; improperly discounted the inconvenience of Foundations'

---

[1] The Court found that the state law claims of unfair competition (fourth claim), intentional interference with prospective economic advantage (fifth claim) and the negligent interference with prospective economic advantage (sixth claim) of the First Amended Complaint were based on the patent infringement allegations, even though they were not traditional patent infringement claims. [A8-A9].

witnesses and the location of physical evidence in Ohio; and improperly found personal jurisdiction over Mr. Lawlor (an individual who resides in Ohio).

Accordingly, the Court abused its discretion in denying Petitioners' motion to transfer to Ohio by not following the controlling Federal Circuit law on the first-to-file rule, and improperly applying the convenience factors of 28 U.S.C. 1404(a).

## III.   STATEMENT OF THE ISSUE

Did the Court abuse its discretion in refusing to transfer a patent infringement suit to the Northern District of Ohio where a first-filed declaratory judgment action against the same Patents-in-Suit was already pending, where third party witnesses and physical evidence are located, and where there would be personal jurisdiction over all of the parties?

## IV.   STATEMENT OF THE FACTS

### A.   Patents-In-Suit

The Patents-in-Suit are U.S. Patent No. 7,401,366 which claims a "play yard liner" (play yards are small baby cribs), and U.S. Patent No. D572,961 which claims an ornamental cover for a play yard. [A36-A52].

### B.   The Accused Product

Foundations just began to market play yard covers, the accused product, but had not sold any, when it filed its declaratory judgment action in Ohio after

being repeatedly threatened by Coverplay.  There was a definite and concrete controversy between Foundations and Coverplay regarding the Patents-in-Suit when Foundations filed its declaratory judgment action in Ohio.

**C.    Events Leading to the Declaratory Judgment Action in Ohio and the Subsequent California Action**

Foundations has sold child care products in the United States for over ten years, and supplies play yards to the hotel and child care industries. [A76 at ¶ 6; A79 at ¶ 2].  This controversy began with a December 2009 meeting requested by Coverplay between the respective principals of Coverplay and Foundations in Medina, Ohio, where Foundations is located. [A76 at ¶ 7; A80 at ¶ 8].  Medina is located in the Northern District of Ohio. At the time of the December 2009 meeting, the Patents-in-Suit already had issued.

Coverplay and Foundations were exploring a possible business relationship concerning play yard covers.  [A80 at ¶¶ 8-9].  They entered into a Non-Disclosure Agreement which expired one year later on December 9, 2010 ("Agreement").  [A55-A56].

In early 2010, Foundations' long-time customers asked Foundations if play yard covers available on the market could be used with Foundations' original play yard.  [A80-A81 at ¶ 14].  These inquires resulted in Foundations sending letters to its customers in April 2010 to address those concerns ("Safety Letters").  [A80-

A81 at ¶ 14; A87-A88].  The Safety Letters stated that the top rails of

Foundations' play yard displayed safety warnings required by an ASTM

Standard.  [A87].  If a play yard cover concealed those safety warnings, the safety

standard would not be met.  Foundations also mentioned that play yard covers

which have loose fitting material could present a suffocation risk for a baby.

[A88].  Foundations indicated that no play yard covers then on the market should

be used with Foundations' play yard.  [A88].  The Safety Letters did not mention

Coverplay, or any other specific manufacturer or model of play yards.  *See id.*

Foundations received a letter dated May 5, 2010, from Coverplay's counsel

demanding that Foundations abide by its Agreement with Coverplay.  [A64-A65].

Specifically, Coverplay alleged that Foundations had sent the Safety Letters to

Coverplay's customers in violation of the Agreement, even though the Safety

Letters were sent to Foundations' existing long-standing customers.  The

Agreement did not require Foundations to exclude its own customers from a

mailing list merely because they are also customers of Coverplay.  [A81 at ¶ 16].

Foundations responded to the May 5, 2010 letter, and believed the matter was

resolved.  *Id*.

In 2011, Marriott Hotels asked Foundations whether Foundations could

work together with Coverplay.  [A82 at ¶ 19].  Marriott's request resulted in the

August 9, 2011 letter from Foundations to Avendra Canada, Inc., an entity that

purchases merchandise for Marriott Hotels, suggesting that a licensing arrangement might be possible. [A66-A67; A82 at ¶ 19]. However, nothing came of this proposed relationship between Coverplay and Foundations. [A82 at ¶ 19].

Foundations began hearing from its customers that Coverplay was accusing Foundations of infringing the Patents-in-Suit. [A82 at ¶ 22]. Coverplay's threats were enough to cause at least one of Foundations' customers to request indemnification from Foundations. [A82 at ¶ 22].

Foundations analyzed the Patents-in-Suit, and determined that Foundations' products did not infringe the Patents-in-Suit, which contained narrow and limited claims. Foundations' engineers and designers in Ohio invented a novel play yard and a play yard cover that is distinct from the Coverplay product. [A77 at ¶ 9; A80 at ¶ 13; and A82 at ¶ 17]. Moreover, Foundations' independently developed play yard cover was only marketed, and had not been sold, when Coverplay made its infringement allegations.

On February 28, 2013, Foundations received a letter dated February 22, 2013, from Coverplay's counsel threatening a patent lawsuit and demanding a response by March 4, 2013. [A82-A83 at ¶ 23; A70-A74]. This left Foundations with only two business days to respond before Coverplay's arbitrary deadline.

On March 5, 2013, Foundations sought additional time to resolve this matter with Coverplay since it had only just received Coverplay's cease-and-desist letter, but Coverplay's counsel demanded a resolution of the dispute within three days—March 8—or else Coverplay would file a patent infringement lawsuit against Foundations.  [A89-A90].

In response to Coverplay's strident demands seeking capitulation instead of dialog, Foundations filed an action in the Northern District of Ohio on March 7, 2013, for declaratory judgment that the Patents-in-Suit are invalid, unenforceable, and not infringed.  [A109-A125].

The next day, March 8, 2013, Foundations' counsel informed Coverplay's counsel of the Ohio filing.  [A127].  Despite being told of the Ohio action, Coverplay filed suit against Foundations, Mr. Lawlor, and five unnamed Doe defendants ("the Does") in the Central District of California.

The timeline below summarizes the communications between Coverplay and Foundations during a three day period in March 2013.  [A129].

## Timeline (March 5th to 8th)



The timeline shows that the three e-mails that were sent over two days. This was the basis for the California Court's decision to ignore the first-to-file rule.

The Ohio and California actions involve nearly identical issues. *Compare* [A11-A32] *with* [A109-A125]. For example, Foundations' Ohio complaint seeks a declaratory judgment that it has not infringed any valid claim of the Coverplay patents, while Coverplay's California complaint alleges infringement of those same patents.

### D.    Procedural Background of Motion to Dismiss or Transfer

On April 16, 2013, Coverplay filed its First Amended Complaint.  [A11-A74].

On May 13, 2013, Petitioners filed a motion to dismiss or transfer the California action to Ohio.

On June 18, 2013, the Court dismissed one claim against Petitioners, but otherwise denied the motion to dismiss or transfer the present action to the Ohio Court where the first-filed declaratory judgment action against the Patents-in-Suit had been filed. [A1-A10].

## V.    REASONS WHY THE WRIT SHOULD ISSUE

The Court abused its discretion in denying Petitioners' motion to dismiss or transfer to Ohio.  Denial of a motion to transfer is an appropriate subject for a writ of mandamus.  *E.g.*, *In re Link_A_Media Devices Corp.,* 662 F.3d 1221 (Fed. Cir. 2011).

First, the Central District of California ignored the controlling Federal Circuit authority, namely *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) ("*Coyle*") ("We apply the general rule favoring the forum of the first-filed case . . .").  The Court abused its discretion by failing to follow Federal Circuit law on the first-to-file rule and instead focused on the alleged anticipatory nature of the suit.

Second, the Court did not give proper weight to the relevant witnesses and physical evidence.  Foundations identified at least five relevant non-party witnesses outside of California.  On the other hand, Coverplay did not identify any material non-party witnesses in California.  Instead, Coverplay identified tangential corporate customers of Foundations without identifying what relevant evidence they would have related to the lawsuit.  The Court also improperly discounted the location of relevant physical evidence regarding the accused products in Ohio.  Even so, the Court did not find that any convenience factor favored California over Ohio.  Accordingly, there is no basis to not follow the first-filed rule in favor of the earlier declaratory judgment action in Ohio.

In addition, there is no dispute that the Ohio Court has personal jurisdiction over all of the parties, and is an appropriate venue for this action.  The Court erred in finding personal jurisdiction over Mr. Lawlor, an Ohio resident.  Personal jurisdiction is inexorably intertwined with the issue of transferring this action to Ohio where there is personal jurisdiction over all of the named parties.

The Petition will address the first-filed rule, and then the remaining convenience factors for transfer.

### A.    The Court Failed to Follow First-Filed Rule

The Court erred in denying Foundations' and Mr. Lawlor's motion to dismiss or transfer in favor of the first-filed Ohio declaratory judgment action.  It is undisputed that the Ohio and California actions involve similar issues.

The Federal Circuit has held that "[w]e apply the general rule favoring the forum of the first-filed [patent] case, 'unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, **requires** otherwise.'" *Coyle*, 394 F.3d at 1347 (emphasis added) (citation omitted); see also *Micron Tech, Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008) ("The general rule favors the forum of the first-filed action.").

In *Coyle*, the patentee made allegations of infringement, pressured the declaratory plaintiff EFI "on an almost daily basis," and on December 5 gave an ultimatum that "December 15 was the deadline" to resolve the dispute without litigation.  *Id*. at 1344.  EFI filed for declaratory judgment against Coyle, the patentee, on December 11.  *Id*.  The Federal Circuit found **nothing** "unjust or inefficient" to prevent application of the first-filed rule.  *Id*. at 1348 (holding it was an abuse of discretion to not allow the first-filed declaratory judgment action to proceed).

Here, Coverplay had made repeated allegations in a whisper campaign to Foundations' customers that Foundations was infringing the Patents-in-Suit,

which caused at least one of Foundations' customers to request indemnification. [A82 at ¶ 22].

The first direct communication from Coverplay about patent infringement was allegedly sent on February 22, but was not received by Foundations until February 28. [A70-A74; A82-A83 at ¶¶ 23-24; A89]. Coverplay threatened that Foundations' only options were complete concession to Coverplay's demands or litigation. Coverplay required Foundations to agree by March 4 to immediately cease all activity concerning a new unreleased product and to provide Coverplay with Foundations' proprietary customer list. [A73].

Coverplay's infringement allegations appear to be based on sheer speculation from review of Foundations' marketing materials rather than on any investigation of the actual product. Coverplay's litigation threats were an attempt to bully Foundations into not launching its product.

Coverplay only gave Foundations ten days from the date of the cease and desist letter to respond. However, when Foundations finally received Coverplay's letter in the mail on February 28, it only had two business days to respond before Coverplay's arbitrary March 4 deadline. [A82-A83]. Coverplay repeatedly refused Foundations' sincere requests for a reasonable 14-day extension to negotiate with Coverplay to resolve everything amicably. [A84]. Instead, Coverplay insisted Foundations had "no defense" and gave an ultimatum

that Foundations resolve the controversy within three days—March 8—or else.
[A84, A90].

As summarized below, the facts here closely follow those in *Coyle*:

| Event | *EFI v. Coyle* | Present Case |
|-------|----------------|--------------|
| Patentee sent letter to accused infringer regarding patent and accused product. | Coyle notified EFI "that his patent would cover all of EFI's print controllers" *Coyle*, at 1344. | Coverplay sent a cease-and-desist letter received on February 28 alleging patent infringement. [A89] |
| Patentee gave an ultimatum to resolve the dispute by a specific date. | Coyle gave EFI an ultimatum on December 5 to resolve the dispute by December 15. *Coyle*, at 1344. | Coverplay gave Foundations an ultimatum on March 5 to resolve the dispute by March 8. [A90] |
| Accused infringer filed for declaratory judgment before ultimatum date. | EFI filed a declaratory judgment action six days later on December 11. | Foundations filed a declaratory judgment action two days later on March 7. |

The Federal Circuit found **nothing** in *Coyle* that would prevent application of the first-filed rule.  Accordingly, the Court should have followed *Coyle* and dismissed the California action in favor of the first-filed declaratory judgment action in Ohio.

The Court, however, ignored the Federal Circuit authority in *Coyle*, and instead relied on a prior district court decision, *Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188 (C.D. Cal. 2006), which declined to follow the first-to file

rule.  In *Xoxide*, while the parties were engaged in ongoing negotiations, Xoxide secretly filed for declaratory judgment, but "pretended to continue negotiation with Ford" for three more weeks.  *Id.* at 1194.  Unlike the declaratory plaintiff in *Xoxide*, however, Foundations promptly informed Coverplay of the Ohio filing the day after the lawsuit was filed.

The Court relied on *Xoxide* for the proposition that the first-filed rule should not be followed if there had been "specific, concrete indications that a suit by the defendant was imminent" [A4]—but this is contrary to Federal Circuit's holding in *Coyle* which found that it was an abuse of discretion for a court to disregard the first-to-file rule where the patentee had stated that a lawsuit was imminent.  See *Coyle*, 394 F.3d at 1344.

The Court also relied on *Xoxide* for the proposition that where a "declaratory judgment action has been triggered by a cease and desist letter . . . equity militates in favor of allowing the second-filed action to proceed to judgment rather than the first."  [A4].  But a cease-and-desist letter is a classic trigger that establishes a concrete controversy for a declaratory judgment action.  *E.g.*, *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358 (Fed. Cir. 2009).  Moreover, the patentee in *Coyle* also had sent a notice asserting that his patent would cover all of the accused products.  See *Coyle*, 394 F.3d at 1343-44.  The

Federal Circuit held that a court should "permit a first-filed action to proceed to judgment" under such circumstances.  *Id*. at 1348.

Foundations filed its Ohio action only after Coverplay refused to grant more than a few days for Foundations to resolve the dispute, at which point Foundations resigned itself to the apparent inevitability of litigation.  It was not bad faith for Foundations to have filed for declaratory relief in Ohio instead of giving in to Coverplay's insistence that Foundations immediately capitulate to Coverplay's demands.  Coverplay was more concerned about saber-rattling with short deadlines and ultimatums than engaging in fruitful dialog.  Foundations had a reasonable apprehension of suit from Coverplay's aggressive posturing and threats of an infringement suit—after Coverplay previously had made prior assertions of infringement in a whisper campaign against Foundations—and sought appropriate declaratory relief.  The first-filed rule should be followed in the present case as it was in *Coyle*.

It was an abuse of discretion to deny Foundations' motion to dismiss or transfer in favor of the first-filed declaratory judgment action in Ohio, where the Court failed to find that any other factors weigh in favor of the California forum. See *Coyle*, 394 F.3d at 1348.  Indeed, the convenience factors strongly favor transfer to Ohio.

**B.     Other Convenience Factors Support Transfer**

28 U.S.C. §1404(a) provides that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." As mandated by the statute, the factors to be considered in a transfer request are: "(1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice." *Los Angeles Mem'l Coliseum Com. v. NFL,* 89 F.R.D. 497, 499 (C.D. Cal. 1981).

Other than the fact that the Coverplay corporation is located in the Central District for California, Coverplay has not established any reason that the Central District of California is more convenient for Coverplay.  In contrast, Foundations and its employees are located in Ohio; the only material non-party witnesses are in Ohio; and the relevant physical evidence is in Ohio.  Foundations and Lawlor have overcome their burden of proof for a transfer pursuant to 28 USC § 1404(a). It was an abuse of the discretion for the Court to find that "[b]oth parties' arguments for convenience and justice are equally forceful."  [A5].

**1.     Convenience of the Parties**

(a)     **Court Overvalued the Convenience of Coverplay**

The Court indicated that the lawsuit was presumed to proceed in Coverplay's choice of forum unless Foundations proved that the convenience

16

factors were strongly in Foundations' favor. [A5]. The Court gave too much weight to Coverplay's choice of forum as the plaintiff of the California lawsuit. Coverplay's choice of forum as a second-filed action does not deserve preference.

Coverplay's selection of the Central District of California should not be given preference as Foundations was the first plaintiff. Foundations filed the first Complaint in Ohio. [A109-A125]. As Foundations filed its Complaint first, Foundations' choice of forum should be given preference.

Coverplay has only shown only that its corporation is in the Central District of California, but not that its principals reside there. The Declaration of Amy Feldman indicates that she is co-owner of Coverplay, but the Declaration fails to state where she resides or where any other owners of Coverplay reside. [A130-A135]. Therefore, the only "convenience of the party" factor favoring Coverplay is that the corporation is located in the Central District of California. See *In re Link_A_Media,* 662 F.3d at 1224 (granting mandamus to transfer from Delaware where a party was incorporated, noting that a party's location of incorporation is not a dispositive fact in the venue transfer consideration).

The Court overvalued Coverplay's filing of the second Complaint in California and the convenience of Coverplay as factors in the transfer analysis. Even so, other than plaintiff's choice of forum, the Court did not find any

17

convenience factor that favored California over Ohio. As will be shown, the convenience factors instead heavily favor Ohio.

(b)    **Court Overlooked Inconvenience to Foundations**

Foundations and Lawlor would be inconvenienced by a lawsuit in California because they reside in Ohio [A76 at ¶¶ 3 and 4]; Foundations has no facilities in California [A76 at ¶ 4]; and the accused product was not developed, designed, researched, or manufactured in California [A77 at ¶ 9]. The U.S. District Court for the Central District of California has found that when the party requesting the transfer did not manufacture any products in California, did not have any employees in California, and had no documents in California it was appropriate to transfer the case out of California. *Metz v. U.S. Life Ins. Co. in City of New York*, 674 F. Supp. 2d 1141, 1147 (C.D. Cal. 2009); *Szegedy v. Keystone Food Products, Inc.,* No 08-5569, 2009 WL 2767683, at *3 (C.D. Cal. Aug. 26, 2009).

It should not be overlooked that at least two defendants reside in Ohio.[2]

Los Angeles, California is approximately 2,350 miles from Medina, Ohio, where

---

[2] Foundations and Lawlor reside in Ohio. There are also five "Doe" defendants named in the First Amended Complaint. The only description of the Does is that each one is "a principal, agent, employee, joint venturer, co-conspirator, representative, or alter ego of some or all of the other named DEFENDANTS (capitalization in original)." [A14-A15 (First Amended Complaint at ¶¶ 13 and 14)]. Therefore, it is likely that all of the five Does live in Ohio or at least do not reside in California.

Foundations is located and Joseph A. Lawlor resides. [A76-77 at ¶¶ 3, 4 and 10];
[A101 at ¶ 8].

### 2.    Convenience of Witnesses

#### (a)    Convenience of Foundations' Employee Witnesses

Foundations has demonstrated that its material employee witnesses are in
Ohio. [A76-A77 at ¶¶ 3, 4 and 10].  Coverplay admitted that Foundations' Ohio
employees are relevant witnesses. [A133 at ¶ 13].  While employee witnesses
may not be as important in the transfer analysis as non-employee witnesses—
nonetheless, employee witnesses should not be ignored in the transfer analysis.
*See Pacific Car and Foundry Company v. Pence,* 403 F.2d 949, 955 (9th Cir.
1968).

#### (b)    Only Foundations has Material Non-Party Witnesses

The most important factor is the convenience of the material non-party
witnesses.  *Saleh v. Titan Corp.,* 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005);
*Hope v. Otis Elevator Co.,* 389 F. Supp. 2d 1235, 1243 (E.D. Cal. 2005).
Foundations has proven that there are five or more material non-party witnesses
located outside of California. [A78-A86 at ¶¶ 14, 17, 34 and 35; A96 at ¶ 6].

Foundations identified David E. Campbell, and at least one other person at
David E. Campbell & Associates, as material non-party witnesses.  [A96 at ¶ 6].
They are independent safety consultants in the Northern District of Ohio who

reviewed the safety of play yard covers. *Id.* Coverplay alleged that Foundations and Lawlor have disparaged the safety of Coverplay's play yard cover product, so the testimony of the safety consultants would be relevant. [A17-A17 at ¶¶ 22 and 27].

Other independent consultants were involved in the development and product launch of the accused product, such as Terri S. Rosenthal Leikin of ColorDirections, LLC and James Kurtz, III of Kurtz Graphic Design Co., both of whom are located in the Northern District of Ohio. [A96 at ¶ 6]. These consultants have relevant information concerning the accused product, which would be important for the patent-related claims. Those consultants are independent witnesses who are also located in Ohio. *Id.*

Mark Suvak, Foundations' former Vice President of Product Development, Safety and Compliance, is another material non-party witness. [A80-A81 at ¶¶ 14 and 19). He does not live in California. *Id.* at ¶14. He is a relevant material witness, as he signed the letter that the Court found was a possible basis for the trade libel claim (third claim). [A7-A8; and A80-A81 at ¶14 and 19].

At least four of these independent third-party witnesses are within the subpoena power of the Northern District of Ohio, but not the Central District of California. The ability to subpoena the independent non-party witnesses to the trial is a factor that weighs heavily in favor of the transfer of this lawsuit to Ohio.

*See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n.6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *In re Air Crash Over the Taiwan Straits on May 25, 2002,* 331 F.Supp.2d 1176, 1199-1200 (C.D. Cal. 2004).

(c)    **Coverplay has not Identified Material Witnesses**

In order for the convenience of Coverplay's alleged non-party witnesses to be considered in the transfer analysis, specific witnesses need to be identified and the reason why those witnesses are material to the case must be shown. *Wiener v. U.S.,* 192 F.Supp. 789, 794 (S.D. Cal. 1960), *rev'd on other grounds* 286 F.2d 302 (9th Cir. 1961). When it is not explained why the potential witnesses are relevant, the mere listing of the possible witnesses is given no weight in the transfer analysis. *Thomas v. Home Depot, U.S.A., Inc.,* 131 F. Supp. 2d 934, 938 (E.D. Mich. 2001).

Coverplay failed to sufficiently identify any non-party witnesses because its list of non-party witnesses: (1) was not based on personal knowledge; (2) in most cases did not identify specific people; and (3) did not show the relevance or materiality of the proposed testimony of the potential witnesses. Coverplay only indicated that "**It is my understanding** that the following entities either have done, or currently do business with Foundations, and are either in California, or have representatives in California with whom Foundations has met." [A132-A133 (emphasis added)]. That confusing statement is followed by a listing of

21

eleven company names. [A133]. That speculative statement does not show that there are non-party witnesses with relevant knowledge located in the Central District of California.

Further, that statement is not based on personal knowledge and does not show that anyone associated with the entities has information relevant to the lawsuit. The statement only lists Foundations' customers that may have offices or representatives in California. Coverplay's listing of entities does not even state that the entities are located in the Central District of California or possess relevant information. *See id.*

Later in the Feldman Declaration, it states that those eleven entities "**may** have information regarding '[Foundations'] Crib Covers' and COVERPLAY's products." [A133 at ¶14 (emphasis added)]. It is speculative to make a statement that is not based on personal knowledge and to use the indefinite word "may." Like in *Szegedy,* Coverplay did not specify relevant witnesses or show the materiality of the potential testimony. "[G]eneral averments are not sufficient to demonstrate inconvenience [or convenience] to non-party witnesses." *Szegedy*, at *10. Specific witnesses and the substance of their testimony must be proven in the Court's record in order for a Court to give any weight to a listing of alleged non-party witnesses. *Thomas*, at 938. Coverplay

failed to specifically identify potential witnesses and to explain why the testimony would be relevant—therefore, the listing of entities should be given no weight.

In addition, Foundations specifically denied that the named entities would have people in California with any relevant information. [A85-A86 and A95-A96]. For most of these eleven entities, Foundations would have interacted with them outside of California. *Id.* Surprisingly, one of the entities listed by Coverplay, Guest Supply, has their central national crib buying office in the Northern District of Ohio. [A85-A86 at ¶ 35]. Thus, any relevant witnesses or evidence from Guest Supply would be in Ohio. *Id*.

Coverplay unsuccessfully attempted to identify other non-party witnesses when it identified Arm's Reach Concepts, Inc. as an Oxnard, California corporation, but failed to identify why anyone from that company would have relevant information. Coverplay only showed that Coverplay and Arm's Reach had a separate unrelated dispute, and Coverplay gave no reason or explanation as to why Arm's Reach Concepts would have relevant information for this lawsuit. [A64-A65 and A134 at ¶ 18].

Coverplay again does not identify a specific person or the relevance of the proposed testimony of the buyers for Disney's California Properties, the head of Standards for Disney's California Properties and the head of Procurement for Disney's California Properties. [A134 at ¶ 19]. The same goes for Coverplay's

allegation that someone from Foundations traveled to California and met with buyers for Disney's California Properties and Hilton. [A133-A134]. That allegation was not based on personal knowledge, no specific person was identified, and no particular reason for the testimony was given. [A133].

Coverplay only identified two non-party individuals, Richard Barter and Ryan Higgins. [A133-A134]. However, Coverplay failed to state that they are witnesses or that they have anything relevant to say. In contrast, Foundations has shown that its President is unaware of any discussions by Foundations with either Mr. Barter or Mr. Higgins concerning Coverplay or the accused product. [A95 at ¶ 3]. There is no reason to find that the above people identified by Coverplay have any relevant information.

Coverplay has not identified with personal knowledge that there are any non-party witnesses in the Central District of California that have relevant information. The quality of the potential witnesses, not the quantity, is important. *Saleh,* 361 F.Supp.2d at 1161. The mere listing of people that Foundations may have talked to is not enough. Coverplay has identified Foundations' California customers in order to present the false illusion of numerous third party witnesses in California.

Because Coverplay failed to identify specific witnesses and the relevance of their potential testimony, the Court abused its discretion when it found that

"[b]oth parties' arguments for convenience and justice are equally forceful." [A5]. Coverplay has only shown that its corporate entity is in the Central District of California. Coverplay has not shown that it has any material non-party witnesses let alone that those witnesses reside in the Central District of California.

### 3.    The Interests of Justice

#### (a)    Court Undervalued the Location of Physical Evidence

In patent infringement cases, the bulk of the evidence is located where the party accused of infringement normally keeps documents, equipment and other evidence. *See In re Genentech, Inc.,* 566 F.3d 1338, 1345 (Fed. Cir. 2009); *In re Link_A_Media*, 662 F.3d at 1224. It is unrefuted that the accused product was developed, designed, researched and tested in Ohio. [A77 at ¶9]. It also is unrefuted that Foundations' employees in Ohio control the documentation regarding the development of the accused product. [A77 at ¶10]. Further, it is unrefuted that Foundations does not maintain or store its records relevant to the accused product in California. On the contrary, the documents relating to the technical features and operation of the accused product are located in Ohio. [A77 at ¶11].

But the Court erroneously discounted the location of the physical evidence as a transfer factor because technology has made it easy to move documents

electronically. [A5]. However, the Ohio location of this evidence still must be given weight. *See, e.g.*, *In re Link_A_Media,* 662 F.3d at 1224 ("While advances in technology may alter the weight given to these factors, it is improper to ignore them entirely."); *Szegedy* at *5; *Metz* at 1149. Moreover, although documents may be transported electronically, physical evidence cannot be transported by electronic means. The location of the physical evidence in Ohio weighs in favor of transfer to Ohio, and it was an abuse of discretion for the Court to have discounted this transfer factor. [A5].

Foundations and Mr. Lawlor both reside in Ohio, the material employee witnesses are in Ohio, the material non-party witnesses reside in Ohio, and the physical evidence is located in Ohio. Those facts support the transfer of this lawsuit to Ohio. Coverplay has only shown that its corporate entity is in the Central District of California. Coverplay has failed to identify that its employees or principals are in the Central District of California, and has not sufficiently identified and indicated why any non-parties would have relevant information.

### (b)    Personal Jurisdiction Over Mr. Lawlor Only in Ohio

The Court found that there was personal jurisdiction over Mr. Lawlor based on two tenuous contacts with California. The Ninth Circuit applies a "but for" test to determine whether a particular claim arises out of or is related to forum-related activities and thereby satisfies the requirement for specific jurisdiction.

26

*Shute v. Carnival Cruise Lines*, 897 F.2d 377 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)).

First, Mr. Lawlor sent an email to an officer of Coverplay discussing the terms of a possible patent license was allegedly contact with California.  [A5-A6]. Mr. Lawlor's email proposing terms for a possible patent license is unrelated to Coverplay's claims against Mr. Lawlor.  The Court, however, found that Mr. Lawlor's email was the motivation for Foundations' wrongful acts, but there is no rational basis for this assertion. [A6].

The California Court's error in finding specific personal jurisdiction over Mr. Lawlor based on an email discussing a possible patent license appears to be the result of the Court's legally erroneous holding that patent infringement can be a basis for state law claims such as unfair competition, tortious interference with contractual relations, and tortious interference with prospective economic advantage. [A9-A10]. See also *Holiday Matinee, Inc. v. Rambus, Inc*., 118 Cal. App. 4th 1413, 1426-27 (Cal. App. Ct. 2004) (substantive patent law is exclusively federal, and cannot be relied upon for a state law claim).

Thus, there is no plausible basis to find that Mr. Lawlor's email is a "but for" cause of the wrongs alleged by Coverplay.

Second, the Court found that Mr. Lawlor had contact in California by signing the Agreement in Ohio on behalf of Foundations and sending it to

California. [A5-A6]. The Agreement was governed by New York law. [A55-A56]. Notably, Coverplay has not asserted a breach of contract claim. Neither the trade secret claim (Claim Eight of Coverplay's Complaint [A11-A32]), nor any other claim, alleged that the claim arose from a violation of the Agreement, so this alleged contact was not a "but for" cause of the wrong alleged.

Thus, it was an abuse of discretion for the Court to have found specific personal jurisdiction in California for claims that did not arise from Mr. Lawlor's email or the Agreement. With only a threadbare basis for specific personal jurisdiction in California, the notions of fair play and the interests of justice favor Ohio where Mr. Lawlor resides and where Foundations' earlier declaratory judgment action was filed.

## VI.    CONCLUSION

The Court abused its discretion when it ignored the Federal Circuit authority in *Coyle* favoring the first-to-file rule. Ohio is where the first-filed action was brought. The Court, however, held that the other convenience factors which favored transfer to Ohio were insufficient to overcome the plaintiff's choice of forum in California. But a plaintiff's choice of forum in a second-filed lawsuit should not trump the first-filed rule in patent cases (otherwise, it would render the rule a nullity). Moreover, Ohio is where the non-party witnesses and evidence regarding the accused products are located, and where there indisputably

is personal jurisdiction over individual defendant, Mr. Lawlor. It was an abuse of discretion to favor the California action over the first-filed declaratory judgment action in Ohio.

DATED: July 19, 2013                    Respectfully submitted,

                                        FULWIDER PATTON LLP


By: _____
    James W. Paul
    James Juo
    Attorneys for Petitioners
    Foundations Worldwide, Inc., and
    Joseph A. Lawlor

681519.1

29

# APPENDIX FOR WRIT OF MANDAMUS

| DOCUMENT | APPENDIX NOS. |
|---|---|
| Court Order dated June 18, 2013 [ECF 27] | A1 – A10 |
| Amended Complaint [ECF 19] | A11 – A74 |
| First Declaration of Joseph A. Lawlor [ECF 21-3] | A75 – A77 |
| Second Declaration of Joseph A. Lawlor [ECF 21-4] | A78 – A93 |
| Third Declaration of Joseph A. Lawlor [ECF 24-1] | A94 – A99 |
| Declaration of James Juo (with selected exhibits) [ECF 21-2] | A100 – A129 |
| Declaration of Amy Feldman (w/o exhibits) [ECF 23-1] | A130 – A135 |

127396.1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 13-01683-RGK (SHx) | Date | June 18, 2013 |
|---|---|---|---|
| Title | ***OLIVER & TATE ENTERPRISES, INC. v. FOUNDATIONS WORLDWIDE, INC. et al*** | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE | |
|---|---|---|
| S. Williams (Not Present) | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS) Order re: Defendants' Motion to Dismiss, or in the Alternative, Transfer (DE 21)**

## I.   INTRODUCTION

On April 15, 2013, Oliver & Tate Enterprises, Inc. d/b/a Coverplay ("Plaintiff" or "Coverplay") filed a Complaint against Foundations Worldwide, Inc. ("Foundations") and Joseph Lawlor ("Lawlor") (collectively "Defendants"). Plaintiff alleges against Foundations the following claims: (1) design patent infringement; (2) utility patent infringement; (3) trade libel; (4) unfair competition under Cal. Bus. & Prof. Code § 17200; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) intentional interference with contractual relations; (8) misappropriation of trade secrets; and (9) unjust enrichment. Plaintiff alleges against Lawlor claims Three, and Five through Nine.

On May 13, 2013, Defendants filed the current Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, Insufficient Process, Insufficient Service of Process, Failure to State a Claim Upon Which Relief Can Be Granted and *Forum Non Conveniens* or in the Alternative to Transfer ("Motion"). For the following reasons, the Court **GRANTS IN PART** Defendants' Motion.

## II.   FACTUAL BACKGROUND

Plaintiff, a California corporation with its principal place of business in California, designs and produces slipcovers for portable child play yards. Foundations, an Ohio corporation with its principal place of business in Ohio, sells child care products, including cribs, to the hotel and child care industry. Lawlor, an Ohio resident, is the President of Foundations.

In December 2009, the parties met to explore the possibility of Defendants either purchasing Plaintiff or licensing Plaintiff's products. The parties entered into a confidentiality agreement prior to negotiations. Though the parties never reached a deal, they exchanged confidential information. Plaintiff

*A1*

alleges that Defendants used the confidential information obtained in negotiations to infringe on Plaintiff's patents and hinder Plaintiff's business.

Plaintiff sent a Cease and Desist letter to Defendants on February 22, 2013, demanding they refrain from all infringing activities. The letter stated that if Defendants did not comply by March 4, 2013, Plaintiff would sue for patent infringement, defamation, breach of the confidentiality agreement, intentional interference with a prospective economic advantage, intentional interference with distribution agreements, violation of the Uniform Trade Secrets Act, and conversion. On March 5, 2013, Foundations responded by asking for an additional two weeks to prepare a response. Plaintiff agreed to extend the deadline to March 8, 2013, and informed Defendants of their intention to file suit on March 8 if no satisfactory response was received. Defendants asked again for a longer extension on March 6, 2013, expressing Defendants' desire to avoid legal action. Plaintiff reaffirmed their March 8 deadline and intention to file. On March 7, 2013, Foundations filed an action for declaratory judgment against Plaintiff in the Northern District of Ohio, seeking a declaration of non-infringement of Plaintiff's patents; no trade libel, product libel, defamation or unfair competition; no breach of the mutual confidentiality agreement; no interference with economic advantage; no interference with distribution agreement; no misappropriation of trade secrets; and no conversion.

On March 8, 2013, Plaintiff filed the current suit against Defendants in this Court.

## III.   **JUDICIAL STANDARD**

### A.   **First-to-File Rule**

The "first-to-file" rule allows a district court to transfer, stay, or dismiss an action when a complaint involving the same parties and issues has already been filed in another district. *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982); *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 623 (9th Cir. 1991). Courts consider three threshold factors in determining the applicability of the first-to-file rule: (1) the chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues. *Ward v. Follett Corp.*, 158 F.R.D. 645, 648 (N.D. Cal. 1994); *Alltrade*, 946 F.2d at 625. The court may, in its discretion, decline to apply the rule, regardless of applicability, if it finds that "equitable concerns militate against application of the rule." *Alltrade*, 946 F.2d at 627.

### B.   **Motion to Dismiss Pursuant to Rule 12(b)(2)**

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may seek dismissal of an action for lack of personal jurisdiction. Once a party seeks dismissal under Rule 12(b)(2), the plaintiff has the burden of demonstrating that personal jurisdiction exists. *Menken v. Emm*, 503 F.3d 1050, 1056 (9th Cir. 2007). Where the motion is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction." *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995). Although the plaintiff cannot "simply rest on the bare allegations of its complaint," uncontroverted allegations in the complaint must be taken as true. *Amba Marketing Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1997); *see AT&T v. Campagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).

A federal district court may exercise personal jurisdiction over a non-resident defendant if the defendant has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1110-11 (9th Cir. 2002) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 326 (1945)). A district court "may exercise either general or specific personal jurisdiction over

**A2**

nonresident defendants." *Fed. Deposit Ins. Corp. v. British-Am. Ins. Co.*, 828 F.2d 1439, 1442 (9th Cir. 1987).

C.     **Motion to Dismiss Pursuant to Rule 12(b)(3)**

A defendant may move to dismiss based on improper venue under Federal Rule of Civil Procedure 12(b)(3). When reviewing a motion to dismiss pursuant to Rule 12(b)(3), a court need not accept the pleadings as true and may consider facts outside the pleadings. *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324 (9th Cir. 1996).

Even if a court finds venue proper, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Courts have discretion to "adjudicate motions for transfer according to an 'individualized case-by-case consideration of convenience and fairness.'" *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). Courts should generally not transfer a matter "unless the 'convenience' and 'justice' factors *strongly* favor venue elsewhere." *Allstar Mktg. Group, LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1131 (quoting *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012)) (emphasis added).

D.     **Motion to Dismiss Pursuant to Rule 12(b)(4)-(5)**

A defendant may move to dismiss based on insufficient process under Federal Rule of Civil Procedure 12(b)(4) or insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5). "A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4 . . . . Without substantial compliance with Rule 4 neither actual notice nor simply naming the defendant in the complaint will provide personal jurisdiction." *Direct Mail Specialists, Inc. v. Eclat Computerized Technologies*, 840 F. 2d 685, 687 (9th Cir. 1988) (citations omitted).

E.     **Motion to Dismiss Pursuant to Rule 12(b)(6)**

A party may move to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). In deciding a Rule 12(b)(6) motion, the court must assume allegations in the challenged complaint are true, and construe the complaint in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court shall not consider facts outside the complaint. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). Dismissal is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, the court need not accept as true conclusory legal allegations cast in the form of factual allegations. *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

IV.     **DISCUSSION**

Defendants argue that the Court should transfer this action based on either the first-to-file rule or

*A3*

convenience.[1] In the alternative, Defendants assert multiple challenges under Federal Rule of Civil Procedure ("Rule") 12(b). Defendants seek the dismissal of Lawlor, as well as dismissal of several claims against both Defendants. The Court addresses each argument in turn.

### A.    **First-to-File Rule and Convenience**

Defendants request that the court transfer this action to the N.D. of Ohio on the grounds that (1) its Declaratory Relief action in Ohio was filed first; or (2) convenience factors weigh in favor of transfer.

### 1.    _First-to-File Rule_

Plaintiff does not challenge the first-to-file rule's threshold requirements of chronology, similarity of the issues, and similarity of the parties. Plaintiff instead argues that because the original action was filed as an anticipatory suit, the Court should not apply the rule. The Court agrees.

The rule's overall purpose is to promote efficiency and it "should not be disregarded lightly." *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 625 (9th Cir. 1991) (citation omitted). "The most basic aspect of the first-to-file rule is that it is discretionary." *Id.* at 628. Within this discretionary power, courts regularly consider equitable factors, often refraining from applying the rule in instances of bad faith, anticipatory suit, or forum shopping by the first-filing party. *Id.*

An anticipatory suit is found when the plaintiff in the first-filed action received "specific, concrete indications that a suit by the defendant was imminent, and are viewed with disfavor as examples of forum shopping and gamesmanship." *Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1192 (C.D. Cal. 2006) (citations omitted). Further, where a "declaratory judgment action has been triggered by a cease and desist letter . . . equity militates in favor of allowing the second-filed action to proceed to judgment rather than the first." *Id.* at 1193 (citations omitted).

Here, Plaintiff made multiple concrete indications of its intentions to file suit prior to Defendants' filing their suit. Plaintiff first declared a general intent to take legal action in the Cease and Desist letter sent on February 22, 2013, two weeks prior to filing the current action.[2] Plaintiff then informed Defendants, on March 5 and again on March 6, of the exact date it planned to file its complaint. Defendants' response on March 6 was to request more time to respond and to declare their desire to solve the matter without legal action. However, the next day Defendants filed an action for Declaratory Judgment in the Northern District of Ohio.

The facts support a finding that, while Defendants were claiming to pursue a non-legal resolution, they were preparing an anticipatory filing. Circumstances here weigh against the discretionary application of the first-to-file rule, and the Court declines its application.

### 2.    _Convenience_

---

[1] Defendant has also moved for dismissal under *forum non conveniens*. However, "[t]he common-law doctrine of *forum non conveniens* 'has continuing application [in federal courts] only in cases where the alternative forum is abroad.'" *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 430 (2007) (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 449 (1981) (alterations in original). That is not the case here.

[2] Defendants state they only received the letter eight days prior to this action being filed, giving insufficient time to prepare a proper response to the Cease and Desist letter. This argument is not persuasive because Defendants went beyond responding to the letter by filing a complete action for declaratory judgment within the same period, an action that dramatically mirrored the threatened claims in the Cease and Desist letter.

*A4*

Defendants assert that if the Court does not apply the first-to-file rule, it should transfer the action to the Northern District of Ohio because of convenience factors.[3] Again the Court disagrees.

Transfers are appropriate for the convenience of parties and witnesses. However, "unless the balance of factors is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed." *Secs. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985) (citations omitted).

Both parties' arguments for convenience and justice are equally forceful. Defendants assert they and their anticipated non-party witnesses reside in Ohio, whereas Plaintiff claims it and its anticipated non-party witnesses reside in California. Defendants attempt to tip the scales by arguing that the "bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genetech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (citations omitted). While this may be true, it should not weigh heavily "given that advances in technology have made it easy for documents to be transferred to different locations." *Metz v. U.S. Life Ins. Co. in N.Y.C.*, 674 F. Supp. 2d 1141, 1149 (C.D. Cal. 2009) (citations omitted).

The Court is not persuaded that Defendants have met their considerable burden of demonstrating transfer would be in the convenience of the parties or witnesses. The Court denies Defendants' request for transfer.

**B.**      **Motion to Dismiss Lawlor for Lack of Personal Jurisdiction**

Defendants' first Rule 12(b) attack asserts that California cannot exercise personal jurisdiction over Lawlor under Rule 12(b)(2). Specifically, Defendants argue (1) Lawlor is an Ohio resident; (2) Lawlor does not have an established place of business in California; and (3) the alleged wrongful acts occurred in Ohio. The Court disagrees.

A state can exercise either general or specific jurisdiction over a party. Plaintiff does not claim general jurisdiction is proper; thus specific jurisdiction must exist. Under the Ninth Circuit's three-prong test, a court may exercise specific personal jurisdiction over a non-resident defendant when (1) the defendant purposefully directs its activities or consummates some transaction with the forum or a forum's resident, or performs some act by which it purposefully avails itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its law; (2) the plaintiff's claim arises out of, or relates to, the defendant's forum-related activities; and (3) the forum's exercise of personal jurisdiction comports with fair play and substantial justice (i.e., reasonableness). *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801-02 (9th Cir. 2004). To find purposeful availment and satisfy the first prong, Plaintiff must show that Lawlor "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Gray & Co. v. Firstenberg Machinery Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (quotations omitted).

Plaintiff meets the first two prongs of the Ninth Circuit requirements. Plaintiff alleges that "Defendants sent Plaintiff a copy of the Non-Disclosure Agreement, which was signed by Lawlor on behalf of Foundations" and that "Defendants sent an e-mail to Plaintiff, in which Defendants outlined terms for a proposed Licensing Agreement." These communications were purposeful actions directed at Plaintiff and both communications clearly displayed Plaintiff's address as being in California. Further, Plaintiff's claims derive from both Defendants' alleged violation of the Non-Disclosure Agreement and misconduct in response to Plaintiff's rejection of the proposed Licensing Agreement. Therefore, a prima

---

[3] As a basis for transfer, Defendants also assert the lack of personal jurisdiction over Lawlor. As discussed in section B below, the Court disagrees with this assertion.

facie case has been made that Lawlor (1) purposefully directed acts toward the forum state and (2) the claims asserted arise from these acts.

If the plaintiff meets the first two prongs of the specific jurisdiction analysis, the burden shifts to the defendant to "present a compelling case" that the exercise of personal jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985). In the attempt to satisfy this burden, Defendants simply reiterate their position that Lawlor does not have minimum contacts with California. For the previously mentioned reasons, the Court finds Lawlor does have sufficient minimum contacts. Therefore, Defendants have not met their burden of proving it would be unreasonable for California to exercise jurisdiction over Lawlor.

For these reasons, the Court denies Defendants' Motion to Dismiss Lawlor for Lack of Personal Jurisdiction.

### C.   Motion to Dismiss Lawlor for Improper Venue

Defendants maintain that the claims against Lawlor are for patent infringement and therefore, 28 U.S.C. § 1400(b) should apply. Defendants argue that under section 1400(b), venue is not proper in California because Lawlor is not a resident of California; nor were the alleged acts of infringement committed in California. Therefore, the action against Lawlor should be dismissed under Rule 12(b)(3).

28 U.S.C. § 1400(b) states civil actions "for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C § 1400(b). However, the statute is not to be liberally construed and so the phrase a "civil action for patent infringement . . . must be given its literal meaning." *Koratron Co. v. Deering Milliken, Inc.*, 418 F.2d 1314, 1318 n.4 (9th Cir. 1969) (citations omitted). Consequently, section 1400(b) applies only to specific patent infringement actions, not "other classes of actions whose subject-matter may nevertheless involve or relate to patents." *Id.* (citations omitted).

Here, Plaintiff's patent infringement claims have been asserted against *only* Foundations (First Claim and Second Claim). Defendants do not dispute this fact. (Def.'s Mot. 15.) Instead, Defendants argue that Plaintiff's claims against Lawlor "expressly *refers* to the 'United States Patent Laws,'" bringing these claims within the reach of section 1400(b). (Def.'s Mot. 15) (emphasis added). This is a general association with patent infringement claims that is proscribed by *Koratron* and cannot be used to bring the claims asserted against Lawlor within the "narrow venue provisions" of 28 U.S.C. §1400(b). *Id.* at 1317.

Defendants Rule 12(b)(3) challenge fails, and the Court denies Defendants' Motion to Dismiss for Improper Venue.

### D.   Motion to Dismiss Lawlor for Insufficient Service of Process

As to Lawlor, Defendants argue that both process was insufficient under Rule 12(b)(4) and service of process was insufficient under Rule 12(b)(5). In support of their argument, Defendants rely on the fact that the mailing address on the proof of service is 5218 Portside Drive instead of Foundations's actual address, 5216 Portside Drive. The Court finds Defendants' argument unavailing.

Rule 4(e)(1) provides that a plaintiff in this district may affect service of process using applicable California law. Fed. R. Civ. Pro. 4(e)(1). California Civil Procedure Code § 415.20(a) states:

*A6*

[A] summons may be served by leaving a copy of the summons and complaint during usual office hours in his or her office . . . with the person who is apparently in charge thereof, and by thereafter mailing a copy of the summons and complaint by first-class mail, postage prepaid to the person to be served at the place where a copy of the summons and complaint were left.

Cal. Civ. Proc. Code § 415.20(a) (West 2013). "Minor, harmless deficiencies will not be allowed to defeat service." *Bein v. Brechtel-Jochim Group, Inc.*, 6 Cal. App. 4th 1387 (1992) (finding the failure to "identify the person to be served on behalf of the corporation" to be immaterial). "It is often stated that the rules governing service of process [in California] are to be liberally construed, and that substantial compliance with the statutory mandates is sufficient to confer jurisdiction." *Cnty. of Riverside v. Superior Court*, 54 Cal. App. 4th 443, 450 (1997) (internal quotation marks omitted).

Defendants do not contest that (1) a summons and complaint were left at Lawlor's office during usual office hours with an employee of Foundations;[4] (2) the person given the summons and complaint was a person who was apparently in charge; and (3) Plaintiff then inadvertently mailed a copy of the summons and complaint to an incorrect neighboring address. Facts indicate substantial compliance. Although the true mailing address was incorrect, Defendants never state Lawlor failed to receive the summons because of the mistake. Nor do Defendants contend that Lawlor never had actual notice of the Complaint. Thus, the incorrect address was a minor and harmless error.

The Court finds Plaintiff's service to have substantially complied with California requirements for service and that Lawlor received actual notice of the Complaint. Consequently, the Court denies Defendants' Motion to Dismiss for Insufficient Process and Service of Process.

### E.    Motion to Dismiss for Failure to State a Claim

Finally, Defendants contest multiple claims as being insufficient under Federal Rules of Civil procedure 12(b)(6).

#### 1.    *Third Claim – Trade Libel*

In its Third Claim, Plaintiff alleges that Defendants published false statements that disparaged the quality of Plaintiff's products and dissuaded business. The statements in question relate to a publication on Foundations's website.[5] Defendant argues that the website's statements are opinions, and "statements of opinion rather than fact cannot form the basis for a libel action." *Campanelli v. Regents of University of California*, 44 Cal. App. 4th 572, 578 (1996). Defendants' motion, however, ignores a letter referenced in Plaintiff's complaint that was sent on August 9, 2011. The Court analyzes both the website and the August 2011 letter to determine if Plaintiff's allegations support a claim of trade libel.

The determination of whether a statement is "fact or opinion is a question of law for the court . . . and therefore suitable for resolution by demurrer." *Id.* To determine this, "the court must look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." *Id.* "Context can also be a major determinant of whether an alleged defamatory statement constitutes fact or opinion" *Id.* at 579. If the statement could reasonably be considered either a fact or an opinion, "the issue should be resolved by a jury." *Id.* at 578.

---

[4] Defendants argue that this employee was not an authorized agent of Lawlor. However, this is not a requirement under Cal. Civ. Proc. Code § 415.20.

[5] The Complaint also refers to an April 2010 letter sent to one of Plaintiff's customers. However, Defendants' motion attacks any reference of this letter for being outside of the statute of limitations. Plaintiff does not oppose this argument.

*A7*

Here, Plaintiff's website contains a page dedicated to the virtues of Foundations's product. The portion to which Plaintiff objects is titled "Safe." Predominant in this section is the picture of the two crib covers side-by-side, one with an "X" and the other with a check-mark. This juxtaposition could communicate the message that one crib cover is safe and the other is unsafe. However, the text under the heading limits this interpretation because the focus is not on scientific or research-based data. Instead, the text emphasizes appearance of the crib cover. This includes language such as "sleek design," "tidy look," and "visibly sanitary crib." The only potential reference to safety is the word "sanitary." This language, however, is not sufficient to show an assertion by Foundations that is factually based. *See Campanelli*, 44 Cal. App. 4th at 581. It is also worth noting that the website's overall tone is one of marketing and sales, and the context is one of persuasion, not straight facts. Therefore, the website's statements cannot be taken as fact and are not sufficient to maintain a claim for trade libel.

Review of the August 2011 letter, however, leads to a different conclusion. In this communication from Defendants to one of Plaintiff's customers, Foundations expresses its intent to "provide the findings of [its] safety and engineering department so [its] customers [can] make informed decisions that are safest." (First Am. Compl. Ex. H.) A particularly pertinent section of the letter reads:

> Our reservations with all play yard covers we have evaluated in the market today has to do with compliance to current play yard safety standards, the creation of suffocation hazards due to loose fitting fabric, and whether they are engineered and constructed in a fashion that will be safe, durable, and not fail in a hospitality environment.

(First Am. Compl. Ex. H.) The only play yard company mentioned in the letter is Coverplay. Foundations's purpose of sending the letter was to convince the customer to advocate for Coverplay "enter[ing] into a license agreement" with Foundations. Foundations asserts that the customer would "benefit from the Foundations safety and quality combined with the Cover Play design and branding."

This letter gives the impression that Coverplay's covers are, in fact, unsafe because they have not met scientific standards. Additionally, the context of the letter was a warning of unsafe products and that Foundations was a needed partner in order to make Coverplay's products comply with safety standards. The Court finds that Foundations's statements in this letter could reasonably be taken as statements of fact that Coverplay's covers are indeed unsafe. Thus, a jury should decide this issue.

Because the August 2011 letter supports an action for trade libel, the Court denies Defendants' Motion to Dismiss Plaintiff's Third Claim.

### 2.    *Fourth Claim – Unfair Competition*

Next, Defendants assert that an unfair competition claim must be founded on the violation of another independent law. Defendants claim the laws relied on by Plaintiff for its Unfair Competition Claim are insufficient, and therefore Plaintiff's Unfair Competition claim fails.

As an initial matter, the primary basis for Defendants' challenge to this claim is that the trade libel claim is insufficient and cannot support the Unfair Competition claim. This argument fails, as the Court has already found that Plaintiff's Third Claim adequately states a claim for relief. (*See* Section IV.E.1 above.) Even if this was not so, California law still vitiates Defendants' argument.

Unfair Competition under Cal. Bus. & Prof. Code § 17200 includes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code Section § 17200 (West 2013). "By defining unfair competition to also include any unfair or fraudulent business act or practice . . . [Cal. Bus. & Prof. Code Section § 17200] sweeps within its scope acts and practices not specifically proscribed by any

*A8*

other law." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949 (2002) (citation omitted). To plead an unfair competition claim, the plaintiff need allege only an unlawful, unfair *or* fraudulent business act.

Here, Plaintiff alleges that Foundations sent "letters to Plaintiff's customers, distributors, and hotels, in which Defendants unjustly attacked and disparaged Plaintiff's products"; "Defendants continue to make false statements regarding safety concerns with Plaintiff's products"; and Foundations "has infringed and continues to infringe upon Plaintiff's '366 and '961 Patents." (First Am. Compl. ¶¶ 22, 27, 31.) These alleged wrongful acts sufficiently fall under the large umbrella of Cal. Bus. & Prof. Code § 17200. Defendants' focus on sufficiency of other claims asserted is misplaced.

The Court Denies Defendants' Motion to Dismiss Fourth Claim for a Failure to State a Claim.

### 3.   *Fifth Through Seventh Claims – Interference*

Defendants assert that Plaintiff's Complaint fails to provide fair notice of Claim Five: Intentional Interference with Prospective Economic Advantage, Claim Six: Negligent Interference with Prospective Economic Advantage, and Claim Seven: Intentional Interference with Contractual Relations (collectively "the Interference Claims").

Interference with prospective economic advantage is very similar to interference with contractual relations. The main difference is that "[i]n one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor." *Kasparian v. Cnty. of Los Angeles*, 38 Cal. App. 4th 242, 261 (1995). An additional difference is that to prove negligent or intentional interference with prospective economic advantage, "plaintiffs must show defendants engaged in conduct that was wrongful by some legal measure other than the fact of the interference itself." *Contemporary Servs. Corp. v. Staff Pro Inc.*,152 Cal. App. 4th 1043, 1060 (2007) (citation omitted). As for intentional interference with contractual relations, "[w]rongfulness independent of the inducement to breach the contract is not an element." *Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist.*, 106 Cal. App. 4th 1219 (2003) (citation omitted).

The Fifth and Sixth claims make explicit references to the patent infringement claims, alleging there were lost "profits from providing, licensing, and/or selling slipcovers for portable play yards," and that Defendants "have created a knock-off product to divert customers, distributors, and hotels from purchasing Plaintiff's products." (First Am. Compl. ¶¶ 72, 73, 81.) These allegations sufficiently plead independent wrongs beyond interference itself, mainly the infringement of Plaintiff's patents. The Court finds that Plaintiff has provided sufficient notice as to claims Five and Six.

Plaintiff's Seventh Claim for Intentional Interference with Contractual Relations alleges that Defendants "intended to disrupt" contracts "between Plaintiff and third party distributors, customers, and hotels including at least, Disney, Marriott, and American Hotel Register." As discussed above, Foundations's August 2011 letter to Plaintiff's customer had the objective of affecting contractual relations with Plaintiff. This alleged interference is sufficient for a claim of Intentional Interference with Contractual Relations because no independent wrong is needed. The facts pled give sufficient notice as to the basis for Plaintiff's Seventh Claim.

The Court denies Defendants' Motion to Dismiss Plaintiff's Fifth, Sixth, and Seventh Claims for Failure to State a Claim.

### 4.   *Ninth Claim – Unjust Enrichment*

---

*A9*

Once again, Defendants assert there are not sufficient facts to provide fair notice for the Ninth Claim of Unjust Enrichment.

Though not raised by the Defendants, the foremost issue is that California does not recognize unjust enrichment as an independent cause of action. *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). Unjust Enrichment "does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." *Id.* (citation omitted). Consequently, the Court does not find unjust enrichment a valid claim under California Law. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 754 F. Supp. 2d 1145, 1194-95 (C.D. Cal. 2010) (dismissing a claim for unjust enrichment because California does not recognize it as a valid claim).

The Court grants Defendants' Motion to Dismiss Claim Nine for Failure to State a Claim.

**V.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** Defendants' Motion. Specifically, the Court dismisses only Plaintiff's Ninth Claim for Unjust Enrichment.

**IT IS SO ORDERED.**

_____   :   _____
                    Initials of Preparer
                                          _____

COPY

1   Marc E. Hankin (SBN: 170505)
    Marc@HankinPatentLaw.com
2   Kevin Schraven (SBN: 259446)
    Kevin@HankinPatentLaw.com
3   Nima Darouian (SBN: 271367)
    Nima@HankinPatentLaw.com
4   **HANKIN PATENT LAW, APC**
    12400 Wilshire Boulevard, Suite 1265
5   Los Angeles, CA  90025
    Tel: (310) 979-3600
6   Fax: (310) 979-3603

7   Attorneys for PLAINTIFF,
    **OLIVER & TATE ENTERPRISES, INC.**
8   **D/B/A COVERPLAY**

FILED
CLERK, U.S. DISTRICT COURT

APR 1 6 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12  OLIVER & TATE ENTERPRISES,        ) Case No.: CV13-01683 RGK (SH)
13  INC. D/B/A COVERPLAY, a California )
    corporation,                      ) Judge Robert Gary Klausner
14                                    )
15          Plaintiff,                ) **PLAINTIFF'S FIRST AMENDED**
                                      ) ***VERIFIED* COMPLAINT FOR:**
16      vs.                           ) **1. DESIGN PATENT**
                                      )    **INFRINGEMENT;**
17                                    ) **2. UTILITY PATENT**
    FOUNDATIONS WORLDWIDE, INC.,      )    **INFRINGEMENT;**
18  an Ohio Corporation, JOSEPH A.    ) **3. TRADE LIBEL;**
    LAWLOR, an individual, and DOES 1 ) **4. UNFAIR COMPETITION UNDER**
19  through 5, inclusive,             )    **CAL. BUS & PROF CODE 17200;**
                                      ) **5. INTENTIONAL INTERFERENCE**
20                                    )    **WITH PROSPECTIVE**
            Defendants.              )    **ECONOMIC ADVANTAGE;**
21                                    ) **6. NEGLIGENT INTERFERENCE**
                                      )    **WITH PROSPECTIVE**
22                                    )    **ECONOMIC ADVANTAGE;**
                                      ) **7. INTENTIONAL INTERFERENCE**
23                                    )    **WITH CONTRACTUAL**
                                      )    **RELATIONS;**
24                                    ) **8. MISAPPROPRIATION OF**
                                      )    **TRADE SECRETS; AND**
25                                    ) **9. UNJUST ENRICHMENT**
                                      )
26                                    ) **DEMAND FOR JURY TRIAL**
                                      )
27

28

*A11*

1    Plaintiff OLIVER & TATE ENTERPRISES, INC. D/B/A COVERPLAY
2    (hereinafter "PLAINTIFF"), for its First Amended *Verified* Complaint, pursuant to
3    Federal Rule of Civil Procedure 15(a)(1)(B), against Defendants FOUNDATIONS
4    WORLDWIDE, INC. ("FOUNDATIONS"), an Ohio corporation, JOSEPH A.
5    LAWLOR, an individual ("LAWLOR"), and DOES 1 through 5, inclusive, and
6    each of them (hereinafter collectively referred to as "DEFENDANTS"), alleges as
7    follows:

8    **JURISDICTION AND VENUE**

9    1.   This civil action for patent infringement, *inter alia*, arises under the patent
10        laws of the United States, 35 U.S.C. § 100, *et seq.*, more particularly 35
11        U.S.C. § 271 and § 281.

12   2.   The Court has supplemental jurisdiction over the state law claims, pursuant to
13        the provisions of 28 U.S.C. § 1367, in that said claims are so related to claims
14        in the action within such original jurisdiction that they form part of the same
15        case or controversy under Article III of the United States Constitution.

16   3.   This Court also has jurisdiction over the parties under diversity jurisdiction
17        (28 U.S.C. § 1332) as all of the DEFENDANTS have citizenship in a
18        different state from that of PLAINTIFF, and the amount in controversy
19        exceeds $75,001.00, exclusive of interest and costs.

20   4.   Upon information and belief, this Court has personal jurisdiction over
21        DEFENDANTS because DEFENDANTS have sufficient minimum contacts
22        with the State of California and the Central District of California;
23        DEFENDANTS have purposely availed themselves to the privileges of
24        conducting business in the State of California and in the Central District of
25        California; DEFENDANTS have sought protection and benefit from the laws
26        of the State of California; DEFENDANTS have purposefully directed their
27        activities, which resulted in the Claims listed below, towards the State of
28        California and residents of the State of California in the Central District of

1    California; FOUNDATIONS regularly conduct business within the State of
2    California and within the Central District of California and PLAINTIFF's
3    claims for relief arise directly from FOUNDATIONS' business contacts and
4    other activities in the State of California and in the Central District of
5    California, in part because the acts and omissions complained of either took
6    place within this Judicial District or had effect within this Judicial District or
7    both; and LAWLOR has committed intentional acts, which resulted in the
8    Claims listed below, expressly aimed at the State of California, and its
9    residents, and the Central District of California, causing harm that LAWLOR
10   knew is likely to be suffered in the State of California and in the Central
11   District of California.

12   5.   Upon information and belief, venue is proper in this judicial district under 28
13        U.S.C. §§1391(b)(2) because FOUNDATIONS transact business in this
14        judicial district; because DEFENDANTS have purposefully directed their
15        activities towards the State of California and residents of the State of
16        California in the Central District of California; because a substantial part of
17        the events giving rise to the claims alleged herein occurred in this district;
18        and because the harm caused to PLAINTIFF by DEFENDANTS had effect
19        within this Judicial District.

20                          **THE PARTIES**

21   6.   PLAINTIFF is a California corporation with its principal place of business at
22        4335 Van Nuys Boulevard, Suite 370, Sherman Oaks, California  91403.

23   7.   PLAINTIFF is the owner and assignee of U.S. Patent No. 7,401,366 ("the
24        '366 Patent") and U.S. Patent No. D 572,961 ("the '961 Patent"), which are
25        the Patents-in-Suit, and possesses the right to sue for infringement and
26        recover past damages. A true and correct copy of the '366 Patent and the
27        '961 Patent are attached hereto as Exhibit A and Exhibit B respectively.

28   8.   PLAINTIFF designs and produces slipcovers for portable play yards that are

covered by the '366 and '961 Patents ("PLAINTIFF's Products").

9.  PLAINTIFF is informed and believe, and thereon allege, that Defendant FOUNDATIONS is an Ohio corporation with its principal place of business at 5216 Portside Drive, Medina, Ohio 44256.

10. Defendant FOUNDATIONS offers consumers a complete line of commercial cribs and baby furnishings including child care cribs, hotel cribs, play yards, crib covers, infant changing stations, multi-child strollers, gliders, high chairs and the like.

11. PLAINTIFF is informed and believes, and thereon alleges, that Defendant LAWLOR is an individual residing in Medina County, Ohio.

12. PLAINTIFF and FOUNDATIONS have had multiple interactions over the past four years regarding the possibility of the businesses working together with respect to PLAINTIFF's Products.

13. The correct and proper names of DEFENDANTS named herein as DOES 1 to 5, inclusive, and each of them, are unknown to PLAINTIFF, who therefore sues such "DOE" Defendants by fictitious names.  PLAINTIFF is informed and believes, and thereon alleges, that each fictitiously named "DOE" Defendant is, in some manner, means, or degree, responsible for the events and happenings alleged herein.  PLAINTIFF will amend this First Amended *Verified* Complaint, as necessary, to set forth the true names and capacities of the fictitiously designated "DOE" Defendants when the same have been ascertained.

14. PLAINTIFF is informed and believes, and thereon alleges, that each Defendant, whether expressly or fictitiously named, in addition to acting for himself, herself, or itself, and on its, his, her or their individual behalf(ves), was at all times herein mentioned a principal, agent, employee, joint venturer, co-conspirator, representative, or alter ego of some or all of the other named DEFENDANTS, and at all times herein mentioned, committed such acts or

1    omissions within the course and scope of that agency, servitude,
2    employment, partnership, joint venture, conspiracy, representation, or alter
3    ego relationship, with the full knowledge, consent, authority, and/or
4    ratification of some or all of the other named DEFENDANTS.

5    **FACTUAL BACKGROUND**

6    15. On or about December 2009, DEFENDANTS met with PLAINTIFF to
7         discuss the possibility of FOUNDATIONS doing business with PLAINTIFF,
8         FOUNDATIONS purchasing PLAINTIFF, and/or FOUNDATIONS
9         licensing PLAINTIFF's Products.

10   16. On or about December 14, 2009, DEFENDANTS sent an email to
11        PLAINTIFF, in which DEFENDANTS stated, "[w]e are confident that there
12        is a lot of mutual benefit in a partnership between our companies," and that it
13        was "important that we get samples of the product as soon as possible to help
14        in our engineering and safety compliance evaluation." DEFENDANTS
15        closed the email by requesting that PLAINTIFF provide a Non-Disclosure
16        Agreement between PLAINTIFF and FOUNDATIONS. A true and correct
17        copy of DEFENDANTS' December 14, 2009 email is attached hereto as
18        Exhibit C.

19   17. On or about December 14, 2009, PLAINTIFF sent DEFENDANTS a copy of
20        the Non-Disclosure Agreement which DEFENDANTS requested.

21   18. On or about December 23, 2009, DEFENDANTS sent PLAINTIFF a copy of
22        the Non-Disclosure Agreement, which was signed by LAWLOR on behalf of
23        FOUNDATIONS. A true and correct copy of the Non-Disclosure Agreement
24        signed by LAWLOR is attached hereto as Exhibit D.

25   19. Pursuant to the Non-Disclosure Agreement, DEFENDANTS agreed that any
26        Evaluation Material that PLAINTIFF provided to DEFENDANTS would be
27        kept confidential and that DEFENDANTS would not disclose any of the
28        Evaluation Material in any manner whatsoever to any other person. The

Evaluation Material that PLAINTIFF provided to DEFENDANTS were comprised of confidential information, including: PLAINTIFF's Products; PLAINTIFF's customers; PLAINTIFF's distributors; and a timeline of the relevant dates related to PLAINTIFF's Products such as when and where the Products would be shipped.

20. On or about January 29, 2010, DEFENDANTS sent an email to PLAINTIFF, in which DEFENDANTS outlined terms for a proposed Licensing Agreement between DEFENDANTS and PLAINTIFF. One of the terms proposed by DEFENDANTS stated, "Cover Play would agree to defend the patent, and Foundations, in any suits from other companies that may sue for patent infringement, and agree to be responsible for any settlements or judgments. She said this language is present in virtually all license agreements and it is standard and customary for the patent holder to agree to this." A true and correct copy of DEFENDANTS' January 29, 2010 email is attached hereto as Exhibit E.

21. PLAINTIFF rejected DEFENDANTS' proposed Licensing Agreement.

22. Upon information and belief, after PLAINTIFF's rejection of DEFENDANTS' proposed Licensing Agreement, DEFENDANTS began sending letters to PLAINTIFF's customers, distributors, and hotels, in which DEFENDANTS unjustly attacked and disparaged PLAINTIFF's Products.

23. On or about April 22, 2010, FOUNDATIONS sent a letter to Disney Sourcing & Procurement, which stated: "Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards… Foundation has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers. Foundation recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards." A true and correct

copy of FOUNDATIONS' April 22, 2010 letter is attached hereto as Exhibit F.

24. Upon information and belief, DEFENDANTS sent additional letters to customers, distributors, and hotels that were similar to FOUNDATIONS' April 22, 2010 letter to Disney Sourcing & Procurement.

25. Upon information and belief, DEFENDANTS had already fully tested and evaluated the safety of PLAINTIFF's Products, despite the contentions made in FOUNDATIONS' letters to PLAINTIFF's customers, potential customers, distributors, and hotels.

26. Upon information and belief, DEFENDANTS were aware that there were no actual safety concerns with PLAINTIFF's Products in light of DEFENDANTS' ongoing communications with PLAINTIFF, despite the contentions made in FOUNDATIONS' letters to PLAINTIFF's customers, distributors, and hotels.

27. Upon information and belief, DEFENDANTS continue to make false statements regarding safety concerns with PLAINTIFF's Products.

28. On or about May 5, 2010, PLAINTIFF's counsel, ARC IP Law, PC, sent DEFENDANTS a letter regarding FOUNDATIONS' letters to PLAINTIFF's customers, distributors, and hotels, in which ARC IP Law, PC warned DEFENDANTS that their letters include defamatory statements and violate the Non-Disclosure Agreement signed by DEFENDANTS. A true and correct copy of PLAINTIFF's counsel's May 5, 2010 letter is attached hereto as Exhibit G.

29. On or about August 9, 2011, FOUNDATIONS sent a letter to Avendra Canada Inc. regarding PLAINTIFF's relationship with Marriott International, Inc., which indicated there may be safety concerns with slipcovers such as PLAINTIFF's; that FOUNDATIONS seeks to "enter into a license agreement with Cover Play"; that "Marriott would benefit from the

Foundations safety and quality combined with the Cover Play design and branding"; and that "it would be most helpful" for Marriott to contact PLAINTIFF regarding PLAINTIFF entering into the Licensing Agreement proposed by FOUNDATIONS. A true and correct copy of FOUNDATIONS' August 9, 2011 letter is attached hereto as Exhibit H.

30. On or about January 2013, FOUNDATIONS began featuring and promoting "SleepFresh Crib Covers" on the FOUNDATIONS website.

31. FOUNDATIONS' "SleepFresh Crib Covers" has infringed and continues to infringe upon PLAINTIFF's '366 and '961 Patents. A true and correct screenshot of FOUNDATIONS' website featuring and promoting the infringing "SleepFresh Crib Covers" is attached hereto as Exhibit I.

32. FOUNDATIONS' website that features the "SleepFresh Crib Covers" displays at least one image of PLAINTIFF's Products, but the image does not depict the proper usage of PLAINTIFF's Products. A true and correct screenshot of the images comparing FOUNDATIONS' slipcover with PLAINTIFF's is attached hereto as Exhibit J. Upon information and belief, FOUNDATIONS is aware that the display of images of PLAINTIFF's Products on FOUNDATIONS' website does not depict the proper usage of PLAINTIFF's Products.

33. On or about February 22, 2013, PLAINTIFF sent a Cease and Desist Letter to DEFENDANTS demanding that DEFENDANTS agree to: 1) immediately cease and desist from making, using, selling, and/or offering to sell the infringing SleepFresh Crib Covers; 2) immediately cease and desist from referencing SleepFresh Crib Covers in all mediums, including but not limited to, Foundations' websites, catalogs, sales rallies, trade shows, and correspondences; 3) agree to refrain from falsely and disparagingly commenting on PLAINTIFF and PLAINTIFF's Products, including, but not limited to, nonexistent safety and quality issues related to the PLAINTIFF's

Products; 4) agree to refrain from contacting PLAINTIFF's distributors for the purpose of attempting to persuade distributors to contact PLAINTIFF in order to convince PLAINTIFF to enter into a licensing agreement with FOUNDATIONS; 5) agree to fully comply with the Non-Disclosure Agreement that FOUNDATIONS signed in 2009; 6) agree to produce a complete list of all clients, companies, hotels, distributors, and/or individuals that FOUNDATIONS sent correspondence to relating to PLAINTIFF, PLAINTIFF's Products, or slipcovers for portable play yards in general. A true and correct copy of PLAINTIFF's February 22, 2013 Cease and Desist Letter is attached hereto as Exhibit K.

34. DEFENDANTS were provided with an opportunity to purchase PLAINTIFF and/or license PLAINTIFF's Products, but did not do so, instead choosing to embark on a campaign designed to destroy PLAINTIFF, out of spite.

35. As a result of DEFENDANTS' unfair and tortious actions, PLAINTIFF has suffered substantial reputational and economic damages, including, but not limited to, lost sales, distributors ceasing to do business with PLAINTIFF, loss of potential customers and sales, and failure of business transactions, including a potential sale of PLAINTIFF.

36. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by PLAINTIFF, but PLAINTIFF are informed and believe, and thereon allege, that PLAINTIFF have sustained such damage in an amount well exceeding $75,001.

## FIRST CLAIM FOR RELIEF

(Design Patent Infringement of the '961 Patent against DEFENDANT FOUNDATIONS)

37. PLAINTIFF re-alleges and incorporates paragraphs 1 through 36 as though fully set forth herein.

38. The '961 Patent was duly and legally issued by the United States Patent and

Trademark Office on July 15, 2008.  PLAINTIFF is the owner of the entire right, title, and interest in and to the '961 Patent, including the right to sue for infringement and recover past damages.

39.  DEFENDANT FOUNDATIONS is currently directly infringing the '961 Patent by, without authority, making, using, offering to sell, or selling, within the United States, or importing into the United States, certain products that are substantially the same as the overall appearance of the design of the '961 Patent.

40.  DEFENDANT FOUNDATIONS' acts constitute direct infringement of the '961 Patent in violation of 35 U.S.C. § 271(a).

41.  Upon information and belief, the infringement by DEFENDANT FOUNDATIONS has been willful, intentional and deliberate with full knowledge of the '961 Patent, entitling PLAINTIFF to enhanced damages under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35 U.S.C. § 285.  DEFENDANT FOUNDATIONS had knowledge of the '961 Patent at least as early as December 2009, and continued to infringe despite an objectively high likelihood that its product infringed the '961 Patent.  The risk of infringement of the '961 Patent was either known to DEFENDANT FOUNDATIONS or so obvious that it should have been known.

42.  Upon information and belief, PLAINTIFF has been and will continue to be injured by DEFENDANT FOUNDATIONS infringement of the '961 Patent, and such acts will continue unless DEFENDANT FOUNDATIONS is enjoined therefrom.

43.  Upon information and belief, DEFENDANT FOUNDATIONS has derived, received, and will continue to derive and receive gains, profits and advantages from the aforesaid acts of infringement in an amount that is not presently known to PLAINTIFF.  By reason of the aforesaid infringing acts, PLAINTIFF has been damaged, and is entitled to monetary relief in an

1     amount to be proven at trial.

2    44.  PLAINTIFF has complied with the statutory requirement of placing a notice

3        of the '961 Patent on all of PLAINTIFF's Products that are manufactured and

4        sold and has given DEFENDANT FOUNDATIONS written notice of the

5        infringement.

6                    **SECOND CLAIM FOR RELIEF**

7       (Utility Patent Infringement of the '366 Patent against DEFENDANT

8                    FOUNDATIONS)

9    45.  PLAINTIFF re-alleges and incorporates paragraphs 1 through 44 as though

10       fully set forth herein.

11    46.  The '366 Patent was duly and legally issued by the United States Patent and

12       Trademark Office on July 22, 2008.  PLAINTIFF is the owner of the entire

13       right, title, and interest in and to the '366 Patent, including the right to sue for

14       infringement and recover past damages.

15    47.  DEFENDANT FOUNDATIONS is currently directly infringing the '366

16       Patent by, without authority, making, using, offering to sell, or selling, within

17       the United States, or importing into the United States, certain products that

18       embody one or more claims of the '366 Patent.

19    48.  DEFENDANT FOUNDATIONS' acts constitute direct infringement of the

20       '366 Patent in violation of 35 U.S.C. § 271(a).

21    49.  Upon information and belief, the infringement by DEFENDANT

22       FOUNDATIONS has been willful, intentional and deliberate with full

23       knowledge of the '366 Patent, entitling PLAINTIFF to enhanced damages

24       under 35 U.S.C. § 284 and attorneys' fees and non-taxable costs under 35

25       U.S.C. § 285.  DEFENDANT FOUNDATIONS had knowledge of the '366

26       Patent at least as early as December 2009, and continued to infringe despite

27       an objectively high likelihood that its product infringed the '366 Patent.  The

28       risk of infringement of the '366 Patent was either known to DEFENDANT

1    FOUNDATIONS or so obvious that it should have been known.

2    50.  Upon information and belief, PLAINTIFF has been and will continue to be

3         injured by DEFENDANT FOUNDATIONS infringement of the '366 Patent,

4         and such acts will continue unless DEFENDANT FOUNDATIONS is

5         enjoined therefrom.

6    51.  Upon information and belief, DEFENDANT FOUNDATIONS has derived,

7         received, and will continue to derive and receive gains, profits and

8         advantages from the aforesaid acts of infringement in an amount that is not

9         presently known to PLAINTIFF.  By reason of the aforesaid infringing acts,

10        PLAINTIFF has been damaged, and is entitled to monetary relief in an

11        amount to be proven at trial.

12   52.  PLAINTIFF has complied with the statutory requirement of placing a notice

13        of the '366 Patent on all of PLAINTIFF's Products that are manufactured and

14        sold and has given DEFENDANT FOUNDATIONS written notice of the

15        infringement.

16                      **THIRD CLAIM FOR RELIEF**

17                (Trade Libel against all DEFENDANTS)

18   53.  PLAINTIFF re-alleges and incorporates paragraphs 1 through 52 as though

19        fully set forth herein.

20   54.  DEFENDANTS have knowingly made false statements regarding the safety

21        of PLAINTIFF's Products, and continue to do so.

22   55.  DEFENDANTS' false statements have been published in correspondence

23        between DEFENDANTS and PLAINTIFF's customers, potential customers,

24        hotels, and distributors, and continue to be published.

25   56.  DEFENDANTS' false statements have been published on FOUNDATIONS'

26        website by placing an "X" next to an image of PLAINTIFF's Products under

27        the subheading "Safe" to indicate, falsely, PLAINTIFF's Products are unsafe.

28   57.  DEFENDANTS' false statements disparage the quality of PLAINTIFF's

Products.

58. Upon information and belief, DEFENDANTS intended, with malice, to cause harm to PLAINTIFF, or should have recognized their false statements as being likely to cause harm.

59. DEFENDANTS' false statements have caused pecuniary harm or loss to PLAINTIFF in an amount that has not yet been ascertained.

## **FOURTH CLAIM FOR RELIEF**

(Unfair Competition Under Cal. Bus. & Prof. Code §§ 17200, *et seq* against

DEFENDANT FOUNDATIONS)

60. PLAINTIFF re-alleges and incorporates paragraphs 1 through 59 as though fully set forth herein.

61. DEFENDANT FOUNDATIONS, who competes directly with PLAINTIFF, has engaged in a pattern of unlawful, unfair, deceptive, and fraudulent business practices, contrary to public policy, in violation of California Business & Professions Code §§ 17200, *et seq.*, including the above-described actions.

62. DEFENDANT FOUNDATIONS' conduct, as alleged herein, has violated, and threatens to continue to violate, United States Patent Laws and California Tort Laws, and the policy and spirit of such laws, and otherwise threatens or harms competition. DEFENDANT FOUNDATIONS' conduct as alleged herein is likely to mislead the general public and, consequently, constitutes a fraudulent business act or practice within the meaning of §17200, *et seq.*, of the California Business and Professions Code.

63. As a direct and proximate cause of the aforementioned unfair and unlawful acts and practices, PLAINTIFF and the general public have suffered injury. These wrongful acts have directly and proximately caused PLAINTIFF substantial injury, including loss of customers, loss of goodwill, dilution, confusion of existing and potential customers, injury to reputation, and

diminution of the value of PLAINTIFF's Products. Unless DEFENDANT FOUNDATIONS is restrained from the unfair, unlawful, and/or fraudulent business practices and unfair competition described herein, PLAINTIFF and the public will continue to be irreparably harmed.

64. PLAINTIFF is informed and believes, and thereon alleges, that DEFENDANT FOUNDATIONS acquired from PLAINTIFF profits and benefits amounting to a substantial sum of money in this pattern of unlawful, unfair, and/or fraudulent business acts and practices set forth in the preceding paragraphs of this First Amended *Verified* Complaint, all to the detriment of PLAINTIFF. This unjust enrichment continues to occur as DEFENDANT FOUNDATIONS continues to engage in said unlawful, unfair, and/or fraudulent business acts and practices.

65. PLAINTIFF and the general public have no adequate remedy at law to compensate them for the continued and irreparable harm they will suffer if DEFENDANT FOUNDATIONS' acts are allowed to continue.

66. DEFENDANT FOUNDATIONS committed these unfair business practices within four years prior to the filing of this First Amended *Verified* Complaint, and are continuing to commit these acts to this day.

67. Pursuant to California Business and Professions Code §17203, PLAINTIFF is entitled to temporary restraining orders, restitution, disgorgement of DEFENDANT FOUNDATIONS' profits, and preliminary and permanent restraining orders, restitution, and preliminary and permanent injunctions against the behavior as alleged hereinabove of DEFENDANT FOUNDATIONS, its agents, employees, representatives, and all persons acting in concert with them from engaging in further acts of unfair competition and unfair business practices.

68. By reason of the foregoing, PLAINTIFF is entitled to preliminary and permanent injunctive relief against DEFENDANT FOUNDATIONS, and

anyone associated with them, and anyone who acts in concert with them, to restrain further acts of unfair competition and, after trial or summary judgment, to recover any damages proven to have been caused by reason of DEFENDANT FOUNDATIONS' aforesaid acts of unfair competition, and to recover enhanced damages and attorneys fees, based upon the willful, intentional, and/or grossly negligent activities of DEFENDANT FOUNDATIONS.

69. Pursuant to California Business & Professions Code Section 17203, DEFENDANT FOUNDATIONS are required to disgorge and restore to PLAINTIFF all profits and property acquired by means of DEFENDANT FOUNDATIONS' unfair competition with PLAINTIFF.

## FIFTH CLAIM FOR RELIEF

(Intentional Interference with Prospective Economic Advantage against all DEFENDANTS)

70. PLAINTIFF re-alleges and incorporates paragraphs 1 through 69 as though fully set forth herein.

71. PLAINTIFF has and had an expectancy in ongoing economic relationships with current and prospective customers, hotels, and distributors of PLAINTIFF's Products, as well as prospective buyers of PLAINTIFF.

72. These relationships contained the probability of future economic benefit in the form of profits from providing, licensing, and/or selling slipcovers for portable play yards, as well as profits from the sale of PLAINTIFF. Had DEFENDANTS refrained from engaging in the unlawful and wrongful conduct described in this First Amended *Verified* Complaint, there is a substantial probability that PLAINTIFF would have been able to obtain further profits.

73. DEFENDANTS' conduct was wrongful by a measure beyond the fact of the interference itself. Despite their knowledge of PLAINTIFF's Products,

DEFENDANTS have engaged in actions to prevent consumers from purchasing said products, and have created a knock-off product to divert customers, distributors, and hotels from purchasing PLAINTIFF's Products. DEFENDANTS have also engaged in actions to prevent prospective buyers from purchasing PLAINTIFF.

74. This conduct, as alleged above, constitutes, at the very least, unfair business practices.

75. DEFENDANTS, through their relationship with PLAINTIFF, knew of and intended to interfere with PLAINTIFF's prospective business advantages as described above.

76. As a proximate result of DEFENDANTS' actions, PLAINTIFF has suffered economic harm, including, but not limited to, loss of profits from sales or licenses to current and potential customers and buyers of PLAINTIFF. DEFENDANTS' wrongful conduct was a substantial factor in causing this harm.

77. Unless DEFENDANTS are restrained by appropriate injunctive relief, their actions are likely to recur and will cause PLAINTIFF irreparable injury for which there is no adequate remedy at law.

78. DEFENDANTS' interference with PLAINTIFF's prospective economic advantage with its current and future customers and buyers, as described above, was willful, malicious, oppressive, and in conscious disregard of PLAINTIFF's rights, and PLAINTIFF are therefore entitled to an award of punitive damages to punish DEFENDANTS' wrongful conduct and deter future wrongful conduct.

## SIXTH CLAIM FOR RELIEF

(Negligent Interference With Prospective Economic Advantage against all DEFENDANTS)

79. PLAINTIFF re-alleges and incorporates paragraphs 1 through 78 as though

**A26**

1    fully set forth herein.

2    80.  PLAINTIFF has and had an expectancy in ongoing economic relationships

3         with current and prospective purchasers and licensees of PLAINTIFF's

4         Products, as well as prospective buyers of PLAINTIFF.

5    81.  These relationships contained the probability of future economic benefit in

6         the form of profits from providing, licensing, and/or selling slipcovers for

7         portable play yards, as well as profits from the sale of PLAINTIFF.  Had

8         DEFENDANTS refrained from engaging in the unlawful and wrongful

9         conduct described in this First Amended *Verified* Complaint, there is a

10        substantial probability that PLAINTIFF would have been able to obtain

11        further profits.

12   82.  DEFENDANTS' conduct was wrongful by a measure beyond the fact of the

13        interference itself.  Despite their knowledge of PLAINTIFF's Products,

14        DEFENDANTS have engaged in actions to prevent consumers from

15        purchasing said products, and have created a knock-off product to divert

16        customers, distributors, and hotels from purchasing PLAINTIFF's Products.

17        DEFENDANTS have also engaged in actions to prevent prospective buyers

18        from purchasing PLAINTIFF.

19   83.  This conduct, as alleged above, constitutes, at the very least, as unfair

20        business practices.

21   84.  DEFENDANTS, through its relationship with PLAINTIFF, knew or should

22        have known that their actions would interfere with PLAINTIFF's prospective

23        business advantages.  DEFENDANTS failed to act with reasonable care.

24   85.  As a proximate result of DEFENDANTS' actions, PLAINTIFF has suffered

25        economic harm, including, but not limited to, loss of profits from sales or

26        licenses to current and potential customers and buyers of PLAINTIFF.

27        DEFENDANTS' wrongful conduct was a substantial factor in causing this

28        harm.

**PLAINTIFF'S FIRST AMENDED VERIFIED COMPLAINT**

*A27*

86. Unless DEFENDANTS are restrained by appropriate injunctive relief, their actions are likely to recur and will cause PLAINTIFF irreparable injury for which there is no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

(Intentional Interference with Contractual Relations against all DEFENDANTS)

87. PLAINTIFF re-alleges and incorporates paragraphs 1 through 86 as though fully set forth herein.

88. There were contracts between PLAINTIFF and third party distributors, customers, and hotels, including, at least, Disney, Marriott, and American Hotel Register.

89. Upon information and belief, DEFENDANTS knew of these contracts, and obtained confidential information regarding these contracts from PLAINTIFF.

90. Upon information and belief, DEFENDANTS intended to disrupt the performance of these contracts.

91. DEFENDANTS' conduct prevented performance or made performance more expensive or difficult.

92. PLAINTIFF was harmed.

93. DEFENDANTS' conduct was a substantial factor in causing PLAINTIFF's harm.

## EIGTH CLAIM FOR RELIEF

(Misappropriation of Trade Secrets against all DEFENDANTS)

94. PLAINTIFF re-alleges and incorporates paragraphs 1 through 93 as though fully set forth herein.

95. PLAINTIFF was the owners of trade secrets, including but not limited to, information that was secret, such as information pertaining to PLAINTIFF's Products; information pertaining to PLAINTIFF's product line; information pertaining to PLAINTIFF's customers; information pertaining to

PLAINTIFF's distributors; information pertaining to a timeline of the relevant dates related to PLAINTIFF's Products such as when and where the products would be shipped; and information pertaining to potential and/or actual business transactions involving PLAINTIFF.

96.  PLAINTIFF's trade secrets had actual or potential independent economic value because it was secret, and PLAINTIFF made reasonable efforts to keep the information secret.

97.  This confidential information pertaining to PLAINTIFF's product line, PLAINTIFF's customers, PLAINTIFF's distributors, PLAINTIFF's timeline of the relevant dates related to PLAINTIFF's Products such as when and where the products would be shipped, and potential and/or actual business transactions involving PLAINTIFF were trade secrets at the time of misappropriation.

98.  DEFENDANTS improperly used and disclosed PLAINTIFF's trade secrets.

99.  PLAINTIFF was harmed by DEFENDANTS' conducts, while DEFENDANTS were unjustly enriched.

100. DEFENDANTS' acquisition, use, or disclosure of PLAINTIFF's trade secrets was a substantial factor in causing PLAINTIFF's harm or causing DEFENDANTS to be unjustly enriched.

101. PLAINTIFF was harmed.

102. DEFENDANTS' conduct was a substantial factor in causing PLAINTIFF's harm.

## NINTH CLAIM FOR RELIEF

### (Unjust Enrichment against all DEFENDANTS)

103. PLAINTIFF re-alleges and incorporates paragraphs 1 through 102 as though fully set forth herein.

104. DEFENDANTS unjustly received benefits at the expense of PLAINTIFF through their wrongful conduct, including FOUNDATIONS' infringement of

1    PLAINTIFF's '366 Patent and '961 Patent and PLAINTIFF's Products, and

2    DEFENDANTS' interference with PLAINTIFF's business relationships,

3    which took substantial time and money for PLAINTIFF to develop.

4    DEFENDANTS continue to unjustly retain these benefits at the expense of

5    PLAINTIFF.  It would be unjust and inequitable for DEFENDANTS to retain

6    any value they obtained as a result of their wrongful conduct.

7    105.  PLAINTIFF is accordingly entitled to full restitution of all amounts in which

8    DEFENDANTS have been unjustly enriched at PLAINTIFF's expense.

9    **PRAYER FOR RELIEF**

10    WHEREFORE, PLAINTIFF prays for judgment against the DEFENDANTS,

11  as follows:

12    1.  A preliminary and, ultimately, permanent nationwide injunction enjoining

13    FOUNDATIONS, and their employees, officers, directors, insurers, agents,

14    representatives, successors, assigns, affiliates, and subsidiaries, and all those

15    in concert or participation with them from further acts of (1) direct

16    infringement, and (2) willful infringement with respect to the claims of the

17    '366 Patent and the '961 Patent;

18    2.  An award to PLAINTIFF of damages adequate to compensate PLAINTIFF

19    for FOUNDATIONS' acts of infringement together with pre-judgment and

20    post-judgment interest;

21    3.  An Order directing that FOUNDATIONS deliver up for destruction all

22    materials and matter in their possession or custody or under their control that

23    infringe or unfairly compete with PLAINTIFF's '366 Patent and '961 Patent,

24    including, without limitation, all advertising and promotional materials and

25    infringing products;

26    4.  An Order awarding PLAINTIFF punitive damages in a sum to be determined

27    at trial on the basis of DEFENDANTS' intentional interference with

28    PLAINTIFF's prospective economic advantage;

5.    An Order awarding restitution and disgorgement of all ill-gotten gains unjustly obtained and retained by DEFENDANTS through the acts complained of here;

6.    An Order awarding damages to be proven at trial or statutory damages including enhanced statutory damages for willful infringement;

7.    That the Court enter a Judgment against DEFENDANTS finding that:

      a.    FOUNDATIONS has infringed PLAINTIFF's '366 Patent and '961 Patent;

      b.    FOUNDATIONS willfully infringed PLAINTIFF's '366 Patent and '961 Patent;

      c.    DEFENDANTS engaged in unfair methods of competition in violation of California common law; and

      d.    DEFENDANTS otherwise injured the business reputation and business of PLAINTIFF by DEFENDANTS' acts and conduct set forth in this First Amended *Verified* Complaint;

8.    An Order directing that FOUNDATIONS file with the Court and serve upon counsel for PLAINTIFF within ten (10) days after the entry of such order or judgment, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunction;

9.    That DEFENDANTS be required to pay over to PLAINTIFF the damages suffered by PLAINTIFF as a consequence of said acts complained of herein, and that those damages be trebled as patent infringement and unfair business practices are intentional, deliberate, and willful, together with costs and interest;

10.    That DEFENDANTS be required to account for all gains, profits, advantages, and unjust enrichment derived from its violations of law;

11.    An Order awarding to PLAINTIFF treble damages based upon an accounting of DEFENDANTS' profits, including all statutory enhancements

1    and other enhancements on account of the willful nature of DEFENDANTS'

2    acts;

3    12.   An Order awarding to PLAINTIFF prejudgment and post judgment interest;

4    13.  An award of PLAINTIFF's costs and expenses, including, without limitation,

5    reasonable attorney's fees and expert witness fees and costs;

6    14.   An order for corrective advertising in a form, manner, and frequency that is

7    acceptable to PLAINTIFF and the Court; and

8    15.  All other relief, in law or in equity, to which PLAINTIFF may be entitled, or

9    which the Court deems just and proper.

10

11                                        Respectfully Submitted,
                                          **HANKIN PATENT LAW, APC**
12

13   Date:  April 15, 2013              By:  /Marc E. Hankin/
                                        _____
14                                      Marc E. Hankin (SBN# 170505)
                                        Attorney for PLAINTIFF
15                                      **OLIVER & TATE ENTERPRISES, INC.**
16                                      **D/B/A COVERPLAY**

17

18

19

20

21

22

23

24

25

26

27

28

1  
2  
3  
4  
5  
6  
7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28  

## **JURY TRIAL DEMANDED**

In accordance with Fed. R. Civ. P. Rule 38(b), PLAINTIFF OLIVER & TATE ENTERPRISES, INC. D/B/A COVERPLAY hereby demands a Trial by Jury on all issues so triable.

Respectfully Submitted,
**HANKIN PATENT LAW, APC**

Date:  April 15, 2013          By:  /Marc E. Hankin/
_____
Marc E. Hankin (SBN# 170505)
Attorney for PLAINTIFF
**OLIVER & TATE ENTERPRISES, INC.
D/B/A COVERPLAY**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I am the co-owner of OLIVER & TATE ENTERPRISES, INC. D/B/A COVERPLAY, which owns U.S Patent No. 7,401,366 and U.S. Patent No. D572,961.  I have read the foregoing First Amended Complaint and Exhibits thereto, and I know the contents thereof.  The same is true of my own personal knowledge, except for those matters which have been stated herein on information and belief, and as to those matters, I believe them to be true.

I declare under the penalties of perjury of the State of California and the United States that the foregoing is true and correct.  Executed at Los Angeles, California, on April 15, 2013.

By: _____

**Amy Feldman**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>THIS PAGE LEFT BLANK INTENTIONALLY</u>

US007401366B1

## (12) United States Patent
### Costa

(10) Patent No.: **US 7,401,366 B1**
(45) Date of Patent: **Jul. 22, 2008**

(54) **CHILDREN'S PLAY YARD AND ELASTIC, REMOVABLE LINER**

(76) Inventor: **Allison Costa**, 3782 Berry Dr., Studio City, CA (US) 91604

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/677,023**

(22) Filed: **Feb. 20, 2007**

(51) **Int. Cl.**
| | |
|---|---|
| A47D 7/00 | (2006.01) |
| A47D 15/00 | (2006.01) |
| A47D 13/06 | (2006.01) |

(52) **U.S. Cl.** .................... **5/93.1**; 5/98.1; 5/658; 5/663; 220/495.11

(58) **Field of Classification Search** ................. 5/93.1, 5/98.1, 99.1, 424, 427, 663, 946; 220/495.01, 220/495.11; 229/117.35
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2,025,613 | A | * | 12/1935 | Rohan | ......................... | 5/93.1 |
| 2,128,978 | A | * | 9/1938 | Akin | ............................. | 5/93.1 |
| 2,566,790 | A | * | 9/1951 | Bloomfield | ................... | 5/93.1 |
| 3,103,669 | A | * | 9/1963 | Mundis | ........................ | 5/98.1 |
| 5,163,191 | A | * | 11/1992 | Chan | ............................ | 5/98.1 |
| 5,941,408 | A | * | 8/1999 | Sherman | ................ | 220/495.01 |
| 6,421,857 | B2 | * | 7/2002 | Whatman et al. | .............. | 5/663 |
| 6,687,927 | B1 | * | 2/2004 | Tharalson et al. | ............. | 5/98.1 |
| 6,895,611 | B2 | * | 5/2005 | Tharalson et al. | ............. | 5/99.1 |

* cited by examiner

*Primary Examiner*—Alexander Grosz
(74) *Attorney, Agent, or Firm*—Marc E. Hankin; Hankin Patent Law, APC

(57) **ABSTRACT**

Various embodiments of the invention are directed towards a baby play yard cover or lining that lines the walls and floor of a baby play yard in order that the play yard is protected from soiling by the baby. Various embodiments of the invention are re-attachable such that the play yard liner may be washed separately from the play yard. The play yard cover has a plurality of elastic reinforcing portions which facilitate the securing of the cover to its corresponding play yard.

**9 Claims, 3 Drawing Sheets**





**U.S. Patent**          **Jul. 22, 2008**          **Sheet 1 of 3**          **US 7,401,366 B1**



FIG. 1

Case: 13-159   Document: 2   Page: 74   Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 19   Filed 04/16/13   Page 28 of 64   Page ID #:410

*FIG. 2*



EXHIBIT A, PAGE 28

**U.S. Patent**        Jul. 22, 2008        Sheet 3 of 3        US 7,401,366 B1



FIG. 3

US 7,401,366 B1

1

## CHILDREN'S PLAY YARD AND ELASTIC, REMOVABLE LINER

### FIELD OF INVENTION

Various embodiments of this invention relate, generally, to children's play yards; more particularly, to liners for children's play yards.

### BACKGROUND

Baby's and children's play yards, cribs, bassinets, and cradles often utilize accessory covers in order to improve the safety and enjoyment of the child and the convenience to the parents. U.S. Pat. No. 3,103,669, for example, discloses a crib safety shield that surrounds the side panels of a baby crib in order to protect the baby while in the crib. This basic type of crib safety shield operates to protect the child from slipping through openings of the crib, prevent children outside of the crib from touching the child within the crib, and prevents toys and other items from slipping out of the crib.

Another such device is disclosed by U.S. Pat. No. 5,941,408 to Sherman. Sherman's patent discloses a container liner with integral handle cover that is directed towards lining the inside of a container while providing a flap that extends beyond the edges of the handle in order to wrap around the container's handle. While Sherman's patent discloses a device that lines the inner portion of a container, it fails to disclose a device that operates to also line the exterior of the container.

Another such device is disclosed by U.S. Pat. No. 2,566,790 to Bloomfield. Bloomfield's patent discloses a crib cover that protects the interior of the crib from drafts or cold. The system improves upon the above patents by disclosing a combined inner and outer cover and lining that attaches at the four sides of the crib to a bottom lining. In this manner, Bloomfield's invention serves to seal the interior of the crib from drafts that may enter from the side of bottom of the crib.

Another such device is disclosed by U.S. Pat. No. 2,025,613 to Rohan. Rohan's patent discloses a baby carriage protector that provides sanitary protection to the carriage while protecting the body of the infant while in the carriage. Rohan's device comprises a water-proof lining for the carriage that features an elastic edge lining to wrap around the edges of the crib and attach the lining to the carriage.

Another such device is disclosed by U.S. Pat. No. 6,421,857 to Whatman et al., which discloses a liner for an infant bed. Whatman's patent discloses a baby crib liner that attaches to the top rails of the baby crib in order to prevent the baby from passing through the walls of the baby crib. Whatman's device features breathable or mesh side walls in order that the baby may receive fresh air and be viewed from outside the crib.

Another such baby crib cover is disclosed by U.S. Pat. No. 2,128,978 to Akin. Akin's cover features a bottom platform and four side walls that serve to protect the crib from soiling by the baby. Akin's cover attaches to the crib by a series of straps that attach the vertical portions of the cover to the crib. The cover further features a zipper at each of the joints between the vertical flaps in order that, when applied to a crib, all sides of the crib are protected.

Yet another such device is disclosed by U.S. Pat. No. 5,163,191 to Chan, which discloses a replaceable two-level crib drape. Chan's device comprises a main drape and upper drape wherein the main drape surrounds the bottom portion of the crib walls and the upper drape rests atop the main drape and

2

surrounds the upper portion of the drape walls. A series of zippers is used in order to attach the various portions of the drapes.

A toy storage cover for portable play yards is disclosed by U.S. Pat. Nos. 6,687,927 and 6,895,611, both to Tharalson et al. Tharalson's patents disclose a toy storage cover that includes four outer panels shaped to surround the outer walls of a play yard and a bottom panel that is used to serve as a mattress pad at the base of the play yard. In this manner, Tharalson's device is directed towards converting a play yard into a toy storage container. In various embodiments of Tharalson's invention, the invention also features pockets along the outside of the cover, such that additional toys may be stored in the pockets along the outside of the cover.

The above devices disclose varying means for covering baby play yards, cribs, and bassinets. While many of the above devices protect a baby from falling out of a crib, they are not directed towards protecting the crib from soiling. Meanwhile, while other devices cover baby play yards, none of these devices are directed towards providing a liner to baby play yards such that the baby may play in a play yard that features the liner, babies may soil the liner, and the liner may be removed for washing. Thus, their remains a long felt need in the art for a play yard liner that protects the play yard while allowing babies and children to play inside the play yard.

### SUMMARY OF THE INVENTION

Various embodiments of the invention are directed towards overcoming the above shortcomings by disclosing a play yard liner that allows babies to play inside the lined play yard while also protecting the play yard from soiling by the babies. Thus, the liner may be separately replaced or washed from the play yard.

Various embodiments of the invention are directed towards a liner that operates to surround the walls and base of a play yard. The liner comprises a bottom surface liner, whose outer surface covers the bottom surface of the play yard. The bottom surface liner may be comprised of any of the various washable or stain resistant materials known in the art. The bottom surface liner serves to protect the bottom surface of the play yard and attaches to the four wall liners.

Various embodiments of the invention further feature wall liners that serve to protect the walls of the play yard. The wall liners comprise a series of liners that attach to the bottom surface liner. The wall liners are shaped generally the same size as that of the play yard walls and wrap around the play yard walls. The wall liners feature an inner liner, that lines the inner walls, and an outer liner, that lines the outer walls. The wall liners are comprised of a plurality of materials. The edges of the wall liners are comprised of a washable or stain resistant material that is not transparent. The center portions of the walls are comprised of a mesh material, which allows parents to view babies while they are within the play yard.

In order to attach the various portions of the play yard liner to one another and help attach the play yard liner to a play yard, various embodiments of the play yard liner feature a plurality of reinforcing sections. In various embodiments of the invention, the play yard liner features an upper reinforcing section that circumscribes the top of the play yard. In various embodiments of the invention, the upper reinforcing section comprises an elastic material, in order that the upper reinforcing section attaches the liner to the play yard. In various embodiments of the invention, the liner further features vertical reinforcing sections that support the liner at areas adjacent to the play yard columns. In various embodiments of the invention, the liner further features a bottom reinforcing por-

US 7,401,366 B1

3

tion that surrounds the inner portion of the liner at the portions where the wall liners meet the bottom liner. The various reinforcing sections or portions comprise an elastic material, which facilitates the secure attachment of the liner to its corresponding play yard.

In various embodiments of the invention, the liner also features a plurality of straps in order to attach the liner to the play yard. In one embodiment of the invention, the plurality of straps are located at the base of the outside of the wall liner adjacent to the play yard's support columns. In various embodiments of the invention, the straps are configured to attach to the support columns by buttons, hooks, fasteners, hook-and-loop fasteners, and other such attachment systems known in the art.

It should be noted that various embodiments of the invention may be removed from the play yard and washed separately from the play yard. In this manner, the liner allows babies to enjoy the play yard without worry that in soiling the play yard, the play yard would be ruined. Thus, a soiled play yard liner may be washed, for example, in a washing machine and reattached to the play yard. In this manner, the liner extends the lifetime of the play yard and allows parents to maintain a clean play area for their babies.

It further remains within the contemplation of the invention to be used with a variety of play yards, play yards of different shapes, cribs, bassinets, and further such baby enclosures known in the art. In further remains within the contemplation to be used with a variety of materials known in the art for constructing baby products.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an illustration from a perspective view of one embodiment of the invention.

FIG. 2 is an illustration from a side view of one embodiment of the invention.

FIG. 3 is an illustration from a top view of one embodiment of the invention.

DETAILED DESCRIPTION OF THE DRAWINGS

In the following detailed description of various embodiments of the invention, numerous specific details are set forth in order to provide a thorough understanding of various aspects of one or more embodiments of the invention. However, one or more embodiments of the invention may be practiced without these specific details. In other instances, well-known methods, procedures, and/or components have not been described in detail so as not to unnecessarily obscure aspects of embodiments of the invention.

While multiple embodiments are disclosed, still other embodiments of the present invention will become apparent to those skilled in the art from the following detailed description, which shows and describes illustrative embodiments of the invention. As will be realized, the invention is capable of modifications in various obvious aspects, all without departing from the spirit and scope of the present invention. Accordingly, the drawings and detailed description are to be regarded as illustrative in nature and not restrictive. Also, the reference or non-reference to a particular embodiment of the invention should not be interpreted as a limit on the scope of the invention.

In the following description, certain terminology is used to describe certain features of one or more embodiments of the invention. For instance, "play yard" refers to any child's play yard, playard, crib, bassinet, cradle, or other such space

4

enclosed in walls for holding children and babies; "mesh" refers to any transparent or semi-transparent garment material.

FIG. 1 is an illustration from a perspective view of one embodiment of the invention. A play yard 100 is illustrated with a play yard liner 102 covering the play yard. The play yard liner 102 features a back wall liner 104, front wall liner 106, and two side wall liners 108. At the top of the wall liners, the wall liners feature an upper reinforcing section 110 that strengthens the top of the wall liners. Also, in various embodiments of the invention, the upper reinforcing section 110 features elastic materials in order to help attach the play yard liner 102 to the play yard 100. In various embodiments of the invention, the upper reinforcing section 110 features curved extensions 112 in order to mate to the shape of the play yard 100. The play yard liner 102 further features a lower reinforcing section 114 in order to support the lower portions of the wall liners. The play yard liner 102 further features vertical reinforcing sections 116 at the areas of the play yard liner 102 adjacent to the play yard's 100 columns. In order to allow parents to view babies while inside the play yard 100, the play yard liner 102 features a plurality of mesh openings 118 that protect the baby while allowing outsiders to visually observe the baby. The play yard liner 102 features a plurality of straps 120 that attach to the columns 122 of the play yard 100.

FIG. 2 is an illustration from a side view of one embodiment of the invention. A play yard 200 is illustrated with a play yard liner 202 covering the play yard from the perspective adjacent to the side wall liner 206. At the top of the side wall liner 206, the wall liner features an upper reinforcing section 210 that strengthens the top of the wall liners. The play yard liner 202 further features a lower reinforcing section 214 in order to support the lower portions of the wall liners. The play yard liner 202 further features vertical reinforcing sections 216 at the areas of the play yard liner 202 adjacent to the play yard's 200 columns. In order to allow parents to view babies while inside the play yard 200, the play yard liner 202 features a plurality of mesh openings 218 that protect the baby while allowing outsiders to visually observe the baby through the side wall liner 206. The play yard liner 202 features a plurality of straps 220 that attach to the columns 222 of the play yard 200.

FIG. 3 is an illustration from a top view of one embodiment of the invention. A play yard 300 is illustrated with a play yard liner 302 covering the play yard. The play yard liner 302 features a bottom liner 324 that covers the bottom portion of the play yard 300. In various embodiments of the invention, the bottom liner 324 is comprised of a resilient or washable material, in order to protect the play yard 300 from being soiled by babies playing within the play yard 300. The play yard liner 302 features a back wall liner 304, front wall liner 306, and two side wall liners 308. At the top of the wall liners, the wall liners feature an upper reinforcing section 310 that strengthens the top of the wall liners.

What is claimed is:

1. A re-attachable play yard liner, in combination with a corresponding play yard to which the liner is adapted to be releasably attached, the liner comprising:

a bottom cover, said bottom cover being configured to substantially match the size and shape of the floor of a play yard and to cover the floor of the play yard,

a plurality of wall covers, said plurality of wall covers being configured to substantially match the size and shape of the play yard walls and to attach to said bottom cover at the base of said plurality of wall covers,

said plurality of wall covers comprising an inner wall cover and an outer wall cover, said inner wall covers being

EXHIBIT A, PAGE 31

*A41*

US 7,401,366 B1

| 5 | 6 |
|---|---|

configured to cover the inner walls of the play yard and comprising a mesh window and a plurality of reinforcing sections, said outer wall covers being configured to cover the outer walls of the play yard and comprising a mesh window and a plurality of reinforcing sections,

said inner wall reinforcing sections and said outer wall reinforcing sections comprising an upper reinforcing section, a lower reinforcing section, and a plurality of vertical reinforcing sections,

said upper reinforcing sections being configured to circumscribe the top of the play yard walls,

said lower reinforcing sections being configured to circumscribe the bottom of the play yard walls, and

said plurality of vertical reinforcing sections being located adjacent to the corners of the play yard walls, all said reinforcing sections comprising an elastic material, whereby the liner can be securely attached to the corresponding play yard.

**2**. A re-attachable play yard liner according to claim **1**, wherein said reinforcing sections comprise a water resistant material.

**3**. A re-attachable play yard liner according to claim **1**, wherein said re-attachable play yard liner comprises materials that are washing machine washable.

**4**. A re-attachable play yard liner according to claim **1**, further comprising a plurality of straps, said straps being configured to attach said re-attachable play yard liner to a play yard.

**5**. A re-attachable play yard liner according to claim **4**, wherein said straps attach said re-attachable play yard liner to a play yard with fasteners selected from one of the following types of fasteners: buttons, snap buttons, hook-and-loop fasteners, hooks, or zippers.

**6**. A re-attachable play yard liner according to claim **1**, wherein said re-attachable play yard liner comprises four wall covers that are configured to cover the walls in a rectangular shaped play yard.

**7**. A washing machine washable re-attachable play yard liner, in combination with a corresponding play yard to which the linear is adapted to be releasably attached, the linear comprising:

a bottom cover, said bottom cover being configured to substantially match the size and shape of the floor of a play yard and to cover the floor of the play yard,

a plurality of wall covers, said plurality of wall covers being configured to substantially match the size and shape of the play yard walls and to attach to said bottom cover at the base of said plurality of wall covers,

said plurality of wall covers comprising an inner wall cover and an outer wall cover, said inner wall covers being configured to cover the inner walls of the play yard and comprising a mesh window and a plurality of reinforcing sections, said outer wall covers being configured to cover the outer walls of the play yard and comprising a mesh window and a plurality of reinforcing sections,

said inner wall reinforcing sections and said outer wall reinforcing sections comprising an elastic material and a water resistant material and further comprising an upper reinforcing section, a lower reinforcing section, and a plurality of vertical reinforcing sections,

said upper reinforcing sections being configured to circumscribe the top of the play yard walls,

said lower reinforcing sections being configured to circumscribe the bottom of the play yard walls,

said plurality of vertical reinforcing sections being located adjacent to the corners of the play yard walls,

a plurality of straps, said plurality of straps being configured to attach said re-attachable play yard liner to a play yard, all said reinforcing sections comprising an elastic material, whereby the linear can be securely attached to the corresponding play yard.

**8**. A washing machine washable re-attachable play yard liner according to claim **7**, wherein said plurality of straps attach said re-attachable play yard liner to a play yard with fasteners selected from one of the following types of fasteners: buttons, snap buttons, hook-and-loop fasteners, hooks, or zippers.

**9**. A washing machine washable re-attachable play yard liner according to claim **7**, wherein said re-attachable play yard liner comprises four wall covers that are configured to cover walls in a rectangular shaped play yard.

\* \* \* \* \*

US00D572961S

(12) **United States Design Patent**
    Costa

(10) Patent No.:  **US D572,961 S**
(45) Date of Patent:  ✳✳ **Jul. 15, 2008**

(54) **SLIP COVER FOR PLAY YARD**

(75) Inventor:  **Allison Costa**, 3782 Berry Dr., Studio City, CA (US) 91604

(73) Assignee:  **Allison Costa**, Studio City, CA (US)

(✳✳) Term:  **14 Years**

(21) Appl. No.: **29/272,932**

(22) Filed:  **Feb. 21, 2007**

(51) LOC (8) Cl.  ...................................  **06-13**
(52) U.S. Cl.  ..........................................  **D6/610**
(58) **Field of Classification Search**  ..................  D6/610, D6/616, 331, 504, 491, 596, 390, 503;  5/93.1, 5/100, 93.2, 97, 98.1, 99.1, 663, 512, 946; 128/872; 135/96
    See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,025,613 | A | | 12/1935 | Rohan |
| 2,128,978 | A | | 9/1938 | Akin |
| 2,556,790 | A | | 6/1951 | Berdan |
| 3,103,669 | A | | 9/1963 | Mundis |
| D323,589 | S | * | 2/1992 | Mariol ........................ D6/331 |
| 5,163,191 | A | | 11/1992 | Chan et al. |
| 5,363,521 | A | * | 11/1994 | Garland et al. ................ 5/99.1 |
| D382,718 | S | | 8/1997 | Mariol ........................ D6/331 |
| 5,781,944 | A | * | 7/1998 | Huang ......................... 5/99.1 |
| 5,941,408 | A | | 8/1999 | Sherman |
| D434,914 | S | * | 12/2000 | Wang .......................... D6/331 |
| D461,645 | S | * | 8/2002 | Hartenstine et al. .......... D6/331 |
| D462,532 | S | * | 9/2002 | Hartenstine et al. .......... D6/331 |
| D478,453 | S | * | 8/2003 | Neveau  ....................... D6/596 |
| 6,687,927 | B1 | | 2/2004 | Tharalson et al. |
| D494,393 | S | * | 8/2004 | Chen .......................... D6/503 |
| 6,887,173 | B2 | | 5/2005 | Lacroix et al. |
| 6,895,611 | B2 | | 5/2005 | Tharalson et al. |
| D510,217 | S | * | 10/2005 | Neveau  ....................... D6/503 |
| D554,871 | S | * | 11/2007 | Volk et al. .................... D6/331 |
| 2003/0098053 | A1* | | 5/2003 | Huang ......................... 135/96 |
| 2006/0218725 | A1* | | 10/2006 | Carpenter et al. ............. 5/93.1 |

* cited by examiner

*Primary Examiner*—Louis S Zarfas
*Assistant Examiner*—David G Muller
(74) *Attorney, Agent, or Firm*—Lerner, David, Littenberg, Krumholz & Mentlik, LLP

(57)  **CLAIM**

The ornamental design for slip cover for play yard, as shown and described.

**DESCRIPTION**

FIG. **1** is a perspective view of the subject slip cover for play yard;

FIG. **2** is a front elevation view thereof (the rear view being a mirror image of the front plan view);

FIG. **3** is a right side view thereof (the left side being a mirror image of the right side elevation view);

FIG. **4** is a top plan view thereof;

FIG. **5** is perspective view of the second embodiment of the subject slip cover for play yard;

FIG. **6** is a front elevation view of the second embodiment thereof (the rear view being a mirror image of the front plan view);

FIG. **7** is a right side elevation view of the second embodiment thereof (the left side being a mirror image of the right side view); and,

FIG. **8** is a top plan view of the second embodiment thereof.

The broken line showing of parts of the drawings is included for the purpose of illustrating use and environment and forms no part of the claimed design.

**1 Claim, 8 Drawing Sheets**



EXHIBIT B, PAGE 33

**A43**

**U.S. Patent**     **Jul. 15, 2008**     **Sheet 1 of 8**     **US D572,961 S**

FIG. 1



EXHIBIT B, PAGE 34

*A44*

**U.S. Patent**          **Jul. 15, 2008**          **Sheet 2 of 8**          **US D572,961 S**

*FIG. 2*



**U.S. Patent**          **Jul. 15, 2008**          **Sheet 3 of 8**          **US D572,961 S**

# FIG. 3



**U.S. Patent**         **Jul. 15, 2008**        **Sheet 4 of 8**         **US D572,961 S**

*FIG. 4*



EXHIBIT B, PAGE 37

**U.S. Patent**          **Jul. 15, 2008**          **Sheet 5 of 8**          **US D572,961 S**

*FIG. 5*



**U.S. Patent**       **Jul. 15, 2008**       **Sheet 6 of 8**       **US D572,961 S**

FIG. 6



**U.S. Patent**      **Jul. 15, 2008**      **Sheet 7 of 8**      **US D572,961 S**

FIG. 7



**U.S. Patent**         **Jul. 15, 2008**         **Sheet 8 of 8**         **US D572,961 S**

FIG. 8



EXHIBIT B, PAGE 41

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.         : Des. 572,961 S                              Page 1 of 1
APPLICATION NO. : 29/272932
DATED                  : July 15, 2008
INVENTOR(S)      : Allison Costa

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title page, Item (Description), FIG. 2, line 2, "plan" should read --elevation--.
On the Title page, Item (Description), FIG. 3, line 1, after "FIG. 3 is a right side" insert --elevation--.
On the Title page, Item (Description), FIG. 6, line 2, "plan" should read --elevation--.
On the Title page, Item (Description), FIG. 7, line 2, after "image of the right side" insert --elevation--.

Signed and Sealed this

Twentieth Day of October, 2009

David J. Kappos
*Director of the United States Patent and Trademark Office*

EXHIBIT B, PAGE 42

**Nima Darouian**

| | |
|---|---|
| **From:** | allisonsck@gmail.com on behalf of Allison Costa <allison@coverplayard.com> |
| **Sent:** | Wednesday, February 20, 2013 3:29 PM |
| **To:** | Nima Darouian |
| **Subject:** | Fwd: Meeting Follow Up |

---------- Forwarded message ----------
From: **Joe Lawlor** <jlawlor@foundations.com>
Date: Mon, Dec 14, 2009 at 8:40 AM
Subject: Meeting Follow Up
To: Allison costa <allison@coverplayard.com>, amy@coverplayard.com>
Cc: Stan Argabrite <sargabrite@foundations.com>, Lisa Vanadia <lvanadia@foundations.com>, Chris Krauth
<ckrauth@foundations.com>

Allison and Amy

I hope this finds you well and that you had safe travels home.   We all enjoyed meeting with you and
hope you both feel the meetings were productive.  We are confident that there is a lot of mutual
benefit in a partnership between our companies.

I think we all know that we should be working with urgency because of the opportunities you must
react to.  Hence, I have initiated the key points we discussed; 1) engineering/safety compliance, 2)
financial viability of the 10% royalty & sales projections, meeting with IP attorney to discuss
agreement.  I will keep you fully abreast of the developments on all these fronts.

It is important that we get samples of the product as soon as possible to help in our engineering and
safety compliance evaluation.  These can be any color or pattern as long as the are representative of
production from a construction standpoint.  Please overnight these to me if possible to the address on
my business card.

Please also forward to me the NDA.

We look forward to working with you.

Joe

Joseph A. Lawlor
President
Foundations Worldwide, Inc.
Telephone: 330-722-5033 Extension 110
Fax: 330-722-5037
jlawlor@foundations.com

Foundations Quality Children's Products
Child Craft

1

EXHIBIT C, PAGE 43

*A53*

Legacy
CarePlay
Italtrike USA




--
Allison Costa
COVERPLAY
4335 Van Nuys Blvd Suite 370
Sherman Oaks,  CA
91403
917-806-2755
Fax: 818-728-0767
www.coverplayard.com
US Patent | Patents: 7,401,366 - D572,961


CONFIDENTIALITY NOTE: The information contained in this email message and any attachments are legally
privileged and confidential information intended only for the use of the individual or entity to whom it is
addressed. If the reader of this message is not the intended recipient, you are hereby notified that any
dissemination, distribution or copy of this message or its attachments is strictly prohibited. If you have received
this email in error, please immediately notify us by telephone, fax, or email and delete the message. Thank you.

EXHIBIT C, PAGE 44

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (this "Agreement") is entered into effective as of the 10 day of December, 2009, between Foundations, Inc. and Oliver & Tate Enterprises, Inc, DBA COVERPLAY.

In connection with the consideration by each party hereto of a possible negotiated transaction with the other party hereto (the "Transaction"), each party is prepared to make available to the other party certain information concerning its business. In consideration for, and as a condition of such information being furnished to the other party and the other party's directors, officers, employees or other representatives) (collectively, "Representatives"), each party agrees to treat any information concerning the other party that is or has been furnished to the other party or to the other party's Representatives (regardless of the manner or form in which it is furnished, including without limitation all written, oral and electronic communications), together with any notes, analyses, compilations, studies, interpretations, documents or records containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, the "Evaluation Material") in accordance with the provisions of this Agreement. The term "Evaluation Material" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure by the receiving party or its Representatives in violation of this Agreement, (ii) was within the receiving party's possession prior to its being furnished to it or is independently developed by the receiving party or its Representatives, or (iii) becomes available to the receiving party from a source other than the disclosing party or any of its Representatives.

Each party agrees that the Evaluation Material received or generated by it or its Representatives will be kept confidential and that neither party nor its Representatives will disclose any of the Evaluation Material in any manner whatsoever to any other person; provided, however, that (i) each party may make any disclosure of such information to which the other party gives its prior written consent: (ii) any of such information may be disclosed to the party's Representatives, and (iii) any of such information may be disclosed as required by law.

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all previous written, and all previous or contemporaneous oral negotiations, understandings, arrangements, and agreements. This Agreement, and each of the obligations herein stated, shall terminate and be of no further consequence or effect on the earlier between (i) one year following the date hereof, and (ii) the execution by the parties of a definitive agreement, if any, with respect to the Transaction. This Agreement and all disputes or controversies arising out of or related to this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without reference to its conflicts of law principles.

This Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed original, and all such counterparts shall together constitute one and the same instrument.

{31160\1280\11\5\2009\00531798v1 }

EXHIBIT D, PAGE 45

Oliver & Tate Enterprises, Inc DBA Coverplay

By:

Name:

Title:

Oliver & Tate Enterprises, Inc
DBA Coverplay
4335 Van Nuys Blvd
Suite 370
Sherman Oaks, CA 91403


Foundations

By:

Name:

Title:

Foundations
7001 Wooster Pike
Medina, Ohio 44256

{31160\1280\11\5\2009\00531798v1 }2

EXHIBIT D, PAGE 46

**A56**

**Nima Darouian**

| | |
|---|---|
| **From:** | allisonsck@gmail.com on behalf of Allison Costa <allison@coverplayard.com> |
| **Sent:** | Wednesday, February 20, 2013 3:27 PM |
| **To:** | Nima Darouian |
| **Subject:** | Fwd: Foundations offer to license |

---------- Forwarded message ----------
From: **Amy** <Amy@coverplayard.com>
Date: Wed, Feb 20, 2013 at 8:37 AM
Subject: Foundations offer to license
To: Allison Costa <allison@coverplayard.com>, marc@hankinpatentlaw.com

-------- Original Message --------
**Subject:** Update
  **Date:** Fri, 29 Jan 2010 17:24:08 -0500
  **From:** Joe Lawlor <jlawlor@foundations.com>
    **To:** 'Allison Costa' <allison@coverplayard.com>, 'Amy Feldman-Coverplay' <amy@coverplayard.com>

Hello Ladies:

I apologize for the delay in communicating.  I have been working on this project and things have been developing.  I thought it important to send you an overview because I want you to be able to make a good business decision particularly since you have this Marriott transaction pending.

Time Line

I have had an engineer working on this and he has outlined the scope of making the product compliant, and how we would want to manage the product from a safety and compliance standpoint.  He reviewed it with me today and feels the execution of this would take 3 weeks.  This includes creating warning labels and everything needed to turn over to
manufacturing.  Hypothetically, if we came to terms on an agreement by the end of next week, we would have a package ready to go to the maker by 3/1.  We then have manufacturing and ocean freight time.  It is easy to see that an April date for shipment to hotels is challenging.  Please tell me your feelings about this based on your knowledge of production time needed.  If we came to terms, and the intended delivery date to Marriott was questionable, we may have to sit down with them and work out a ship date a few weeks later than intended.  I was curious to know also what the status was of your agreement with them.  If they still have not made a commitment to you in terms of a signed agreement you could possibly buy some time with them on a shipment date based on that it has taken them so long to get an agreement in your hands.  Your thoughts?

Agreement

1

EXHIBIT E, PAGE 47

I have discussed the drafting of an agreement with our attorney and, based on her assessment, this would be a pretty straight forward, simple agreement. She can also get us an initial working draft within a day or so of us outlining terms to her. I discussed with her several of the points that came up in our last conversation and outlined below my thoughts. Please give me your feedback.

- Initial term is proposed as from signing through 2011. The agreement would automatically renew for subsequent calendar years (after initial term) unless it was cancelled by the either party by September 1st of current year. Cancelation of agreement would be effective 1/1.
- Foundations would completely indemnify you against product liability suits and commit to keep you continuously listed as an additional insured on our product liability insurance coverage.
- Cover Play would agree to defend the patent, and Foundations, in any suits from other companies that may sue for patent infringement, and agree to be responsible for any settlements or judgments. She said this language is present in virtually all license agreements and it is standard and customary for the patent holder to agree to this.
- The license would be exclusive for the commercial market.
- Royalties paid either semi annually or annually (your call) with a report showing number of units and dollar volume sold. You would have ability to audit in the event you wanted to.
- Coverplay would be responsible for providing fashion merchandising. It is probably easiest to state a minimum number of collections you would be responsible for merchandising annually to make it simple.
- It makes sense to have two royalty rates; one for the coverplay units that is higher and another (lower) for the sheets that we sell in which we use your fashion designs. You and I spent quite a bit of time talking about royalties and I have given this some more thought. There is quite a bit of work that needs to be done on safety engineering, and up front developmental work that we have to do. We also think, after looking at the product, that we will have to put more raw materials and labor in the product for us to make the product safe and compliant. Given there is a price ceiling for the product this will have a net effect of lowering Foundation's margins. Given this, I propose a royalty of 7% on coverplay and 3% on sheets with your fashions. We also talked a lot about annual minimum royalty commitment and discussed our concerns. Although Foundations is in a highly unique situation to maximize market penetration of this product, there are variables outside our control that can effect the volume. We do not want to invest greatly in pioneering and product development, maximize the market, and be in jeopardy of loosing the license because the market is not as big as we had hoped. As a result I propose a minimum annual royalty of $35,000..

I am sure there are other points I am forgetting. I wanted to get something in your hands as soon as possible so we could start working through this. Please provide your feedback.

Sincerely,

Joe

Joseph A. Lawlor
President
Foundations Worldwide, Inc.
Telephone: 330-722-5033 Extension 110
Fax: 330-722-5037

2

EXHIBIT E, PAGE 48

*A58*

jlawlor@foundations.com

Foundations Quality Children's Products
Child Craft
Legacy
CarePlay
Italtrike USA

--
Allison Costa
COVERPLAY
4335 Van Nuys Blvd Suite 370
Sherman Oaks,  CA
91403
917-806-2755
Fax: 818-728-0767
www.coverplayard.com
US Patent | Patents: 7,401,366 - D572,961

CONFIDENTIALITY NOTE: The information contained in this email message and any attachments are legally privileged and confidential information intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message or its attachments is strictly prohibited. If you have received this email in error, please immediately notify us by telephone, fax, or email and delete the message. Thank you.

EXHIBIT E, PAGE 49

*A59*

04-22-10; 10:49AM;                                                    ;                    #  1/  3

 **Foundations**
*Quality Children's Products*

7001 Wooster Pike
Medina, Ohio 44256
Phone: (330) 722- 5033
Fax:     (330) 722-5037

# Fax

| | |
|---|---|
| To: Jon Butte / Disneyland Resort | From: Stan Argabrite / Foundations Worldwide |
| Disney Sourcing and Procurement | |
| Fax: 818-260-7806 | Pages: 3 (including cover sheet) |
| Phone: 714-781-1136 | Date: 4-22-10 |
| Re: **Play Yard Covers** | CC: Virginia Williams - Fax - **334-712-0042** |

● Comments:

Please see the following letter being mailed to your office from Mark Suvak, our Vice President of Product Development, Safety and Compliance, addressing Play Yard Covers.

Please feel free to contact us with any questions.

EXHIBIT F, PAGE 50

**A60**

04-22-10;10:49AM;                                                    ;                    # 2/ 3

# Foundations®

## WORLD LEADER IN HOTEL CRIBS

April 19, 2010

Jon Butte
Disney Sourcing & Procurement
1313 South Harbor Blvd
Anaheim, CA 92802

Dear Jon,

As you are aware, Foundations is a manufacturer of high quality children's cribs and play yards for the hospitality, daycare, and nursery markets.

Foundations has become aware of companies marketing aftermarket play yard covers that are designed to cover the top rails and sides of play yards to help keep them clean and prevent soiling of the fabric. As these covers completely cover the play yard, inside and outside, it is evident that when using the covers, the product warnings provided by Foundations are covered and not available to the parent or caregiver using the product. Foundations is concerned that the safe environment provided by its play yards may thus be compromised. As a result, Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards.

While covering a play yard to keep it clean and prevent soiling of the fabric seems like a good idea, there are several reasons that Foundations recommends against using play yard covers. They are as follows:

1. Play yard covers are designed to cover the top rails of the play yard. Play yard covers that cover the inside of the top rail also cover the warnings provided to ensure correct use. By covering these warnings, the warnings are not available to the parent or caregiver using the product.

2. These warnings are required by the ASTM "*Standard Consumer Safety Specification for Non-Full-Size Cribs and Play yards*". Covering the warnings on the play yard takes the play yard out of compliance with this safety standard.

3. Foundations play yards have been designed for commercial applications in hotels and child care facilities where the play yard is often setup by the hotel staff, or child care center staff, before the guest or caregiver arrives. The play yard covers are also designed for the use with play yards in this application. In consideration of the specifics of this use, and the fact that setup is provided by the hotel or child care staff, Foundations has placed warnings about correct use on the inside of the top rails. Such placement of warnings is done so that information is readily available to the guest or caregiver when they see the play yard setup and ready to use. The play yard cover covers these warnings and thus prevents the guest or caregiver from seeing the warnings to ensure correct use and to prevent injuries.

Page 2 of 2

4. Foundations has not fully tested or evaluated the safety of its play yards when a play yard cover is in use with the play yard. In addition to above mentioned issues, Foundations is concerned about suffocation risks that a loose fitting cover may present. For these reasons, Foundations cannot support using this add-on product as it could compromise the safe environment provided by the play yard.

In summary, the play yard cover takes the play yard out of compliance with the applicable safety standard. The product warnings that Foundations feels the user of the play yards need to see are covered by the play yard cover. Foundations has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers. Foundations recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards. Foundations expressly disclaims all liability for any losses or damages arising out of or relating to any claim or claims for personal injury, illness, disease or death caused by, or alleged to have been caused by play yard covers or the use of play yard covers.

Please feel free to contact us if you have specific questions.

Sincerely,

Mark Suvak
Vice President of Product Development, Safety, and Compliance

EXHIBIT F, PAGE 53

*A63*



Danna Cotman, Esq.

ARC IP Law, PC
7910 Ivanhoe Ave #325
La Jolla, CA  92037
T: 858.729.1927
F: 858.777.5425
danna@arciplaw.com
www.arciplaw.com

MAY 5, 2010

*VIA EMAIL, FAXSIMILE and CERTIFIED MAIL*
*jlawlor@foundations.com*
*msuvak@ foundations.com*
*Fax: (330) 722-5037*
*Certified mail receipt Numbers: 7008 3230 0000 3207 4964*
*and 7008 3230 0000 3207 4972*

Foundations Worldwide, Inc.
Joseph A. Lawlor, President
Mark Suvak, VP Product Development
7001 Wooster Pike
Medina, OH 44256

**RE:    COVERPLAY PLAY YARD COVERS**

Dear Mr. Lawlor & Mr. Suvak,

This law firm has been engaged by Oliver & Tate Enterprise, Inc., DBA COVERPLAY ("COVERPLAY"), in connection with protection of its proprietary and intellectual property rights.

Our client has become aware of recent defamatory correspondence authored by Mark Suvak on behalf of Foundations Worldwide, Inc. ("Foundations") concerning COVERPLAY.  Specifically, we have learned that the Foundations correspondence at issue was distributed to COVERPLAY's customers.  The Foundations correspondence recommends specifically against the use of play yard covers with any Foundations play yards and casts a negative light on our client's products.  While the correspondence does not specifically name our client's product, the letter uses innuendo to identify our client and state that our client's patented product should not be used with any Foundations play yards.  Furthermore, our client's customers who have received the letter believe that the letter is directed to COVERPLAY's product.

Your knowledge regarding our client's product line, customers, business methods and business relationships was obtained under a Nondisclosure Agreement, signed on behalf of Foundations and its employees, effective December 10, 2009.  Any information concerning our client that is or has been furnished by our client, in any manner, to Foundations or its representatives, is proprietary and confidential under the Nondisclosure Agreement.  Foundations has hereby **VIOLATED** this Non Disclosure Agreement by authoring and sending this correspondence to our client's customers.

Given that COVERPLAY's play yard covers have been used in conjunction with Foundations play yard covers in hotels for over two years without incident, the timing of this distribution of the

Case: 13-159    Document: 2    Page: 101    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH    Document 19    Filed 04/16/13    Page 55 of 64    Page ID #:437

Page 2 of 2

correspondence by Foundations is shocking.  In addition, given the nature of the relationship between COVERPLAY and Foundations, it is surprising that Foundations did not previously bring their concerns to COVERPLAY to work out a reasonable resolution prior to the distribution of the Foundations correspondence to our client's customers.  Plainly stated, the timing of Foundations correspondence reeks of underhandedness and malice.  It is specifically suspect, given the particulars of certain business opportunities that COVERPLAY has spent over a year developing and which were disclosed to Foundations under the Non Disclosure Agreement.

In addition to violating the Nondisclosure Agreement, the Foundations correspondence at a minimum constitutes trade libel, product libel, and tortious interference with economic relationships, in addition to other violations of state and federal law.  Our client takes these matters seriously and will vigorously protect its products and business.

**At this time COVERPLAY demands that Foundations immediately:**

1.     Cease and desist sending any further correspondence recommending against the use of our client's play yard covers, whether directly referenced or referenced by innuendo.

2.     Cease and desist from making any negative statements about our client, client's product, safety or product testing.

3.     Cease and desist using or exposing any confidential information covered by the Nondisclosure Agreement.

4.     Provide COVERPLAY with a complete list of all clients, companies or individuals that were sent correspondence relating to play yard covers.

Please respond to this letter in writing no later than May 14, 2010. In the absence of a written response by said date that complies with our demands, our client will conclude that you have no intention of ceasing or remedying this wrongful conduct and shall then pursue all remedies available.

This letter is presented without waiver of any of the rights of our client, all of which are specifically reserved.

Sincerely,
ARC IP LAW, P.C.

Danna Cotman, Esq.
Intellectual Property Counsel for COVERPLAY

DJC:pm
 Cc:    Allison Costa
        Amy Feldman



August 9, 2011

Ms. Sheila Sagansky
Director, Strategic Contracting
Avendra Canada Inc.
112 - 720 6th Street
New Westminster, B.C., Canada
V3L 3C5

Dear Sheila,

As discussed in our recent meetings, Foundations wants to do everything possible to facilitate Marriott using a Cover Play branded play yard cover with Foundations play yard cribs. At this time we would like to present a path way forward to accomplish that. Foundations never had, and still does not have, any desire to be involved in any distributor's, or hotel chain's decision as to whether they sell or utilize any brand of play yard covers. Our sole objective in previous communications concerning play yard covers was to provide the findings of our safety and engineering department so our customers could make informed decisions that are safest for their hotel guests as well as minimize any potential liability for Foundations and its valued business partners.

**Challenge:**
Our reservations with all play yard covers we have evaluated in the market today has to do with compliance to current play yard safety standards, the creation of suffocation hazards due to loose fitting fabric, and whether they are engineered and constructed in a fashion that will be safe, durable, and not fail in a hospitality environment. Additionally, new play yard standards are being written and adopted by the CPSC for all new play yards manufactured after mid-2012. Among many other new tests, the new standard requires that the mattress must securely fasten to the play yard as to eliminate suffocation hazards by the infant becoming lodged under the mattress. To be compliant with this new Federal standard play yard covers should not impede the fastening method. It is further complicated by the fact that fastening methods will vary from manufacturer to manufacturer. Hence, we believe play yard covers must be designed to be "Play Yard Specific" Covers you purchase today that do not take this into consideration will be obsolete soon if your goal is to be compliant with Federal play yard standards while they are in use.

**Solution:**
Foundations has engineered play yard covers to be compliant with new Federal standards while in use on Foundations play yards. If we enter into a license agreement with Cover Play we can produce these covers quickly. Foundations is desirous of manufacturing as to control the quality and, hence, the safety of the product. Cover Play personnel could still be involved as much as Marriott would like in fashion design or any other areas that are important to Marriott. The covers could be produced in the same fashions, fabrics, and designs you currently use so you

---

EXHIBIT H, PAGE 56

*A66*

achieve continuity. Cover Play would be compensated for the value they add to the product by the royalties they receive from Foundations. Marriott would benefit from the Foundations safety and quality combined with the Cover Play design and branding. As is the case with all Foundations products we would provide Marriott with certification to all federal standards supported by third party independent testing. The products would also be covered under Foundations extensive product liability insurance policy listing Marriott as an additional insured. We would also immediately put the products into distribution with any of the distributors you wish to buy from.

If this solution is viable for Marriott we will immediately put resources toward executing it. In the event this is the pathway forward it would be most helpful for Marriott to contact Cover Play and advocate this course of action. Foundations could then immediately go into discussions about agreement and product with Cover Play.

Respectfully Submitted,

*Mark Suvak*

Mark Suvak
Vice President of Product Development, Quality, and Safety Compliance
330-636-6642
msuvak@foundations.com

cc: Scott Hancock, Marriott

EXHIBIT H, PAGE 57

*A67*



EXHIBIT I, PAGE 58

# Safe.

Crisp, white linens complement all hotel rooms. The sleek design integrates with the play yard beautifully for a tidy look. Microfiber is wrinkle resistant and looks great even after many washings. A visibly sanitary crib makes a great impression.



EXHIBIT J, PAGE 59

*A69*

# HANKIN PATENT LAW, APC

12400 Wilshire Boulevard, Suite 1265
Los Angeles, CA  90025
Telephone:  (310) 979-3600
Facsimile:  (310) 979-3603
Marc@HankinPatentLaw.com
February 22, 2013

**Via Email With Confirmation via U.S. Mail**

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
7001 Wooster Pike
Medina, Ohio  44256
jlawlor@foundations.com

Re:    **SleepFresh Crib Covers and Your Infringement of COVERPLAY's Patents**

Dear Mr. Lawlor:

Our firm is Intellectual Property Litigation Counsel for Oliver & Tate Enterprises, Inc. *dba* COVERPLAY ("COVERPLAY").  As you know, COVERPLAY designs and produces slipcovers for portable play yards.  COVERPLAY is the owner of multiple U.S. Patents, including U.S. Patent No. 7,401,366 ("the '366 Patent") and U.S. Patent No. D572,961 ("the '961 Patent").

You are hereby warned and notified to **CEASE AND DESIST** making, using, selling, and/or offering to sell Foundations Worldwide, Inc.'s ("Foundations") SleepFresh Crib Covers, because your product belongs to our Client.  You are currently **infringing** and we **DEMAND that you immediately stop.**  If you do not immediately agree to cease all activities related to the SleepFresh Crib Covers, we will take all action necessary to protect our Client's Intellectual Property.

Your failure to comply with our Client's Cease and Desist demand will result in our Client's full and forceful prosecution of all rights, including contacting your current and potential customers to request that they do not purchase the infringing products.  In addition, our Client is prepared to go forward with litigation alleging that: 1) your company has illegally made, used, sold, and/or offered to sell a product that clearly infringes our Client's Intellectual Property Rights; 2) you have defamed our Client by committing trade libel; 3) you have breached the Mutual Confidentiality Agreement between Foundations and COVERPLAY; 4) you have intentionally interfered with a prospective economic advantage to COVERPLAY; 5) you have intentionally interfered with the Distribution Agreements between COVERPLAY and its distributors; 6) you have misappropriated COVERPLAY's trade secrets; and 7) you have committed conversion by taking possession of COVERPLAY's Product and claiming it belongs to you.

Accordingly, we expect you to comply with COVERPLAY's Cease an0d Desist demand so that we can avoid unnecessary litigation.

EXHIBIT K, PAGE 60

*A70*

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 2 of 5

### I.    <u>Background</u>

In 2009, you met with COVERPLAY's owners and business partners, Allison Costa and Amy Feldman.  The purpose of this meeting was to discuss the possibility of COVERPLAY working with Foundations.

In December 2009, you sent an email to Ms. Costa and Ms. Feldman.  In this email you stated that you "are confident that there is a lot of mutual benefit in a partnership between our companies." In your email, you also stated that it was "important that we get samples of the product as soon as possible" and requested that COVERPLAY forward you a Non-Disclosure Agreement.  Ms. Feldman responded to your email by attaching a Non-Disclosure Agreement, and requested that you sign the Agreement.

You subsequently *signed* the Non-Disclosure Agreement, and indicated your title as "President" of Foundations.  You agreed that any Evaluation Material you received would be kept confidential and that you would not disclose any of the Evaluation Material in any manner whatsoever to any other person.  The Evaluation Material that you received consisted of confidential information – including our Client's Product line, our Client's customers, our Client's distributors, and a timeline of the relevant dates related to our Client's Product such as when and where the Product would be shipped.

In early 2010, you attempted, multiple times, to push COVERPLAY to enter into a Licensing Agreement with you, in which COVERPLAY would license its Product to Foundations.  On January 29, 2010, you offered various terms for this proposed Licensing Agreement, including the following: "Cover Play would agree to defend the patent, and Foundations, in any suits from other companies that may sue for patent infringement, and agree to be responsible for any settlements or judgments. [Our attorney] said this language is present in virtually all license agreements and it is standard and customary **for the patent holder** to agree to this."  Thus, you acknowledged that COVERPLAY owns the patent you sought to license.

Despite your multiple attempts, however, COVERPLAY repeatedly turned down your offers, and consistently refused to enter into a Licensing Agreement with Foundations.  Upon COVERPLAY's rejection, you engaged in actions that were entirely irrational and unwarranted. Your crusade of misinformation included sending letters to COVERPLAY's customers, hotels, and distributors – including Disney, Marriott, Wyndham, and American Hotel Register – in which you attacked COVERPLAY's product without any justification.  For example, in Foundations' April 2010 letter to Disney Sourcing & Procurement, Foundation's Vice President of Product Development, Safety, and Compliance, Mark Suvak, stated: "Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards… Foundation has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers.  Foundation recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards."  However, you already had tested and evaluated the safety of our Client's Product, despite the letter indicating otherwise.  Moreover, you were fully aware that there were no actual safety concerns with our Client's Product in light of your ongoing communications with COVERPLAY.  There was thus absolutely no reason for your Vice President to send a letter full of such blatant inaccuracies.

EXHIBIT K, PAGE 61

**A71**

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 3 of 5

        In May 2010, COVERPLAY had its counsel, ARC IP Law, PC, send you a letter regarding the defamatory correspondence authored by Mr. Suvak.  This letter informed you that you engaged in improper actions because of these defamatory statements, and that you violated the Non-Disclosure Agreement – which you signed – by having your Vice President send frivolous letters to COVERPLAY's customers and hotel distributors.

        Despite being warned that your actions relating to COVERPLAY have been completely inappropriate and improper, your crusade of misinformation nevertheless continued.

        On August 9, 2011, you had your Vice President, Mr. Suvak, send a meritless letter to Avendra Canada Inc. regarding COVERPLAY and Marriott.  The letter falsely suggested that there were safety concerns with slipcovers such as COVERPLAY's Product, and that "[c]overs you purchase today that do not take this into consideration will be obsolete soon if your goal is to be compliant with Federal play yard standard while they are in use."  Mr. Suvak' letter specifically identified COVERPLAY, and Foundations' persistent push to "enter into a license agreement with Cover Play[.]"  The letter also acknowledged the significance of COVERPLAY's Patents by stating, "Marriott would benefit from the Foundations safety and quality combined **with the Cover Play design and branding.**"  Finally, the letter concluded with a bizarre and highly unusual request – "it would be most helpful for Marriott to contact Cover Play and advocate this course of action. Foundations could then immediately go into discussions about agreement and product with Cover Play."  It is simply outrageous that Foundations even attempted to convince Marriott to push COVERPLAY to enter into a Licensing Agreement with Foundations.

        As a result of Foundations' sending this baseless and unjustified letter, COVERPLAY was forced to send a letter to Marriott the following day, in which COVERPLAY had to explain: "COVERPLAY is a totally safe product which Foundation well knows… COVERPLAY fully complies with all current safety standards… We have no desire to enter into a license agreement with Foundations at this time… our product is totally safe and has never received ONE SINGLE SAFETY COMPLAINT."

        In early 2013, your crusade of misinformation and deceit reached an alarming and shocking point.  On the Foundations website, you are now featuring and promoting SleepFresh Crib Covers. Not only do the SleepFresh Crib Covers completely and totally infringe COVERPLAY's Patents, but you even have the audacity to falsely present COVERPLAY's slipcovers on your website.  You placed an "X" next to an image of COVERPLAY's slipcover (presumably to falsely indicate the Product is not safe), even though you are fully aware that the image is not depicting the proper usage of COVERPLAY's Product.

        Because of your improper conduct, COVERPLAY has suffered substantial economic damages – including distributors dropping COVERPLAY, and business transactions involving COVERPLAY falling apart.  In addition, it is absurd that you would so blatantly infringe COVERPLAY's Patents when: 1) you have acknowledged multiple times that COVERPLAY owns these Patents; 2) you have complimented and spoken positively about COVERPLAY's patented design; 3) you have insisted that COVERPLAY enters into a Licensing Agreement with Foundations regarding COVERPLAY's Patents; and 4) you had an opportunity to purchase COVERPLAY's Patents.  Accordingly, we expect you to comply with COVERPLAY's demands.

EXHIBIT K, PAGE 62

*A72*

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 4 of 5

## II.    **COVERPLAY's Demands**

Simply put, this letter is your final warning.  Your actions have been completely inappropriate, and COVERPLAY is prepared to seek Court intervention if you do not put an end to your unnecessary crusade.

Accordingly, COVERPLAY demands that you do the following:

1) You immediately cease and desist from making, using, selling, and/or offering to sell SleepFresh Crib Covers;

2) You immediately cease and desist from referencing SleepFresh Crib Covers in all mediums, including but not limited to, Foundations' websites, catalogs, sales rallies, trade shows, and correspondences;

3) You agree to refrain from falsely commenting on COVERPLAY, including but not limited to, attacking nonexistent safety and quality issues related to COVERPLAY;

4) You agree to refrain from contacting COVERPLAY's distributors for the purpose of attempting to persuade distributors to convince COVERPLAY to enter into a licensing agreement with Foundations;

5) You agree to fully comply with the Non-Disclosure Agreement that you signed in 2009;

6) You agree to produce a complete list of all clients, companies, hotels, distributors, and/or individuals that were sent correspondence relating to COVERPLAY, or slipcovers for portable play yards in general.

We require a written response to this letter on or before the close of business on **March 4, 2013**, affirmatively agreeing to the terms outlined above so that we may attempt to resolve this matter without incurring any further unnecessary legal expenses on our Client's behalf.  Because Foundations cannot possibly prevail, I am optimistic that Foundations will comply with COVERPLAY's requests without Court intervention.  COVERPLAY is sincerely hopeful that this matter can be resolved amicably.

Nevertheless, COVERPLAY is prepared to go forward with litigation if necessary.  Should Foundations refuse to comply promptly with COVERPLAY's requests, Foundations will have infringed COVERPLAY's Patents – the '366 Patent and the '961 Patent.  *See* 35 USC § 271. Second, you will have defamed COVERPLAY by disparaging the quality of COVERPLAY's products and services.  *Computerexpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010.  Third, you will be in breach of the Non-Disclosure Agreement between Foundations and COVERPLAY, which you clearly signed.  *Acoustics, Inc. v. Trepte Construction Co.* (1971) 14 Cal.App.3d 887, 913. Fourth, Foundations will have intentionally interfered with a prospective economic advantage to COVERPLAY by interfering with the future economic benefit that COVERPLAY would have received as a result of its work, its relationship with its customers and distributors, and any potential transactions involving COVERPLAY that were interfered with by Foundations.  *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6.  Fifth, Foundations will have intentionally interfered with the

EXHIBIT K, PAGE 63

*A73*

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 5 of 5

Distribution Agreements between COVERPLAY and its distributors. *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126. Sixth, Foundations will be in violation of the *Uniform Trade Secrets Act* due to Foundation's misappropriation of COVERPLAY's trade secrets. *See* Cal. Civ. Code 3426.1. Seventh, Foundations will be liable for conversion by taking possession of COVERPLAY's Product and claiming it belongs to Foundations. *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 50.

I look forward to receiving your confirmation that Foundations intends to comply with COVERPLAY's demands. Should you have any questions, comments, or concerns, please bring them to my attention directly. Thank you very much for your time and consideration.

Sincerely yours,
**HANKIN PATENT LAW, APC**

/Marc E. Hankin/

Marc E. Hankin, Esq.

cc: COVERPLAY

EXHIBIT K, PAGE 64

*A74*

1   James W. Paul (State Bar No. 90,133)
       jpaul@fulpat.com
2   James Juo (State Bar No. 193,852)
       jjuo@fulpat.com
3   FULWIDER PATTON, LLP
    Howard Hughes Center
4   6060 Center Drive, Tenth Floor
    Los Angeles, California 90045
5   Telephone:  (310) 824-5555
    Facsimile:  (310) 824-9696
6
7   Attorney for Defendants,
    FOUNDATIONS WORLDWIDE, INC.,
    JOSEPH A. LAWLOR and DOES 1 through 5
8

9                **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11

12  OLIVER & TATE ENTERPRISES,           CASE NO. CV13-01683 RGK (SH)
    INC.
13              Plaintiff,               DECLARATION OF JOSEPH A.
                                         LAWLOR IN SUPPORT OF MOTION
14          v.                           TO DISMISS

15  FOUNDATIONS WORLDWIDE,
    INC., et al.
16              Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH A. LAWLOR
                                        1

***A75***

1    I, Joseph A. Lawlor, am the adult individual who was named personally as a

2    Defendant in the present action filed by Oliver & Tate Enterprises, Inc. in

3    California, declares as follows.

4    1.    I am the President of Foundations Worldwide, Inc. ("Foundations") that

5    filed the lawsuit against Oliver & Tate in the Northern District of Ohio, and was

6    sued by Oliver & Tate Enterprises, Inc. in the U.S. District Court for the Central

7    District of California.

8    2.    Prior to filing the lawsuit in the U.S. District Court for the Northern

9    District of Ohio, Foundations wanted to make another attempt to resolve this matter,

10   however the attorney for Oliver & Tate Enterprises, Inc. would not give Foundations

11   enough time to try to resolve the matter.

12   3.    My home address is not 5216 Portside Drive, Medina, Ohio. However,

13   I do live and work in Medina County, Ohio.

14   4.    I do not have a regular and established place of business in California.

15   Foundations does not have any employees in California, nor any facilities in

16   California.

17   5.    I was not personally handed the Summons and Complaint that was filed

18   in the Central District of California. I am informed that those documents were

19   handed to Steve Puto, who is the Warehouse Manager for Foundations and works at

20   5216 Portside Drive, Medina, Ohio 44256.  Steve Puto is not an agent of mine or

21   Foundations who is authorized by appointment or law to receive service of process.

22   6.    Foundations is a supplier of hotel and childcare cribs in the United

23   States. For over ten years Foundations has sold child care products. Foundations

24   owns numerous patents on child care products. In the many years that Foundations

25   has been selling child care products, Foundations has developed many business

26   relationships, and has many long-standing customers.

27   7.    In December 2009, Allison B. Costa and Amy Feldman of Oliver &

28   Tate Enterprises, Inc. travelled to Medina, Ohio to meet with Foundations.

DECLARATION OF JOSEPH A. LAWLOR

2

*A76*

8.    Since 2010, Oliver & Tate Enterprises, Inc., or its predecessor, has told customers that Foundations was infringing the patents-in-suit. At least one customer has asked for indemnification from Foundations for the alleged infringement of those patents.

9.    The play yards of Foundations and the play yard cover of Foundations were developed, designed, researched, and tested in Ohio. The play yards and play yard covers were not developed, designed, researched, tested or manufactured in California.

10.    Foundations' employees in Ohio also control development of the documentation, such as user manuals and instructions for operation of the play yard.

11.    Foundations does not store or maintain records relevant to its play yard or play yard covers in California. Documents relating to the technical features and operation of the play yard and documents concerning the play yard cover product are located at the Foundations' facilities in the Northern District of Ohio.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 1, 2013.

Joseph A. Lawlor

DECLARATION OF JOSEPH A. LAWLOR

3

*A77*



James W. Paul (State Bar No. 90,133)
jpaul@fulpat.com
James Juo (State Bar No. 193,852)
jjuo@fulpat.com
FULWIDER PATTON, LLP
Howard Hughes Center
6060 Center Drive, Tenth Floor
Los Angeles, California 90045
Telephone: (310) 824-5555
Facsimile: (310) 824-9696

Attorney for Defendants,
FOUNDATIONS WORLDWIDE, INC.,
JOSEPH A. LAWLOR and DOES 1 through 5

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OLIVER & TATE ENTERPRISES, INC.<br><br>Plaintiff,<br><br>v.<br><br>FOUNDATIONS WORLDWIDE, INC., et al.<br><br>Defendants. | CASE NO. CV13-01683 RGK (SH)<br><br>SECOND DECLARATION OF JOSEPH A. LAWLOR IN SUPPORT OF MOTION TO DISMISS<br><br>Date:     May 6, 2013<br>Time:     9:00 AM<br>Ctrm:     850, Roybal Building |

1

I, Joseph A. Lawlor, do hereby declare as follows:

1.     I was sued individually by Oliver & Tate Enterprises, Inc. ("Oliver & Tate") in this lawsuit despite this matter only involving Foundations. I am also the President and an employee of Foundations Worldwide, Inc. ("Foundations") that is also a Defendant in this lawsuit. Unless otherwise indicated, I have personal knowledge of the facts stated herein, and, if called as a witness, could and would testify to the following matters.

2.     For over ten years Foundations has designed, manufactured and sold innovative child care products to the hotel and child care industry. Foundations has been granted numerous patents for its novel child care products.

3.     Foundations' offices are located in Medina County, Ohio. Our warehouse is located at 5216 Portside Drive, Medina, Ohio 44256. Foundations is not located at 521<u>8</u> Portside Drive, Medina, Ohio 44256, the address that was used for an attempted service of the Complaint.

4.     I live in Ohio, I do not own any property in California, and Foundations does not own any property in California. Foundations also does not have any employees or facilities in California.

5.     I have not been in California for anything related to play yard covers.

6.     I have not met with anyone from Hilton Worldwide in California since Foundations began its relationship with Oliver & Tate in December 2009. The Director of Procurement for Hilton Worldwide that is referenced in Paragraph 14, page 3 of the Declaration of Amy Feldman no longer is employed by Hilton and I do not know her whereabouts. Presently, all the people responsible for buying cribs or play yard covers for Hilton Worldwide are in the McLean, Virginia office of Hilton Worldwide.

7.     Neither Foundations nor I aimed any activities against Oliver & Tate and we have intended no harm to Oliver & Tate.

DECLARATION OF JOSEPH A. LAWLOR

2

8.      The relationship between Oliver & Tate and Foundations began in December 2009 when Allison B. Costa and Amy Feldman of Oliver & Tate traveled to the Northern District of Ohio to meet with Foundations.  We met Ms. Costa and Ms. Feldman at the Cleveland, Ohio airport, took them to dinner at the House of Hunan in Medina, Ohio and arranged for their lodging at the Hampton Inn in Medina County, Ohio.

9.      Oliver & Tate and Foundations explored a possible business relationship and we entered into a Mutual Confidentiality Agreement ("Agreement") that governed the disclosure of trade secret and confidential information.  The Agreement expired in 2010.  After the meeting, Foundations and Oliver & Tate continued to discuss a possible license arrangement, but have not entered into a license agreement.

10.      Neither Foundations nor I have personal knowledge of any executed contracts between Oliver & Tate and a third party.

11.      At the time of the initial meeting with Oliver & Tate, the two patents of Oliver & Tate had issued and were publicly available.

12.      Foundations received a February 25, 2010 letter concerning ARMs Reach Concepts, Inc. that indicated that the play yard cover of Oliver & Tate may infringe the patents of ARM's Reach Concepts, Inc.  The letter was addressed to both Foundations and Oliver & Tate.

13.      Foundations began to review the patents of Oliver & Tate and those of Oliver & Tate's competitors.  Foundations determined that the Oliver & Tate patents were narrow and contained limited inventions.  It eventually became evident that Foundations would need to design around all the issued patents and invent a novel play yard with a play yard cover that was distinct from the competitors.

14.      In 2010, Foundations' long-time customers asked Foundations if play yard covers could be used with Foundations' original play yard.  The customers

DECLARATION OF JOSEPH A. LAWLOR

3

1  demanded that Foundations respond in writing, which resulted in the April 2010

2  letters ("Safety Letters"). Exh. A. The Safety Letters were sent by Mark Suvak,

3  who was then the Vice President of Product Development, Safety and Compliance

4  of Foundation. Mark Suvak is a possible witness and he is no longer an employee

5  of Foundations. He does not live in California.

6        15.   The Safety Letters do not mention Oliver & Tate or its products. The

7  Safety Letters only indicate that play yard covers that cover the top rails of a play

8  yard hide the mandatory safety warnings. It is my understanding that if the

9  warnings required by ASTM "Standard Consumer Safety Specifications for Non-

10  Full Size Cribs and Play Yards" are not visible, the safety standard is not met. The

11  Safety Letters mention that play yard covers that have loose fitting material could

12  cause a suffocation risk for a baby. Due to those two factors, Foundations indicated

13  that play yard covers on the market in 2010 should not be used with the then current

14  Foundations' play yard. Foundations did not mention the Oliver & Tate products.

15  One safety consultant for the play yard covers is a possible witness and he lives in

16  Ohio. He is not an employee of Foundations.

17        16.   Foundations received a May 5, 2010 cease and desist letter from Oliver

18  & Tate indicating that Foundations had not complied with its Agreement and that

19  the Safety Letters were false. Foundations believes it has complied with the

20  Agreement and that the Safety Letters were true and helped to keep babies safe.

21  Foundations responded to the cease and desist letter and thought the matter was

22  resolved.

23        17.   After the expiration of the Agreement with Oliver & Tate, Foundations

24  began to develop a novel play yard with an accompanying play yard cover. The

25  play yard and the play yard cover were developed, designed, researched and tested

26  in Ohio. The play yard and play yard cover were not developed, designed,

27  researched, tested or manufactured in the State of California. The safety consultant

28

4

DECLARATION OF JOSEPH A. LAWLOR

1  for the safety testing of the new play yard and play yard cover is not an employee of

2  Foundations, and that safety consultant lives in the Northern District of Ohio.

3      18.    Foundations' employees in Ohio control the development of the

4  documentation of the allegedly infringing product.  Foundations does not store or

5  maintain records relevant to its play yard or play yard covers in California.

6  Documents relating to the play yard cover product are located at the Foundations

7  facilities in the Northern District of Ohio.

8      19.    In 2011, Marriott Hotels indicated that they wanted to work with both

9  Oliver & Tate and Foundations concerning play yards and play yard covers.  This

10  was not an initiative that was started by Foundations.  Marriott Hotels was the

11  originator of the request for a mutual project between Oliver & Tate and

12  Foundations.  Marriott Hotels asked Foundations to come up with a way that Oliver

13  & Tate and Foundations could work together for the benefit of Marriott Hotels.  The

14  August 9, 2011 letter from Mark Suvak to Avendra Canada, Inc., an entity that

15  purchases merchandise for Marriott Hotels, resulted from Marriott's request to

16  Foundations.  Nothing came of the initiative.

17      20.    In February 2012, Oliver & Tate contacted Foundations and indicated

18  that Foundations should work together with Oliver & Tate.  Nothing came of that

19  contact.

20      21.    Oliver & Tate is not mentioned or referred to on the Foundations' web

21  site.

22      22.    Some of Foundations' customers are being told by Oliver & Tate that

23  Foundations' new product, a play yard cover that accompanied the Foundations'

24  new play yard, infringed Oliver & Tate's patents.  At least one Foundations'

25  customer requested indemnification from Foundations.

26      23.    On February 28, 2013, Foundations received in the United States mail

27  the cease and desist letter that is Exhibit A of the Declaration of James Juo.  I did

28

5

not receive the cease and desist nor know of the existence of the cease and desist letter until Thursday, February 28, 2013.

24.     I have not seen an e-mail from the attorney for Oliver & Tate that was allegedly sent to the e-mail system of Foundations on February 22, 2013.  Since being told that the e-mail existed, I have tried to find it with no luck.  Foundations did not have any knowledge of the Oliver & Tate cease and desist letter until February 28, 2013.

25.     Foundations took the cease and desist letter seriously.  Foundations received the letter on Thursday, February 28, 2013 and the demand for a response was Monday, March 4, 2013, two and one-half business days later.  The Foundations Compliance Specialist left a voice mail with the office of Marc Hankin when the cease and desist letter was first received.

26.     Foundations decided that a lengthy discussion of Foundations view of its relationship with Oliver & Tate was warranted and would be an appropriate response to the letter.  Foundations believed that discussing the reasons why it did not infringe the patents would allow Oliver & Tate to reconsider the matter and end the controversy.

27.     Foundations began obtaining the correspondence referred to in the cease and desist letter and trying to develop a possible amicable solution that Oliver & Tate might find appealing.  In that conciliatory vein, our Compliance Specialist requested fourteen (14) days to respond to the strident cease and desist letter.  It appeared that the matter could be resolved amicably, despite the tone of the letter.  Foundations was hopeful that a spirit of cooperation instead of a harsh tone would prevail after Oliver & Tate reviewed the reasons why Foundations did not infringe any of the Oliver & Tate patents.  The e-mails between Foundations and Oliver & Tate have been put in an easy to review format and are attached as Exhibit B.

28.     Another complication to the plan to inform Oliver & Tate of

1  Foundations' view of its relationship with Oliver & Tate and why Foundations did

2  not infringe the Oliver & Tate patents was that our intellectual property lawyers,

3  Walker & Jocke, were all out of the office on Monday, March 4, 2013.  I believe

4  there was a regional intellectual property seminar that day.

5    29.    The reaction of Oliver & Tate's lawyers to the reasonable request for a

6  total of  18 full days from the date of receipt of the cease and desist letter to respond

7  concerning the patent infringement allegations was that our legal counsel will advise

8  us that "there is no good defense" for what Foundations did.  Exhibit B, March 5,

9  2013, 7:37 p.m., Hankin e-mail.  The e-mail went on to say that we had another two

10  and one-half days to "resolve this amicably," and "If not, then we [Oliver & Tate]

11  will be filing the Complaint in Federal Court on Friday afternoon."  Exhibit B,

12  March 5, 2013, 7:37 p.m., Hankin e-mail.  It was beginning to appear that we had no

13  option to suggest a solution; our only option was to agree to Oliver & Tate's

14  demands or to be sued.

15    30.    Foundations Compliance Specialist responded at 8:14 a.m. the next

16  morning reducing the amount of time requested to respond to one week (13 full days

17  from receipt of the case and desist letter).  Exhibit B, March 6, 2013, 8:14 a.m.,

18  Haid e-mail.

19    31.    Oliver & Tate's lawyer responded that Foundations had to stop "its

20  tortious behavior" before Friday or be sued, and he threatened a preliminary

21  injunction.  Exhibit B, March 6, 2013, 12:10 p.m., Hankin e-mail.  He further

22  threatened to publicize the "wrongs that Foundations has committed."  The

23  communications were not conducive to amicably resolving the matter.

24    32.    On March 6, 2013 at 4:43 p.m., Foundations' Compliance Specialist

25  responded to the Oliver & Tate's lawyer's e-mail without knowing that Foundations

26  had already decided to protect itself by filing a declaratory judgment complaint in

27  the Northern District of Ohio.

28

DECLARATION OF JOSEPH A. LAWLOR

7

33.     Foundations had been dealing with questions from customer about infringing the Oliver & Tate patents, and requests for indemnification, demands from Oliver & Tate for a list of customers who Foundations had talked to about play yard covers, and Oliver & Tate's lawyer's accusatory language and threats of a lawsuit. The communications from the attorney for Oliver & Tate were increasingly nasty and it became apparent that presenting Foundations' view of matters was not going to resolve anything. After the communications from the attorney for Oliver & Tate continued to state that unless Foundations admitted that it was wrong and liable for damages to Oliver & Tate a Complaint was going to be filed in Federal District Court in California on Friday afternoon, Foundations made the decision during March 6 that a Complaint in Ohio needed to be filed. That Complaint was filed the next day. The California lawsuit was filed on March 8, 2013. It is my belief that Oliver & Tate's lawyer was told of the Ohio lawsuit within 24 hours of the suit being filed.

34.     Any relevant witnesses or evidence from our customer, Kaplan, would be in Winston-Salem, North Carolina. Hertz and Buy Buy Baby are contacted by Foundations in New Jersey, and that would be the location for any relevant witnesses or evidence. Foundations interacts with Constructive Playthings in Kansas City, Missouri and that would be where any relevant witnesses or evidence would be located. Grainger and American Hotel Register are located in Chicago, Illinois and that would be where any relevant witnesses or evidence would be located. Foundations does work with Disney at its Florida Headquarters. Foundations has discussed play yard covers with Disney in Florida, Hilton Worldwide in Virginia, and American Hotel Register in Illinois.

35.     Oliver & Tate mentioned Guest Supply as a possible source of evidence and witnesses. The central national crib buying office of Guest Supply is located in Lorain, Ohio and that would be where Foundations conducts its business with Guest

DECLARATION OF JOSEPH A. LAWLOR

8

1    Supply.  Lorain is located in the Northern District of Ohio.

2          36.    Foundations continues to want to resolve this matter amicably; however

3    its communications with the attorney for Oliver & Tate have not been productive.  I

4    believe we offered an extension of time for briefing in both the Ohio and California

5    cases so that there would be time to think about settlement, but that was rejected.

6          I declare under penalty of perjury that the foregoing is true and correct.

7    Executed on April 19, 2013.

8

9                                                    Joseph A. Lawlor

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH A. LAWLOR

9

 **Foundations**

## WORLD LEADER IN HOTEL CRIBS

April 19, 2010

Jon Butte
Disney Sourcing & Procurement
1313 South Harbor Blvd
Anaheim, CA 92802

Dear Jon,

As you are aware, Foundations is a manufacturer of high quality children's cribs and play yards for the hospitality, daycare, and nursery markets.

Foundations has become aware of companies marketing aftermarket play yard covers that are designed to cover the top rails and sides of play yards to help keep them clean and prevent soiling of the fabric. As these covers completely cover the play yard, inside and outside, it is evident that when using the covers, the product warnings provided by Foundations are covered and not available to the parent or caregiver using the product. Foundations is concerned that the safe environment provided by its play yards may thus be compromised. As a result, Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards.

While covering a play yard to keep it clean and prevent soiling of the fabric seems like a good idea, there are several reasons that Foundations recommends against using play yard covers. They are as follows:

1. Play yard covers are designed to cover the top rails of the play yard. Play yard covers that cover the inside of the top rail also cover the warnings provided to ensure correct use. By covering these warnings, the warnings are not available to the parent or caregiver using the product.

2. These warnings are required by the ASTM *"Standard Consumer Safety Specification for Non-Full-Size Cribs and Play yards"*. Covering the warnings on the play yard takes the play yard out of compliance with this safety standard.

3. Foundations play yards have been designed for commercial applications in hotels and child care facilities where the play yard is often setup by the hotel staff, or child care center staff, before the guest or caregiver arrives. The play yard covers are also designed for the use with play yards in this application. In consideration of the specifics of this use, and the fact that setup is provided by the hotel or child care staff, Foundations has placed warnings about correct use on the inside of the top rails. Such placement of warnings is done so that information is readily available to the guest or caregiver when they see the play yard setup and ready to use. The play yard cover covers these warnings and thus prevents the guest or caregiver from seeing the warnings to ensure correct use and to prevent injuries.

**LAWLOR DECL. EXHIBIT A, PAGE 10**

*A87*

Page 2 of 2

4.  Foundations has not fully tested or evaluated the safety of its play yards when a play yard cover is in use with the play yard. In addition to above mentioned issues, Foundations is concerned about suffocation risks that a loose fitting cover may present. For these reasons, Foundations cannot support using this add-on product as it could compromise the safe environment provided by the play yard.

In summary, the play yard cover takes the play yard out of compliance with the applicable safety standard. The product warnings that Foundations feels the user of the play yards need to see are covered by the play yard cover. Foundations has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers. Foundations recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards. Foundations expressly disclaims all liability for any losses or damages arising out of or relating to any claim or claims for personal injury, illness, disease or death caused by, or alleged to have been caused by play yard covers or the use of play yard covers.

Please feel free to contact us if you have specific questions.

Sincerely,

Mark Suvak
Vice President of Product Development, Safety, and Compliance

**LAWLOR DECL. EXHIBIT A, PAGE 11**

*A88*

On Mar 5, 2013, at 9:18 AM, "Lisa Haid" <lhaid@foundations.com> wrote:

Dear Mark,


Thank you for your letter dated February 22, 2013. Although it was dated February 22 it was just recently received. The letter was extensive and in order to provide an appropriate response we will need 14 days to respond. We will respond by March 18, 2013.


I am sure this matter can be handled amicably.


Sincerely,




*Lisa Haid*

Compliance Specialist

Foundations Worldwide, Inc.

phone: 330.722.5033 ext 102

fax: 330.722.5037

www.foundations.com


**LAWLOR DECL. EXHIBIT B, PAGE 12**


*A89*

**From:** Marc E. Hankin [mailto:Marc@hankinpatentlaw.com]
**Sent:** Tuesday, March 05, 2013 7:37 PM
**To:** Lisa Haid
**Cc:** Nima Darouian; Court Filing
**Subject:** Re: Letter to Foundations of Feb 22, 2103

Dear Lisa,

I always hate to start a relationship off on the wrong foot.  Nonetheless, my Clients take very seriously your company's actions.  We already have given what we believe to be an adequate amount of time to:  consider what your company has done wrong; consult legal counsel who will advise you there is no good defense for what has been done; and get back to us with your proposal for remedying the situation promptly.

As a show of good faith, I have convinced my Clients to authorize me to give your company until Noon this coming Friday, March 8, to resolve this amicably.  If not, then we will be filing the Complaint in Federal Court on Friday afternoon.

Please act accordingly.

Thank you,

Marc

**LAWLOR DECL. EXHIBIT B, PAGE 13**

On Mar 6, 2013, at 8:14 AM, "Lisa Haid" <lhaid@foundations.com> wrote:

Dear Marc,

Thank you for your reply. I want you to know that we will do everything we can to respond as quickly possible and that we understand your urgency to resolving this.  We are also desirous of resolving it as quickly as possible and doing so without any legal action.  Please understand, however, that we have only had your letter for two full business days.  We have turned it over to legal counsel and are pushing them to respond to you quickly.  We have instructed them to be in touch with you to attempt to work out an acceptable resolution.  We ask at this time if we could please have until the 13th to respond, which is only one week from today.  They want to look at all the information, be sure they fully understand your concerns and facts, and come back to you with something that is constructive.

 Please confirm your receipt of this e-mail at your convenience. Again, we are hopeful that we can work through this quickly.

Regards,

Lisa

*Lisa Haid*

Compliance Specialist

Foundations Worldwide, Inc.

 phone: 330.722.5033 ext 102

fax: 330.722.5037

www.foundations.com

**LAWLOR DECL. EXHIBIT B, PAGE 14**

*A91*

**From:** Marc E. Hankin [mailto:Marc@hankinpatentlaw.com]
**Sent:** Wednesday, March 06, 2013 12:10 PM
**To:** Lisa Haid
**Cc:** Nima Darouian
**Subject:** Re: Letter to Foundations of Feb 22, 2103

Dear Lisa,

I appreciate your diligence in seeking an extension of time.  I cannot understand why you have not had sufficient time to review and respond, but we did not cause your delay.

Frankly, when you failed to respond timely, by Monday, my Clients authorized us to draft a Complaint.  They are reviewing it now.  They have instructed me to file it at 12:01 pm on Friday unless your company has agreed to stop its tortious behavior before that time.  They are not willing to extend the deadline a second time.

I do hope that you will understand, because they feel really wronged by Foundations, and as we have advised them that the Federal Court will likely issue a Preliminary Injunction once we have filed, that is what they have instructed me to do to protect their rights and vindicate your company's infringement and trade libel.

Please have your attorney get in touch with me today or tomorrow with a proposed resolution if you want to avoid our filing publicly all of the wrongs that Foundations has committed.

Seriously,

Marc

**LAWLOR DECL. EXHIBIT B, PAGE 15**

*A92*

**From:** Lisa Haid [mailto:lhaid@foundations.com]
**Sent:** Wednesday, March 06, 2013 4:43 PM
**To:** 'Marc E. Hankin'
**Subject:** RE: Letter to Foundations of Feb 22, 2103

Dear Marc,

We are pushing our legal counsel as hard as possible and they have said they will respond to you by the weekend. Please understand that because of when your letter arrived at our office, Monday was the first day they saw it.

It is all new to them and they need time to review all of the past correspondence you referenced in your letter. They also have other things, such as court, they have to plan around this week. Because of that they will not be in touch today but may be able to call you tomorrow between other meetings. If not they will be in touch Friday.

Thank you,

*Lisa Haid*

Compliance Specialist

Foundations Worldwide, Inc.

phone: 330.722.5033 ext 102

fax: 330.722.5037

www.foundations.com

**LAWLOR DECL. EXHIBIT B, PAGE 16**

*A93*

1  James W. Paul (State Bar No. 90,133)
   jpaul@fulpat.com
2  James Juo (State Bar No. 193,852)
   jjuo@fulpat.com
3  FULWIDER PATTON, LLP
   Howard Hughes Center
4  6060 Center Drive, Tenth Floor
   Los Angeles, California 90045
5  Telephone: (310) 824-5555
   Facsimile: (310) 824-9696
6
7  Attorney for Defendants,
   FOUNDATIONS WORLDWIDE, INC.,
   JOSEPH A. LAWLOR
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12 OLIVER & TATE ENTERPRISES,          CASE NO. CV13-01683 RGK (SH)
   INC.
13            Plaintiff,               THIRD DECLARATION OF JOSEPH
                                       A. LAWLOR IN SUPPORT OF
14      v.                             MOTION TO DISMISS

15 FOUNDATIONS WORLDWIDE,              Date: June 10, 2013
   INC., et al.                        Time: 9:00 AM
16            Defendants.              Ctrm: 850, Roybal Building

17

18

19

20

21

22

23

24

25

26

27

28

                                        1
DECLARATION OF JOSEPH A. LAWLOR

1    I, Joseph A. Lawlor, do hereby declare as follows:

2    1.    I am the named defendant sued individually by Oliver & Tate

3  Enterprises, Inc. ("Coverplay") in this lawsuit.  I am also the President and an

4  employee of Foundations Worldwide, Inc. ("Foundations") that is also a Defendant

5  in this lawsuit.  Unless otherwise indicated, I have personal knowledge of the facts

6  stated herein, and, if called as a witness, could and would testify to the following

7  matters.

8    2.    The initial contact between Foundations and Coverplay was from

9  Coverplay's Allison Costa.  She called in December 2009 and asked if she could

10  come to Medina, Ohio to meet with Foundations before she went back to California

11  as she was currently travelling on the east coast.  In response, I agreed for her to

12  visit Medina.  I offered to make accommodations and she accepted.  In December

13  2009, both Allison Costa and Amy Feldman travelled to Medina, Ohio to meet with

14  Foundations.

15    3.    In her declaration submitted in support of Coverplay's opposition, Amy

16  Feldman named a number of people who live in California who might be witnesses

17  in this lawsuit, however it is unlikely any of them would have personal knowledge

18  of relevant information for this lawsuit.  For instance, I am unaware of any

19  discussions by Foundations with either Mr. Higgins or Mr. Barter concerning

20  Coverplay or the Foundations play yard cover product, the alleged infringing

21  product.

22    4.    Hotel chains generally have people at the corporate level who make the

23  procurement decisions as to what products will be purchased. The people on the

24  regional level have some buying authority, but it is limited and their authority is not

25  as extensive as that of the corporate decision makers. Foundations usually presents

26  new products to the corporate procurement decision makers.  Foundations does not

27  normally introduce new products to regional procurement people.  The regional

28

2

DECLARATION OF JOSEPH A. LAWLOR

1   procurement people are most often only involved with the logistics of the

2   procurement transactions.  Mr. Jon Butte, who is mentioned by Coverplay, was a

3   part of the regional personnel for Disney.

4         5.      The 2010 Safety Letter signed by Mark Suvak, which indicated that we

5   knew of no play yard cover on the market at that time that was safe to be used with

6   Foundations' play yard, was initially sent to the corporate decision makers. The

7   corporate decision makers at Disney that Foundations normally deals with are

8   located in Florida.  Attached is a copy of the 2010 Safety Letter sent to a Disney

9   corporate decision maker in Florida.  Mr. Jon Butte was on the regional level for

10  Disney and not a corporate decision maker.  Foundations presents products to

11  Disney in Florida.  Mr. Butte was a regional person that worked for Disney in

12  California.  Mr. Butte does not now work for Disney.  I do not know where Mr.

13  Butte currently lives.  Mr. Butte left Disney prior to the introduction of the alleged

14  infringing product into the market and prior to Foundations presenting that product

15  to Disney.

16        6.      The independent safety consultants that were retained by Foundations

17  for the review of covers for play yards, and therefore have information relevant to

18  this lawsuit, are David E. Campbell & Associates, which is located in northern

19  Ohio.  We worked with a number of people at David E. Campbell & Associates,

20  including David Campbell.  In the development and product launch of our

21  SleepFresh™ product, the allegedly infringing product, we used other consultants

22  such as Terri S. Rosenthal Leikin of ColorDirections, LLC of northern Ohio and

23  web marketing consultant James Kurtz, III of the Kurtz Graphic Design Co. of

24  northern Ohio.  All of them have relevant information concerning the SleepFresh™

25  product.  These are all independent witnesses in Ohio.

26

27

28

DECLARATION OF JOSEPH A. LAWLOR

3

1

2          I declare under penalty of perjury that the foregoing is true and correct.

3    Executed on May 23, 2013.

4

5                                              Joseph A. Lawlor

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSEPH A. LAWLOR                         4

# Foundations®

## WORLD LEADER IN HOTEL CRIBS

April 19, 2010


Peggy Patterson
Disney Worldwide Services, Inc.
1800 Live Oak Lane
Lake Buena Vista, FL 32830


Dear Peggy Patterson,

As you are aware, Foundations is a manufacturer of high quality children's cribs and play yards for the hospitality, daycare, and nursery markets.

Foundations has become aware of companies marketing aftermarket play yard covers that are designed to cover the top rails and sides of play yards to help keep them clean and prevent soiling of the fabric. As these covers completely cover the play yard, inside and outside, it is evident that when using the covers, the product warnings provided by Foundations are covered and not available to the parent or caregiver using the product. Foundations is concerned that the safe environment provided by its play yards may thus be compromised. As a result, Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards.

While covering a play yard to keep it clean and prevent soiling of the fabric seems like a good idea, there are several reasons that Foundations recommends against using play yard covers. They are as follows:

1. Play yard covers are designed to cover the top rails of the play yard. Play yard covers that cover the inside of the top rail also cover the warnings provided to ensure correct use. By covering these warnings, the warnings are not available to the parent or caregiver using the product.

2. These warnings are required by the ASTM *"Standard Consumer Safety Specification for Non-Full-Size Cribs and Play yards"*. Covering the warnings on the play yard takes the play yard out of compliance with this safety standard.

3. Foundations play yards have been designed for commercial applications in hotels and child care facilities where the play yard is often setup by the hotel staff, or child care center staff, before the guest or caregiver arrives. The play yard covers are also designed for the use with play yards in this application. In consideration of the specifics of this use, and the fact that setup is provided by the hotel or child care staff, Foundations has placed warnings about correct use on the inside of the top rails. Such placement of warnings is done so that information is readily available to the guest or caregiver when they see the play yard setup and ready to use. The play yard cover covers these warnings and thus prevents the guest or caregiver from seeing the warnings to ensure correct use and to prevent injuries.

Page 2 of 2

4. Foundations has not fully tested or evaluated the safety of its play yards when a play yard cover is in use with the play yard. In addition to above mentioned issues, Foundations is concerned about suffocation risks that a loose fitting cover may present. For these reasons, Foundations cannot support using this add-on product as it could compromise the safe environment provided by the play yard.

In summary, the play yard cover takes the play yard out of compliance with the applicable safety standard. The product warnings that Foundations feels the user of the play yards need to see are covered by the play yard cover. Foundations has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers. Foundations recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards. Foundations expressly disclaims all liability for any losses or damages arising out of or relating to any claim or claims for personal injury, illness, disease or death caused by, or alleged to have been caused by play yard covers or the use of play yard covers.

Please feel free to contact us if you have specific questions.

Sincerely,

Mark Suvak
Vice President of Product Development, Safety, and Compliance

**A99**

1   James W. Paul (State Bar No. 90,133)
       jpaul@fulpat.com
2   James Juo (State Bar No. 193,852)
       jjuo@fulpat.com
3   FULWIDER PATTON, LLP
    Howard Hughes Center
4   6060 Center Drive, Tenth Floor
    Los Angeles, California 90045
5   Telephone:  (310) 824-5555
    Facsimile:  (310) 824-9696
6
    Attorney for Defendants,
7   FOUNDATIONS WORLDWIDE, INC.,
    and JOSEPH A. LAWLOR
8

9               UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11

12   OLIVER & TATE ENTERPRISES,        CASE NO. CV13-01683 RGK (SH)
     INC.
13                  Plaintiff,          DECLARATION OF JAMES JUO IN
                                        SUPPORT OF MOTION TO DISMISS
14          v.                          FIRST AMENDED COMPLAINT, OR,
                                        IN THE ALTERNATIVE, TRANSFER
15   FOUNDATIONS WORLDWIDE,
     INC., et al.
16                  Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JAMES JUO
                              1

**A100**

I, James Juo, do hereby declare as follows:

1.    I am an attorney with the law firm of Fulwider Patton LLP, and I am duly licensed to practice law in the state of California.  I represent Defendants Foundations Worldwide, Inc. and Joseph A. Lawlor in the above-identified matter. Unless otherwise indicated, I have personal knowledge of the facts stated herein, and, if called as a witness, could and would testify to the following matters.

2.    Attached as Exhibit A is a copy of a letter dated February 22, 2013, from Marc Hankin to Joseph A. Lawlor.

3.    Attached as Exhibit B is a copy of the Complaint filed by Foundations Worldwide, Inc. against Oliver & Tate Enterprises, Inc. (d/b/a Coverplay) in the U.S. District Court for the Northern District of Ohio, No. 13-506, on March 7, 2013.

4.    Attached as Exhibit C is a copy of a letter dated March 22, 2013, from Marc Hankin to Patricia A. Walker.

5.    Attached as Exhibit D is a copy of the return receipt provided by counsel for Plaintiff on April 1, 2013.

6.    Attached as Exhibit E is a copy of the Amended Complaint  filed by Foundations Worldwide, Inc. in the U.S. District Court for the Northern District of Ohio, No. 13-506, on April 25, 2013.

7.    Attached as Exhibit F is a printed copy of the "Contact Us" page on Foundations' website at http://www.foundations.com/contact-us.html (last visited April 1, 2013).  The page identifies "5216 Portside Dr." as the address.

8.    According to a Google map search I recently performed, Los Angeles, California is located approximately 2350 miles from Medina, Ohio.

9.    On March 26, 2013, I attempted to contact Marc Hankin, lead counsel for Plaintiff, to conduct a conference of counsel under L.R. 7-3 for a motion to dismiss or transfer.  He was unavailable, so I spoke with Nima Darouian who is listed as counsel of record for this action as well.  After I disclosed the substance of its motion to dismiss, Mr. Darouian stated that further discussion would require lead

DECLARATION OF JAMES JUO

2

1  counsel, Mr. Hankin who was out of the country and would not be available until
2  Monday, April 1, 2013.  Then Mr. Darouian insisted that Foundations dismiss the
3  Ohio action instead of filing a motion to dismiss the California action.  In addition,
4  when asked about the service on Mr. Lawlor, Mr. Darouian stated that Plaintiff
5  would stand by the proof of service filed with the Court.

6       10.    The next day, March 27, 2013, during a follow-up telephone call with
7  Mr. Darouian, I pointed out that Plaintiff had filed two different proofs of service for
8  Mr. Lawlor—one proof for personal service, and the other proof for certified mail.
9  When asked which proof of service Plaintiff would be relying upon for Mr. Lawlor,
10  Mr. Darouian stated that this question should be directed to lead counsel, Mr.
11  Hankin, who would be unavailable until April 1.

12       11.    One of Plaintiff's proofs of service stated that the summons and
13  complaint were mailed to Mr. Lawlor, but did not identify the mailing address.  The
14  proof, however, did state that there was a "return receipt" for the mailing, but Mr.
15  Darouian (who signed the proof) declined to provide a copy to Foundation, insisting
16  that Foundation's request should be made to lead counsel instead.

17       12.    Because Mr. Darouian has deferred all discussion regarding
18  Foundation's motion until Mr. Hankin's return—Foundation's counsel requested
19  that the parties agree to a mutual extension of time to respond to the respective
20  complaints in the Ohio and California actions, to give the parties additional time to
21  resolve as many issues as possible before filing any motions.  Again, Mr. Darouian
22  deferred discussing the proposed extensions of time until Mr. Hankin's return.
23  Foundations filed its motion to dismiss or transfer on April 2, 2013.

24       13.    On May 1, 2013, the Court issued an order [ECF 20] denying
25  Foundations' motion to dismiss or transfer as moot "[i]n light of Plaintiff's First
26  Amended Complaint, filed April 16, 2013."

27

28

DECLARATION OF JAMES JUO

3

14.     On Friday, May 3, 2013, I attempted to contact Marc Hankin, lead counsel for Plaintiff, to conduct a conference of counsel under L.R. 7-3 for another motion to dismiss or transfer, but he was unavailable.  I asked to speak with the other counsel of record, Kevin Schraven and Nima Darouian, but neither returned my telephone call that day.

15.     On Monday, May 6, 2013, Mr. Hankin was still unavailable, but I was able to speak with Nima Darouian.  During the conference of counsel, I asked Mr. Darouian whether Plaintiff's trade libel claim was based on the April 2010 Safety Letter.  Mr. Darouian responded by stating that the Amended Complaint set forth the basis for trade libel.  When asked to explain the basis for Plaintiff's assertion that the play yard cover in Exhibits I and J attached to Plaintiff's First Amended Complaint was Plaintiff's product, Mr. Darouian asserted that it was Plaintiff's product and no further explanation was necessary.

16.     When asked about the basis for Plaintiff's Unfair Competition Law ("UCL") claim at the May 6 conference of counsel, Mr. Darouian relied upon the allegation's reference to "California Tort Laws."  When pressed for more specificity, Mr. Darouian noted that the later Interference claims also supported the UCL claim.

17.     Attached as Exhibit G is a timeline summarizing communications between Plaintiff and Defendant from March 5–8, 2013.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 13, 2013.

_____

James Juo

# HANKIN PATENT LAW, APC

12400 Wilshire Boulevard, Suite 1265
Los Angeles, CA  90025
Telephone:  (310) 979-3600
Facsimile:  (310) 979-3603
Marc@HankinPatentLaw.com
February 22, 2013

**Via Email With Confirmation via U.S. Mail**

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
7001 Wooster Pike
Medina, Ohio  44256
jlawlor@foundations.com

Re:     **SleepFresh Crib Covers and Your Infringement of COVERPLAY's Patents**

Dear Mr. Lawlor:

Our firm is Intellectual Property Litigation Counsel for Oliver & Tate Enterprises, Inc. *dba* COVERPLAY ("COVERPLAY").  As you know, COVERPLAY designs and produces slipcovers for portable play yards.  COVERPLAY is the owner of multiple U.S. Patents, including U.S. Patent No. 7,401,366 ("the '366 Patent") and U.S. Patent No. D572,961 ("the '961 Patent").

You are hereby warned and notified to **CEASE AND DESIST** making, using, selling, and/or offering to sell Foundations Worldwide, Inc.'s ("Foundations") SleepFresh Crib Covers, because your product belongs to our Client.  You are currently **infringing** and we **DEMAND that you immediately stop.** If you do not immediately agree to cease all activities related to the SleepFresh Crib Covers, we will take all action necessary to protect our Client's Intellectual Property.

Your failure to comply with our Client's Cease and Desist demand will result in our Client's full and forceful prosecution of all rights, including contacting your current and potential customers to request that they do not purchase the infringing products.  In addition, our Client is prepared to go forward with litigation alleging that: 1) your company has illegally made, used, sold, and/or offered to sell a product that clearly infringes our Client's Intellectual Property Rights; 2) you have defamed our Client by committing trade libel; 3) you have breached the Mutual Confidentiality Agreement between Foundations and COVERPLAY; 4) you have intentionally interfered with a prospective economic advantage to COVERPLAY; 5) you have intentionally interfered with the Distribution Agreements between COVERPLAY and its distributors; 6) you have misappropriated COVERPLAY's trade secrets; and 7) you have committed conversion by taking possession of COVERPLAY's Product and claiming it belongs to you.

Accordingly, we expect you to comply with COVERPLAY's Cease and Desist demand so that we can avoid unnecessary litigation.

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 2 of 5

### I.    <u>Background</u>

In 2009, you met with COVERPLAY's owners and business partners, Allison Costa and Amy Feldman. The purpose of this meeting was to discuss the possibility of COVERPLAY working with Foundations.

In December 2009, you sent an email to Ms. Costa and Ms. Feldman. In this email you stated that you "are confident that there is a lot of mutual benefit in a partnership between our companies." In your email, you also stated that it was "important that we get samples of the product as soon as possible" and requested that COVERPLAY forward you a Non-Disclosure Agreement. Ms. Feldman responded to your email by attaching a Non-Disclosure Agreement, and requested that you sign the Agreement.

You subsequently *signed* the Non-Disclosure Agreement, and indicated your title as "President" of Foundations. You agreed that any Evaluation Material you received would be kept confidential and that you would not disclose any of the Evaluation Material in any manner whatsoever to any other person. The Evaluation Material that you received consisted of confidential information – including our Client's Product line, our Client's customers, our Client's distributors, and a timeline of the relevant dates related to our Client's Product such as when and where the Product would be shipped.

In early 2010, you attempted, multiple times, to push COVERPLAY to enter into a Licensing Agreement with you, in which COVERPLAY would license its Product to Foundations. On January 29, 2010, you offered various terms for this proposed Licensing Agreement, including the following: "Cover Play would agree to defend the patent, and Foundations, in any suits from other companies that may sue for patent infringement, and agree to be responsible for any settlements or judgments. [Our attorney] said this language is present in virtually all license agreements and it is standard and customary <u>for the patent holder</u> to agree to this." Thus, you acknowledged that COVERPLAY owns the patent you sought to license.

Despite your multiple attempts, however, COVERPLAY repeatedly turned down your offers, and consistently refused to enter into a Licensing Agreement with Foundations. Upon COVERPLAY's rejection, you engaged in actions that were entirely irrational and unwarranted. Your crusade of misinformation included sending letters to COVERPLAY's customers, hotels, and distributors – including Disney, Marriott, Wyndham, and American Hotel Register – in which you attacked COVERPLAY's product without any justification. For example, in Foundations' April 2010 letter to Disney Sourcing & Procurement, Foundation's Vice President of Product Development, Safety, and Compliance, Mark Suvak, stated: "Foundations is advising its customers that it recommends against using play yard covers with any Foundations play yards… Foundation has not yet fully tested or evaluated the safety of its play yards when using one of these play yard covers. Foundation recommends against using any play yard covers with its play yards and assumes no responsibility for the use of covers with its play yards and/or your decision to use covers with its play yards." However, you already had tested and evaluated the safety of our Client's Product, despite the letter indicating otherwise. Moreover, you were fully aware that there were no actual safety concerns with our Client's Product in light of your ongoing communications with COVERPLAY. There was thus absolutely no reason for your Vice President to send a letter full of such blatant inaccuracies.

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 3 of 5

In May 2010, COVERPLAY had its counsel, ARC IP Law, PC, send you a letter regarding the defamatory correspondence authored by Mr. Suvak. This letter informed you that you engaged in improper actions because of these defamatory statements, and that you violated the Non-Disclosure Agreement – which you signed – by having your Vice President send frivolous letters to COVERPLAY's customers and hotel distributors.

Despite being warned that your actions relating to COVERPLAY have been completely inappropriate and improper, your crusade of misinformation nevertheless continued.

On August 9, 2011, you had your Vice President, Mr. Suvak, send a meritless letter to Avendra Canada Inc. regarding COVERPLAY and Marriott. The letter falsely suggested that there were safety concerns with slipcovers such as COVERPLAY's Product, and that "[c]overs you purchase today that do not take this into consideration will be obsolete soon if your goal is to be compliant with Federal play yard standard while they are in use." Mr. Suvak' letter specifically identified COVERPLAY, and Foundations' persistent push to "enter into a license agreement with Cover Play[.]" The letter also acknowledged the significance of COVERPLAY's Patents by stating, "Marriott would benefit from the Foundations safety and quality combined **with the Cover Play design and branding.**" Finally, the letter concluded with a bizarre and highly unusual request – "it would be most helpful for Marriott to contact Cover Play and advocate this course of action. Foundations could then immediately go into discussions about agreement and product with Cover Play." It is simply outrageous that Foundations even attempted to convince Marriott to push COVERPLAY to enter into a Licensing Agreement with Foundations.

As a result of Foundations' sending this baseless and unjustified letter, COVERPLAY was forced to send a letter to Marriott the following day, in which COVERPLAY had to explain: "COVERPLAY is a totally safe product which Foundation well knows… COVERPLAY fully complies with all current safety standards… We have no desire to enter into a license agreement with Foundations at this time… our product is totally safe and has never received ONE SINGLE SAFETY COMPLAINT."

In early 2013, your crusade of misinformation and deceit reached an alarming and shocking point. On the Foundations website, you are now featuring and promoting SleepFresh Crib Covers. Not only do the SleepFresh Crib Covers completely and totally infringe COVERPLAY's Patents, but you even have the audacity to falsely present COVERPLAY's slipcovers on your website. You placed an "X" next to an image of COVERPLAY's slipcover (presumably to falsely indicate the Product is not safe), even though you are fully aware that the image is not depicting the proper usage of COVERPLAY's Product.

Because of your improper conduct, COVERPLAY has suffered substantial economic damages – including distributors dropping COVERPLAY, and business transactions involving COVERPLAY falling apart. In addition, it is absurd that you would so blatantly infringe COVERPLAY's Patents when: 1) you have acknowledged multiple times that COVERPLAY owns these Patents; 2) you have complimented and spoken positively about COVERPLAY's patented design; 3) you have insisted that COVERPLAY enters into a Licensing Agreement with Foundations regarding COVERPLAY's Patents; and 4) you had an opportunity to purchase COVERPLAY's Patents. Accordingly, we expect you to comply with COVERPLAY's demands.

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 4 of 5

II.    <u>COVERPLAY's Demands</u>

Simply put, this letter is your final warning. Your actions have been completely inappropriate, and COVERPLAY is prepared to seek Court intervention if you do not put an end to your unnecessary crusade.

Accordingly, COVERPLAY demands that you do the following:

1) You immediately cease and desist from making, using, selling, and/or offering to sell SleepFresh Crib Covers;

2) You immediately cease and desist from referencing SleepFresh Crib Covers in all mediums, including but not limited to, Foundations' websites, catalogs, sales rallies, trade shows, and correspondences;

3) You agree to refrain from falsely commenting on COVERPLAY, including but not limited to, attacking nonexistent safety and quality issues related to COVERPLAY;

4) You agree to refrain from contacting COVERPLAY's distributors for the purpose of attempting to persuade distributors to convince COVERPLAY to enter into a licensing agreement with Foundations;

5) You agree to fully comply with the Non-Disclosure Agreement that you signed in 2009;

6) You agree to produce a complete list of all clients, companies, hotels, distributors, and/or individuals that were sent correspondence relating to COVERPLAY, or slipcovers for portable play yards in general.

We require a written response to this letter on or before the close of business on **March 4, 2013**, affirmatively agreeing to the terms outlined above so that we may attempt to resolve this matter without incurring any further unnecessary legal expenses on our Client's behalf. Because Foundations cannot possibly prevail, I am optimistic that Foundations will comply with COVERPLAY's requests without Court intervention. COVERPLAY is sincerely hopeful that this matter can be resolved amicably.

Nevertheless, COVERPLAY is prepared to go forward with litigation if necessary. Should Foundations refuse to comply promptly with COVERPLAY's requests, Foundations will have infringed COVERPLAY's Patents – the '366 Patent and the '961 Patent. *See* 35 USC § 271. Second, you will have defamed COVERPLAY by disparaging the quality of COVERPLAY's products and services. *Computerexpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010. Third, you will be in breach of the Non-Disclosure Agreement between Foundations and COVERPLAY, which you clearly signed. *Acoustics, Inc. v. Trepte Construction Co.* (1971) 14 Cal.App.3d 887, 913. Fourth, Foundations will have intentionally interfered with a prospective economic advantage to COVERPLAY by interfering with the future economic benefit that COVERPLAY would have received as a result of its work, its relationship with its customers and distributors, and any potential transactions involving COVERPLAY that were interfered with by Foundations. *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6. Fifth, Foundations will have intentionally interfered with the

EXHIBIT A
Page 4 of  5

Joseph A. Lawlor, President
**Foundations Worldwide, Inc.**
February 22, 2013
Page 5 of 5

Distribution Agreements between COVERPLAY and its distributors. *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126. Sixth, Foundations will be in violation of the *Uniform Trade Secrets Act* due to Foundation's misappropriation of COVERPLAY's trade secrets. *See* Cal. Civ. Code 3426.1. Seventh, Foundations will be liable for conversion by taking possession of COVERPLAY's Product and claiming it belongs to Foundations. *Plummer v. Day/Eisenberg, LLP* (2010) 184 Cal.App.4th 38, 50.

I look forward to receiving your confirmation that Foundations intends to comply with COVERPLAY's demands. Should you have any questions, comments, or concerns, please bring them to my attention directly. Thank you very much for your time and consideration.

Sincerely yours,
**HANKIN PATENT LAW, APC**

/Marc E. Hankin/

Marc E. Hankin, Esq.

cc: COVERPLAY

EXHIBIT A
Page 5 of  5

9

*A108*

Case: 13-159    Document: 2    Page: 145    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 10 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1   Filed: 03/07/13   1 of 17.   PageID #: 1
#:435

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **FOUNDATIONS WORLDWIDE, INC.** | ) | **CASE NO.** |
| | ) | |
| **Plaintiff** | ) | **JUDGE:** |
| | ) | |
| **v.** | ) | |
| | ) | **COMPLAINT FOR** |
| | ) | **DECLARATORY JUDGMENT** |
| **OLIVER & TATE ENTERPRISES, INC.** | ) | **OF PATENT** |
| | ) | **NONINFRINGEMENT AND** |
| **Defendant** | ) | **OTHER CAUSES OF ACTION** |
| | ) | |
| | ) | |
| | ) | **JURY DEMAND** |
| | ) | **ENDORSED HEREON** |
| | ) | |

Foundations Worldwide, Inc. ("**Foundations**") for its Complaint for Declaratory

Judgment of Patent Noninfringement and Other Causes of Action ("**Complaint**") against Oliver

& Tate Enterprises, Inc. ("**Oliver & Tate**") states as follows:

**THE PARTIES, JURISDICTION AND VENUE**

1.      Foundations is an Ohio corporation, with its principal place of business in Medina, Ohio,

in the Northern District of Ohio.

1

Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 11 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1  Filed: 03/07/13  2 of 17.  PageID #: 2
#: 486

2.      Oliver & Tate is a California corporation, which is subject to the personal jurisdiction of

the U.S. District Court for the Northern District of Ohio, as it has substantial contacts with the

Northern District of Ohio.

3.      Oliver & Tate nationally sells covers for small baby cribs commonly known as "play

yards."   Oliver & Tate sells its products through retail stores in the Northern District of Ohio

and through web sites.  Oliver & Tate has substantial contact with this Judicial District through

its sale of its products in this Judicial District.

4.      Additionally, the principals of Oliver & Tate travelled to this Judicial District to pursue a

business relationship with Foundations.

5.      Venue is proper under 28 U.S.C. § 1391(b)(2).  A substantial part of the events giving

rise to the claims in this Complaint occurred in this Judicial District.  Oliver & Tate's actions

were designed to cause harm to Foundations in this Judicial District.

6.      This Complaint seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C.

§§ 2001 and 2202.  This Court has subject matter jurisdiction of the claims in this Complaint

pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## **BACKGROUND**

7.      Foundations realleges the allegations of Paragraphs 1 through 6 of this Complaint as if

fully rewritten herein.

8.      Foundations is the foremost supplier of hotel and childcare cribs in the United States.  For

over 10 years Foundations has sold childcare products.  Foundations sold childcare products,

including play yards, to Marriott International for years prior to learning of the existence of

Oliver & Tate.  Foundations owns numerous patents on childcare products.

2

Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 12 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-2  Filed: 03/07/13  3 of 17.  PageID #: 3
#:497

9.      On or about December 10, 2009, Allison B. Costa and Amy Feldman, principals of

Oliver & Tate, met with Foundations at Foundations' office in the Northern District of Ohio.  In

the meeting they explored a business relationship concerning covers for play yards.

10.     Subsequently, Foundations and Oliver & Tate entered into a Mutual Confidentiality

Agreement that was retroactive to December 10, 2009 that governed the use of certain

"Evaluation Material" that each party provided to the other ("**Mutual Confidentiality**

**Agreement**").  The Mutual Confidentiality Agreement and all obligations thereunder expired on

December 9, 2010, and no further agreements were executed between Foundations and Oliver &

Tate.  Foundations has not used any of the Evaluation Material of Oliver & Tate to further its

business or develop its products.

11.     A true and exact copy of the Mutual Confidentiality Agreement is attached and

incorporated in this Complaint as **Exhibit 1**.

12.     Oliver & Tate claim to own U.S. Patent Nos. 7,401,366 ("**`366 patent**") and D572,961

("**`961 patent**"), hereafter collectively referred to as the "OT patents."

13.     A copy of the `366 patent is attached and incorporated in this Complaint as **Exhibit 2**.

14.     A copy of the `961 patent is attached and incorporated in this Complaint as **Exhibit 3**.

15.     Foundations determined that the OT patents were limited in scope.  Both OT patents had

issued and were publicly available prior to the time of the December 2009 meeting with Oliver &

Tate in Medina, Ohio.

16.     Foundations also determined that there are earlier patents concerning play yard covers

that put in doubt the ability of Oliver & Tate to market their play yard cover without risk of

infringing other entities' patents.

3

Case: 13-159    Document: 2    Page: 148    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 13 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-1298d:  03/07/13  4 of 17. PageID #: 4
#:498

17.    Subsequent to the December 2009 meeting between Foundations and Oliver & Tate, some of Foundations' customers began to ask Foundations if play yard covers in the market could be used with Foundations manufactured play yards.

18.    Foundations' customers demanded an answer in writing from Foundations.  In the spring of 2010, Foundations responded to its customers and indicated that the play yard covers on the market at that time hid the warning labels that were required to be visible on play yards by the ASTM "Standard Consumer Safety Specification for Non-full Size Cribs and Play Yards."  The warnings about correct usage are placed on the inside of the top rails on the Foundations play yards.  The placement of the warnings allowed the information to be readily available to a guest at a hotel or a caregiver in a childcare facility in order for that individual to be able to determine how to set up the play yard and to use the play yard correctly to prevent injuries.  Foundations also expressed concern about possible suffocation risks that a loose fitting cover may present.  In addition, the play yard covers on the market had not been fully tested by Foundations.  At the same time as notifying its customers about the safety issues, Foundations gave the same information to Oliver & Tate.

19.    Foundations did not use or disclose any of the Evaluation Material provided by Oliver & Tate.  In fact, Foundations did not begin development of a play yard cover until after the expiration of the Mutual Confidentiality Agreement.  Foundations has since developed a play yard cover that is to be used exclusively with Foundations' new model play yard, and not with any other play yard.  Foundations designed their play yard cover to maximize safety with many novel features that are the subject of several patent applications.

20.    A cease and desist letter dated May 5, 2010 from an attorney representing Oliver & Tate was directed to Foundations in this Judicial District.  The letter objected to Foundations' truthful

4

EXHIBIT B
Page 4 of  44

Case: 13-159    Document: 2    Page: 149    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 14 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-5 Filed: 03/07/13  5 of 17.  PageID #: 5
#:439

information sent to customers concerning the safe use of play yards and also falsely alleged

disclosure of the Evaluation Material of Oliver & Tate by Foundations.  The attorney for Oliver

& Tate threatened a lawsuit for breach of the Mutual Confidentiality Agreement, trade libel,

product libel, tortious interference with the economic relationships of Oliver & Tate and other

causes of action.

21.    Foundations denied the allegations in the cease and desist letter on May 11, 2010.

Foundations defended its dissemination of truthful information concerning the universe of play

yard covers that were available as of that time, and indicated that no Evaluation Material of

Oliver & Tate had been disclosed by Foundations.

22.    After sending the May 11, 2010 letter, Foundations believed that any misunderstandings

between Foundations and Oliver & Tate had been resolved.  Foundations justifiably relied on the

lack of response of Oliver & Tate.

23.    The purchasing entity for Marriott International wanted to work with both Foundations

and Oliver & Tate concerning play yards and play yard covers.

24.    In response to that request, Foundations sent a letter on August 9, 2011 suggesting that

Oliver & Tate may want to enter into a license agreement with Foundations in which Oliver &

Tate would supply fashion designs for play yard covers to Foundations for the benefit of Marriott

International.

25.    Foundations and Oliver & Tate have not entered into any license agreement.

26.    Oliver & Tate has represented and is continuing to represent to Foundations' customers

that Foundations has infringed the OT patents.

27.    Foundations has received requests from at least one customer for indemnification from

claims related to the OT patents.

5

Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 15 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-1 Filed: 03/07/13  6 of 17.  PageID #: 6
#: 490

28.     A cease and desist letter dated February 22, 2013 was sent on Oliver & Tate's behalf directed to Foundations in this Judicial District accusing Foundations of infringing the OT patents.

29.     On February 28, 2013, Foundations received the letter from an attorney for Oliver & Tate dated February 22, 2013 demanding that Foundations cease and desist from selling Foundations' play yard covers, referring to Foundations' play yard covers in marketing materials, commenting on Oliver & Tate's products, persuading distributors to convince Oliver & Tate to enter into a license agreement with Foundations, and breaching the Mutual Confidentiality Agreement.  The letter also demanded a list of everyone that Foundations has corresponded with regarding play yard covers.  The letter further wrongfully asserts that Foundations has infringed the OT patents, defamed the quality of Oliver & Tate's products and services, breached the Mutual Confidentiality Agreement, interfered with a prospective economic advantage to Oliver & Tate, misappropriated Oliver & Tate's trade secrets and converted Oliver & Tate's product by claiming it belongs to Foundations.

30.     The letter that was sent on behalf of Oliver & Tate and that was received by Foundations on February 28, 2013 promised a lawsuit against Foundations if Foundations did not capitulate to all of the demands of Oliver & Tate.  The letter further stated that "Foundations cannot possibly prevail."

31.     Foundations denies the assertions in the February 22, 2013 letter.

32.     Foundations requested additional time to resolve the dispute between Oliver & Tate and Foundations, however Oliver & Tate has indicated that it is not interested in allowing Foundations a reasonable time to respond.

33.     An actual controversy exists between Foundations and Oliver & Tate.

Case: 13-159    Document: 2    Page: 151    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 16 of 101   Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1 Filed: 03/07/13  7 of 17.  PageID #: 7
#:491

## COUNT 1
## DECLARATORY JUDGMENT OF INVALIDITY, UNENFORCEABILITY, AND NONINFRINGEMENT OF THE '366 PATENT

34.     Foundations realleges the allegations of Paragraphs 1 through 33 of this Complaint as if fully rewritten herein.

35.     The `366 patent is invalid for failure to comply with the requirements of 35 U.S.C. §§ 101, 102, 103 and 112.

36.     Foundations has not and is not infringing any valid claim of the `366 patent.

37.     Foundations asserts any and all other defenses available to it.

38.     Oliver & Tate was not harmed by any conduct of Foundations.

39.     Foundations is entitled to a declaratory judgment that Foundations has not infringed the `366 patent.

## COUNT 2
## DECLARATORY JUDGMENT OF INVALIDITY, UNENFORCEABILITY, AND NONINFRINGEMENT OF THE '961 PATENT

40.     Foundations realleges the allegations of Paragraphs 1 through 39 of this Complaint as if fully rewritten herein.

41.     The `961 patent is invalid for failure to comply with the requirements of 35 U.S.C. §§ 101, 102, 103 and 112.

42.     Foundations has not and is not infringing any valid claim of the `961 patent.

43.     Foundations asserts any and all other defenses available to it.

44.     Oliver & Tate was not harmed by any conduct of Foundations.

45.     Foundations is entitled to a declaratory judgment that Foundations has not infringed the `961 patent.

7

Case: 13-159    Document: 2    Page: 152    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 17 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-2 Filed: 03/07/13   8 of 17.   PageID #: 8
#:492

**COUNT 3**
**DECLARATORY JUDGMENT OF NO TRADE LIBEL,**
**PRODUCT LIBEL, DEFAMATION OR UNFAIR COMPETITION**

46.     Foundations realleges the allegations of Paragraphs 1 through 45 of this Complaint as if fully rewritten herein.

47.     In the cease and desist letters sent to Foundations in this Judicial District, Oliver & Tate wrongfully asserts that Foundations defamed the quality of Oliver & Tate's products and services by committing trade libel, product libel and/or unfair competition.

48.     Foundations has fairly competed with Oliver & Tate.

49.     Foundations has not made a derogatory and false statement concerning Oliver & Tate's reputation or the reputation of Oliver & Tate's products and services.

50.     Any assertions of Foundations that play yard covers could not be safely used with the prior version of the Foundations' play yard were made out of public concern to prevent injuries to children.

51.     Any assertions or depictions in Foundations' materials concerning play yard covers has not specifically mentioned or made implied reference to the play yard covers sold by Oliver & Tate.

52.     Any statements made by Foundations concerning play yard covers are truthful.

53.     Any claim for alleged defamation, trade libel, product libel and/or unfair competition by Oliver & Tate against Foundations is not actionable because the relevant statute of limitations has expired.

54.     Foundations asserts any and all other defenses available to it.

55.     Oliver & Tate was not harmed by any conduct of Foundations.

8

Case: 13-159    Document: 2    Page: 153    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 18 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-5 Filed: 03/07/13  9 of 17.  PageID #: 9
#:498

56.    Foundations is entitled to a declaratory judgment that Foundations has not committed

trade libel, product libel and/or unfair competition and has not defamed Oliver & Tate.

**COUNT 4**
**DECLARATORY JUDGMENT OF NO BREACH OF**
**THE MUTUAL CONFIDENTIALITY AGREEMENT**

57.    Foundations realleges the allegations of Paragraphs 1 through 56 of this Complaint as if

fully rewritten herein.

58.    In the cease and desist letters sent to Foundations in this Judicial District, Oliver & Tate

wrongfully alleged that Foundations breached the Mutual Confidentiality Agreement.

59.    Foundations has complied with all of the terms of the Mutual Confidentiality Agreement.

60.    Foundations has not wrongfully disclosed any of the Evaluation Material of Oliver &

Tate.

61.    Foundations kept confidential the Evaluation Material of Oliver & Tate.

62.    If any information related to Oliver & Tate was disclosed by Foundations, such

information is free to be disclosed under the terms of the Mutual Confidentiality Agreement

because it was information that was known to Foundations prior to it being furnished by Oliver

& Tate, it was generally known to the public other than as a result of a wrongful disclosure,

and/or it became available to Foundations from a source other than Oliver & Tate.

63.    The Mutual Confidentiality Agreement does not prohibit use of the Evaluation Material.

64.    Foundations and Oliver & Tate did not execute a definitive agreement after the date of

the Mutual Confidentiality Agreement.

65.    By the express terms of the Mutual Confidentiality Agreement, the Mutual

Confidentiality Agreement and all obligations related to material disclosed thereunder expired on

December 9, 2010.

9

Case: 13-159    Document: 2    Page: 154    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 19 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-4 Filed: 03/07/13  10 of 17.  PageID #: 10

66.     Any claim for alleged breach of the Mutual Confidentiality Agreement by Oliver & Tate

against Foundations is not actionable because the relevant statute of limitations has expired.

67.     Foundations asserts any and all other defenses available to it.

68.     Oliver & Tate was not harmed by any conduct of Foundations.

69.     Foundations is entitled to a declaratory judgment that Foundations has not breached the

Mutual Confidentiality Agreement.

## COUNT 5
## DECLARATORY JUDGMENT OF NO INTERFERENCE
## WITH ECONOMIC ADVANTAGE

70.     Foundations realleges the allegations of Paragraphs 1 through 69 of this Complaint as if

fully rewritten herein.

71.     Oliver & Tate has wrongfully asserted that Foundations has interfered with Oliver &

Tate's economic advantage.

72.     Foundations has not interfered with a prospective economic advantage of Oliver & Tate,

nor intentionally interfered with a prospective economic advantage of Oliver & Tate.

73.     Foundations has not interfered with the future economic benefit that Oliver & Tate would

have received as a result of its work and relationship with customers.

74.     Foundations has not interfered with any potential transactions of Oliver & Tate.

75.     Any statements of Foundations concerning play yard safety were in response to inquiries

by Foundations' customers and were not an interference with the economic advantage of Oliver

& Tate.

76.     The August 9, 2011 letter suggesting a license agreement between Foundations and

Oliver & Tate was written at the insistence of the purchasing entity for Marriott International.

10

Case: 13-159    Document: 2    Page: 155    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 20 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-4 Filed: 03/07/13   11 of 17.  PageID #: 11
#:490

77.    If any actions of Foundations are determined to be interference with the economic advantage of Oliver & Tate, the interference was justified and not wrongful in any way.

78.    If any actions of Foundations are determined to be interference with the economic advantage of Oliver & Tate, Foundations' actions were not wrongful and Foundations acted in good faith to protect Foundations' own bona fide interests.

79.    Foundations has only engaged in fair competition.

80.    The only economic relationship at issue in the alleged interference claim of Oliver & Tate against Foundations relates to the competition in the market between Foundations and Oliver & Tate.

81.    Foundations did not use any wrongful means or participate in any wrongful activity that interfered with any business relationship of Oliver & Tate.

82.    Foundations did not intend to create and did not create an illegal restraint of competition.

83.    Foundations' activities have at all times relevant hereto been lawful activities related to Foundations' market competition with Oliver & Tate.

84.    At all times relevant hereto, Foundations provided truthful information regarding play yard covers that was requested by its customers.

85.    At all times relevant hereto, Foundations provided honest advice related to play yard covers that was requested by its customers.

86.    Any claim for alleged interference with economic advantage by Oliver & Tate against Foundations is not actionable because the relevant statute of limitations has expired.

87.    Foundations asserts any and all other defenses available to it.

88.    Oliver & Tate was not harmed by the conduct of Foundations.

11

Case: 13-159    Document: 2    Page: 156    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 21 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1 Filed: 03/07/13   12 of 17.  PageID #: 12
#:499

89.     Foundations is entitled to a declaratory judgment that Foundations has not committed

interference with the economic advantage of Oliver & Tate.

<u>**COUNT 6**</u>
<u>**DECLARATORY JUDGMENT OF NO INTERFERENCE**</u>
<u>**WITH DISTRIBUTION AGREEMENT**</u>

90.     Foundations realleges the allegations of Paragraphs 1 through 89 of this Complaint as if

fully rewritten herein.

91.     The cease and desist letters that Foundations received in this Judicial District wrongfully

alleged that Foundations intentionally interfered with the distribution agreements of Oliver &

Tate.

92.     Foundations did not interfere with any distribution agreement or other contract to which

Oliver & Tate is or was a party.

93.     Upon information and belief, the only contract that Foundations is specifically aware of

to which Oliver & Tate was a party is the Mutual Confidentiality Agreement.

94.     Foundations does not specifically know of any distribution agreement of Oliver & Tate.

95.     Foundations has a number of distribution agreements with its customers, including one

for the benefit of Marriott International.

96.     Foundations did not interfere with a distribution or other agreement of Oliver & Tate, let

alone intentionally interfere with a distribution or other agreement of Oliver & Tate.

97.     If Foundations is found to have interfered with a distribution agreement or other

agreement of Oliver & Tate, the interference was justified and was the result of lawful conduct.

98.     Foundations stated safety concerns about play yard covers that were not designed

specifically for Foundations' play yards because Foundations' customers demanded that type of

statement from Foundations.

99.    Foundations stated safety concerns with play yard covers on the market that were not specifically made for a specific play yard, to prevent injury to children.

100.    Foundations made statements concerning the safety of play yard covers not specifically designed for a specific play yard, to avoid liability of Foundations for injuries caused by use of a non-approved play yard cover for a Foundations' product.

101.    Foundations' written statements concerning the safety of play yard covers did not specifically mention the play yard covers of Oliver & Tate.

102.    If it is found that Foundations interfered with a distribution agreement or contract of Oliver & Tate, Foundations' conduct was lawful as Foundations had a good faith right to protect the public and Foundations' own bona fide interests.

103.    If Foundations is found to have interfered with a distribution agreement or contract of Oliver & Tate, Foundations' conduct was lawful and was protecting the public interest as well as its reputation and the reputation of its products.

104.    Foundations always engaged in fair competition with regard to Oliver & Tate.

105.    The only economic relationship at issue in the alleged interference claim of Oliver & Tate against Foundations relates to the competition in the market between Foundations and Oliver & Tate.

106.    Foundations did not use any wrongful means or participate in any wrongful activity that interfered with any business relationship of Oliver & Tate.

107.    Foundations did not intend to create and did not create an illegal restraint of competition.

108.    Foundations' activities at all times relevant hereto have been lawful activities related to Foundations' market competition with Oliver & Tate.

13

Case: 13-159    Document: 2    Page: 158    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 23 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-Filed: 03/07/13  14 of 17.  PageID #: 14
#:469

109.    At all times relevant hereto, Foundations provided truthful information related to play

yard covers that was requested by its customers.

110.    At all times relevant hereto, Foundations provided honest advice related to play yard

covers that was requested by its customers.

111.    Any claim for alleged interference with economic advantage by Oliver & Tate against

Foundations is not actionable because the relevant statute of limitations has expired.

112.    Foundations asserts any and all other defenses available to it.

113.    Oliver & Tate was not harmed by any conduct of Foundations.

114.    Foundations is entitled to a declaratory judgment that Foundations has not interfered with

any distribution agreements or other contracts of Oliver & Tate.

### COUNT 7
### DECLARATORY JUDGMENT OF NO
### MISAPPROPRIATION OF TRADE SECRETS

115.    Foundations realleges the allegations of Paragraphs 1 through 114 of this Complaint as if

fully rewritten herein.

116.    The two cease and desist letters that were sent to Foundations in this Judicial District

wrongfully allege that Foundations has misappropriated trade secrets of Oliver & Tate.

117.    Foundations has not misappropriated any trade secrets of Oliver & Tate.

118.    Foundations did not acquire, use or disclose any trade secrets of Oliver & Tate in any

unauthorized manner.

119.    If Foundations acquired, used or disclosed any alleged trade secrets of Oliver & Tate, the

information comprising the alleged "trade secret" of Oliver & Tate does not qualify as such

because such information was obtained by Foundations through independent lawful means

and/or the information was readily available and public.

14

EXHIBIT B
Page 14 of  44

Case: 13-159    Document: 2    Page: 159    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 24 of 101   Page ID
Case: 1:13-cv-00506-CAB   Doc #: 1-5 Filed: 03/07/13   15 of 17.  PageID #: 15

120.    Any alleged trade secrets of Oliver & Tate did not derive independent economic value from not being generally known.

121.    On information and belief, Oliver & Tate did not take reasonable efforts to maintain its information as secret.

122.    Oliver & Tate has not identified any information disclosed or used by Foundations that would qualify as a trade secret of Oliver & Tate.

123.    Any state or federal statute concerning the protection of trade secrets or the Uniform Trade Secret Act does not apply to claims related to information disclosed pursuant to the Mutual Confidentiality Agreement between Foundations and Oliver & Tate, as the express terms of that Mutual Confidentiality Agreement released the parties from any secrecy obligations with respect to information disclosed thereunder on December 9, 2010.

124.    Any alleged cause of action for misappropriation of trade secrets by Oliver & Tate against Foundations is not actionable because the relevant statute of limitations has expired.

125.    Foundations asserts any and all other defenses available to it.

126.    Oliver & Tate was not harmed by any conduct of Foundations.

127.    Foundations is entitled to a declaratory judgment that Foundations has not misappropriated any trade secrets of Oliver & Tate.

### COUNT 8
### DECLARATORY JUDGMENT OF
### NO CONVERSION

128.    Foundations realleges the allegations of Paragraphs 1 through 127 of this Complaint as if fully rewritten herein.

129.    Oliver & Tate has wrongfully alleged that Foundations has converted Oliver & Tate's product and has claimed that it belongs to Foundations.

15

*A123*

Case: 13-159    Document: 2    Page: 160    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH  Document 21-2  Filed 05/13/13  Page 25 of 101  Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-1 Filed: 03/07/13  16 of 17.  PageID #: 16
#:500

130.    At no time did Foundations claim that any product of Oliver & Tate belonged to

Foundations.

131.    Any alleged cause of action for conversion by Oliver & Tate against Foundations is not

actionable because any relevant statute of limitations has expired.

132.    Foundations asserts any and all other defenses available to it.

133.    Oliver & Tate was not harmed by any conduct of Foundations.

134.    Foundations is entitled to a declaratory judgment that Foundations did not convert Oliver

& Tate's product.

WHEREFORE, Plaintiff, Foundations Worldwide, Inc., prays that this Court enter

judgment that:

A.    The claims of the `366 patent are invalid;

B.    Foundations Worldwide, Inc. has not infringed any valid claims of the `366

patent;

C.    The claims of the `961 patent are invalid;

D.    Foundations Worldwide, Inc. has not infringed any valid claims of the `961

patent;

E.    Foundations Worldwide, Inc. has not committed trade libel, product libel and/or

unfair competition and has not defamed Oliver & Tate;

F.    Foundations Worldwide, Inc. has not breached the Mutual Confidentiality

Agreement;

G.    Foundations Worldwide, Inc. has not interfered with the economic advantage of

Oliver & Tate Enterprises, Inc.;

16

Case: 13-159    Document: 2    Page: 161    Filed: 07/22/2013
Case 2:13-cv-01683-RGK-SH   Document 21-2   Filed 05/13/13   Page 26 of 101   Page ID
Case: 1:13-cv-00506-CAB  Doc #: 1-Filed: #:501  03/07/13  17 of 17.  PageID #: 17

H.      Foundations Worldwide, Inc. has not interfered with the distributor or other

agreements of Oliver & Tate Enterprises, Inc.;

I.      Foundations Worldwide, Inc. has not misappropriated any trade secrets of Oliver

& Tate Enterprises, Inc.;

J.      Foundations Worldwide, Inc. did not convert the product of Oliver & Tate

Enterprises, Inc.

K.      Foundations Worldwide, Inc. also requests such other and further relief as the

Court may deem to be proper and equitable under the circumstances.

A TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted,


        /s/ Patricia A. Walker
Patricia A. Walker        Ohio Reg.  No. 0001779
Ralph E.  Jocke           Ohio Reg.  No. 0011642
Christopher L. Parmelee   Ohio Reg.  No. 0069532
Attorneys for Plaintiff
Walker & Jocke
231 South Broadway
Medina, Ohio  44256
Phone: 330-721-0000
Fax: 330-722-6446
E-mail: iplaw@walkerandjocke.com

EXHIBIT B
Page 17 of  44

# HANKIN PATENT LAW, APC

12400 Wilshire Boulevard, Suite 1265
Los Angeles, CA  90025
Telephone:  (310) 979-3600
Facsimile:  (310) 979-3603
Marc@HankinPatentLaw.com
March 22, 2013

_**Via Email and U.S. Mail**_

Patricia A. Walker, Esq.
**Walker & Jocke, LPA**
231 South Broadway
Medina, Ohio  44256-2601
iplaw@walkerandjocke.com

**Re:**     _**Meet and Confer Letter Regarding Motions to Dismiss and/or Transfer** Venue_

Dear Pat:

As you already know, our firm is Intellectual Property Litigation Counsel for Oliver & Tate Enterprises, Inc. _dba_ COVERPLAY ("COVERPLAY").   We were somewhat surprised by Foundations Worldwide, Inc.'s ("Foundations") deceitful behavior leading up to what can only be termed your bad-faith filing of the Complaint for Declaratory Judgment of Patent Noninfringement and Other Causes of Action ("Ohio Complaint") in the United States District Court for the Northern District of Ohio ("Northern District of Ohio").  It is completely transparent that your decision to file the Ohio Complaint was only done in anticipation of the forthcoming suit brought by COVERPLAY in the United States District Court for the Central District of California (the "Substantive Suit"), and was an unveiled attempt to "gain home court advantage" in a dispute that only exists because your Client has willfully and intentionally violated my Client's substantive Intellectual Property Rights.

Accordingly, we hereby request that you Meet and Confer with us, or in the alternative, you simply consider the facts and the law and conclude that your Client should just agree to the following:  **that your Client will stipulate to dismiss the Ohio Complaint without prejudice, and will file a substantive Answer to the Substantive Suit in California, without either side needing to engage in any wasteful motion practice.**  Realistically, there is no point in fighting over this issue.  There is _**substantial**_ authority in favor of dismissing the Ohio Complaint, and it is a waste of our respective Clients' time and money to battle over something that you cannot – and will not – win.  I sincerely hope that we can resolve this matter amicably, and begin communicating cordially and openly, without any further deceit or subterfuge, for the mutual benefit of each of our respective Clients.  Please let me know by **Wednesday, March 27, 2013** whether you will agree to our request.

## I.     Background

On February 22, 2013, we emailed, and sent via U.S. mail, a Cease and Desist Letter to the President of Foundations – Joseph Lawlor.  In our Letter, we warned and notified Mr. Lawlor that his product, SleepFresh Crib Covers, is infringing our Client's Intellectual Property Rights.  In addition,

EXHIBIT C
Page 1 of  3

Patricia A. Walker, Esq.
**Walker & Jocke, LPA**
March 22, 2013
Page 2 of 3

we alerted Mr. Lawlor that he has engaged in conduct that is in violation of California law, including trade libel, breach of contract, intentional interference with prospective economic advantage, intentional interference with contractual relations, and misappropriation of trade secrets.   We explained to Mr. Lawlor that, while our Client was hopeful that this matter could be resolved without Court intervention, COVERPLAY was prepared to go forward with litigation if necessary.   We requested that Mr. Lawlor respond to our Cease and Desist Letter by March 4, 2013 – giving him more than a week to reply.

On March 4, 2013 – the date we requested a response by – we received absolutely nothing from you or Mr. Lawlor, nor any of your or his designees.

On March 5, 2013, we received an email from Foundations' Compliance Specialist, Lisa Haid.  Ms. Haid's email indicated that Foundations "just recently received" COVERPLAY's Cease and Desist Letter, even though it was emailed directly to Mr. Lawlor's own email address, with a courtesy copy sent via U.S. Mail on February 22, 2013.  In addition, Ms. Haid requested 14 days to respond to the letter, and concluded her email with "I am sure this matter can be handled amicably."

On that same day, March 5, 2013, I responded to Ms. Haid's email and explained that we have already given Foundations adequate amount of time to consider our Cease and Desist Letter.  Nevertheless, I closed my email by stating, "As a show of good faith, I have convinced my Clients to authorize me to give your company until Noon this coming Friday, March 8, to resolve this amicably.  If not, then we will be filing the Complaint in Federal Court on Friday afternoon."

On March 6, 2013, Ms. Haid responded to my email, and again requested more time – even though Foundations had the Cease and Desist Letter for nearly two weeks at that point.  In addition, Ms. Haid stated, "We are also desirous of resolving it as quickly as possible and doing so without any legal action."  Ms. Haid again closed her email by stating, "[W]e are hopeful that we can work through this quickly."

Again, I responded on the same day, March 6, 2013.  In my response, I explained that, when Foundations failed to respond timely to our Cease and Desist Letter, COVERPLAY authorized us to draft a Complaint.  Nevertheless, in another show of good faith, I stated, "Please have your attorney get in touch with me today or tomorrow with a proposed resolution if you want to avoid our filing publicly all of the wrongs that Foundations has committed."

Ms. Haid responded to my email on March 6, 2013.  Her response stated, "It is all new to [Foundations' legal counsel] and they need time to review all of the past correspondence you referenced in your letter. They also have other things, such as court, they have to plan around this week. Because of that they will not be in touch today but may be able to call you tomorrow between other meetings. If not they will be in touch Friday."

Despite the fact that I was available all week, it was not until Friday, March 8, 2013 that you and I finally had a telephone conversation regarding my February 22, 2013 Cease and Desist Letter.  And as you recall, I was absolutely shocked when you told me *midway* during the phone call that you had filed the Ohio Complaint on the previous day, Thursday March 7, 2013.  What was most disturbing is that you filed a **_17-page_** complaint on the day before we were supposed to discuss the Cease and Desist Letter, and the day before we indicated we would file the Substantive Suit.

EXHIBIT C
Page 2 of   3

55

**A127**

Patricia A. Walker, Esq.
**Walker & Jocke, LPA**
March 22, 2013
Page 3 of 3

Obviously, you were just playing highly improper stall games with us during that entire week, and
were simply looking to buy time to draft the Ohio Complaint.  Quite frankly, I found this conduct to
be unprofessional.  And as you should be aware:  "Courts take a dim view of declaratory plaintiffs
who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who
seem to have done so for the purpose of acquiring a favorable forum."  *Amsouth Bank v. Dale*, 386
F.3d 763, 788 (6th Cir. 2004).

    **II.**    <u>**Our Client's Request**</u>

        As discussed above, COVERPLAY's request is simple – **COVERPLAY wants Foundations
to**stipulate to dismiss the Ohio Complaint and file a substantive Answer to the Substantive Suit
in California, without either side needing to engage in any wasteful motion practice.**  There is
simply no reason for us to fight over this matter, especially when it will be a losing battle for
Foundations.

        The law on this issue is clear:  "[W]here a putative defendant files a declaratory action whose
only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the
declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum — a
guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act."
*Id.*  Further, "Cases construing the interplay between declaratory judgment actions and suits based on
the merits of underlying substantive claims create, in practical effect, a presumption that a first filed
declaratory judgment action should be dismissed or stayed in favor of the substantive suit." *Id.* at
791, n. 8.

        Accordingly, we require a written response to this letter on or before the close of business on
**<u>March 27, 2013</u>** affirmatively agreeing to the terms outlined above so that we may attempt to
resolve this matter without our respective clients' incurring any further unnecessary legal expenses.
Because Foundations cannot possibly prevail, and because the Sixth Circuit has made it clear that no
real value is served by your decision to file the Ohio Complaint a day before we filed the Substantive
Suit, I am optimistic that Foundations will comply with COVERPLAY's requests without engaging
in any needless motion practice.  If not, then please contact me or my Associate, Nima Darouian, and
we can Meet and Confer on our Motion to Dismiss and/or Transfer your Complaint from the
Northern District of Ohio to the Central District of California where it belongs.

        I look forward to receiving your confirmation that Foundations intends to comply with
COVERPLAY's reasonable request.  Should you have any questions, comments, or concerns, please
bring them to my attention directly, or to Nima's if I am unavailable when you call or email.  We
really do hope to resolve this amicably, and trust that you and your Client will take the appropriate
steps now towards doing so.  Thank you very much for your time and consideration.

                           Sincerely yours,
                           **HANKIN PATENT LAW, APC**

                           /Marc E. Hankin/

                           Marc E. Hankin, Esq.

cc:    COVERPLAY

EXHIBIT C
Page 3 of  3

56

**A128**

Case 2:13-cv-01683-RGK-SH    Document 21-2    Filed 05/13/13    Page 101 of 101    Page ID #:576



Exhibit G
Page 1 of 1

*A129*

Marc E. Hankin (SBN: 170505)
Marc@HankinPatentLaw.com
Kevin Schraven (SBN: 259446)
Kevin@HankinPatentLaw.com
Nima Darouian (SBN: 271367)
Nima@HankinPatentLaw.com
**HANKIN PATENT LAW, APC**
12400 Wilshire Boulevard, Suite 1265
Los Angeles, CA  90025
Tel: (310) 979-3600
Fax: (310) 979-3603

Attorneys for PLAINTIFF,
**OLIVER & TATE ENTERPRISES, INC.
D/B/A COVERPLAY**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OLIVER & TATE ENTERPRISES, INC. D/B/A COVERPLAY, a California corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>FOUNDATIONS WORLDWIDE, INC., an Ohio Corporation, JOSEPH A. LAWLOR, an individual, and DOES 1 through 5, inclusive,<br><br>    Defendants. | ) Case No.: CV13-01683 RGK (SH)<br>)<br>) Judge Robert Gary Klausner<br>)<br>) **DECLARATION OF AMY**<br>) **FELDMAN IN SUPPORT OF**<br>) **PLAINTIFF OLIVER & TATE**<br>) **ENTERPRISES, INC.'S**<br>) **OPPOSITION TO**<br>) **DEFENDANTS' MOTION TO**<br>) **DISMISS FOR LACK OF**<br>) **PERSONAL JURISDICTION,**<br>) **IMPROPER VENUE,**<br>) **INSUFFICIENT PROCESS,**<br>) **INSUFFICIENT SERVICE OF**<br>) **PROCESS, FAILURE TO**<br>) **STATE A CLAIM UPON**<br>) **WHICH RELIEF CAN BE**<br>) **GRANTED AND *FORUM NON***<br>) ***CONVENIENS* OR IN THE**<br>) **ALTERNATIVE TO TRANSFER**<br>)<br>) Date:        June 10, 2013<br>) Time:        9:00 AM<br>) Ctrm:        850, Roybal Building<br>) |

**DECLARATION OF AMY FELDMAN IN SUPPORT OF
PLAINTIFF OLIVER & TATE ENTERPRISES, INC.'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

*A130*

I, AMY FELDMAN, declare and state as follows:

1.      I am the co-owner of COVERPLAY.  I am over the age of eighteen and am competent to testify to the facts as stated below.  Unless otherwise stated herein, I make this Declaration based upon my personal knowledge.  I make this Declaration in support of Plaintiff Oliver & Tate Enterprises, Inc.  If called as a witness, I could and would testify competently to the matters stated herein.

2.      COVERPLAY is a California Corporation that designs and produces slipcovers for portable children's play yards.  COVERPLAY's principal place of business is Sherman Oaks, California.  COVERPLAY's slipcovers are based upon COVERPLAY's two Patents: U.S. Patent No. 7,401,366 ("the '366 Patent") and U.S. Patent No. D572,961.   The patented products have appeared on ABC's television show "Shark Tank" and Marriott's online program "Tots Travel 2", and have been featured in Parenting Magazine and Twins Magazine.

3.      It   is   my   understanding   that   Foundations   Worldwide,   Inc. ("Foundations") is an Ohio Corporation that supplies cribs and play yards nationwide, including to several large companies located in California.

4.      In December 2009, Foundations' President, Joseph A. Lawlor invited Allison Costa and me to meet with him to discuss the possibility of Foundations entering into a business relationship with COVERPLAY.  Mr. Lawlor picked us up from the airport, took us to dinner, and made our hotel reservations.

5.      On December 14, 2009, Foundations' President, Joseph Lawlor, sent me an email follow-up regarding our December 2009 meeting.  In this email, Mr. Lawlor stated, "We are confident that there is a lot of mutual benefit in a partnership between our companies."  Attached hereto as **Exhibit A** is a true and correct copy of Mr. Lawlor's December 14, 2009 email.

6.      On January 29, 2010, Foundations' President, Joseph Lawlor, sent me an email in which he offered to license COVERPLAY's patented products.  One of

1  the terms Mr. Lawlor offered for his proposed Licensing Agreement was: "Cover
2  Play would agree to defend the patent, and Foundations, in any suits from other
3  companies that may sue for patent infringement, and agree to be responsible for any
4  settlements or judgments. [Our attorney] said this language is present in virtually
5  all license agreements and it is standard and customary for the patent holder to
6  agree to this." Attached hereto as **Exhibit B** is a true and correct copy of Mr.
7  Lawlor's January 29, 2010 email.

8      7.    COVERPLAY refused to license its patented products to Foundations,
9  and refused to agree to the proposed terms in Mr. Lawlor's January 29, 2010 email.

10     8.    After COVERPLAY refused Mr. Lawlor's proposed Licensing
11  Agreement, Foundations sent letters to COVERPLAY's customers, hotels, and
12  distributors regarding the slipcovers that COVERPLAY designs and produces.
13  Attached hereto as **Exhibit C** is a true and correct copy of one of Foundations'
14  letters, which was sent on April 22, 2010 to Disney Sourcing & Procurement.

15     9.    On August 9, 2011, Foundations sent a letter to Avendra Canada Inc.,
16  requesting that Marriott "contact Cover Play and advocate" that COVERPLAY
17  enter into a Licensing Agreement with Foundations regarding COVERPLAY's
18  patented products. Attached hereto as **Exhibit D** is a true and correct copy of
19  Foundations' August 9, 2011 letter to Avendra Canada.

20     10.   It is my understanding that Mr. Lawlor has engaged in actions and
21  behavior against COVERPLAY because of COVERPLAY's refusal to license its
22  patented products.

23     11.   In February 2013, I discovered that Foundations was featuring and
24  promoting products on its website that, on information and belief, infringe
25  COVERPLAY's Patents.

26     12.   It is my understanding that the following entities either have done, or
27  currently do business with Foundations, and are either based in California, or have

28

**Page 2**
**DECLARATION OF AMY FELDMAN IN SUPPORT OF**
**PLAINTIFF OLIVER & TATE ENTERPRISES, INC.'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

representatives in California with whom Foundations has met:

    1) Disney;

    2) Hilton Worldwide;

    3) Kaplan;

    4) Guest Supply;

    5) Hertz;

    6) Lakeshore;

    7) Buy Buy Baby;

    8) Constructive Playthings;

    9) HD Supply;

    10) Grainger;

    11) American Hotel Register.

    13.    It is my understanding that there are no witnesses in Ohio that would be relevant to this case, outside of individuals that have worked for Foundations and Joseph Lawlor.

    14.    It is my understanding that Disney, Hilton Worldwide, Kaplan, Guest Supply, Hertz, Lakeshore, Buy Buy Baby, Constructive Playthings, HD Supply, Grainger, American Hotel Register, and Arms Reach Concepts, Inc. may have information regarding "SleepFresh Crib Covers" and COVERPLAY's products.

    15.    It is my understanding that a sales representative for Foundations has traveled to California frequently, and has met with buyers for Disney's California properties and Hilton. Hilton was headquartered in Beverly Hills, California until recently.

    16.    It is my understanding that Foundations met with the individual that served as the Director of Procurement for Hilton Worldwide at times relevant to this case. This individual is named Richard Barter, and it is my understanding that he is currently located in California.

Page 3
**DECLARATION OF AMY FELDMAN IN SUPPORT OF
PLAINTIFF OLIVER & TATE ENTERPRISES, INC.'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**A133**

17.    It is my understanding that the individual that served as American Hotel Register's National Account Manager for all Marriott properties at the relevant times in this case is based in California.  This individual is named Ryan Higgins.

18.    On March 8, 2010, Mr. Lawlor forwarded me an email in which he acknowledged that he discussed COVERPLAY with a representative for Arm's Reach Concepts, Inc. and indicated that there would likely be a follow-up with the representative.   Arms Reach Concepts, Inc. is located in Oxnard, California. Attached hereto as **Exhibit E** is a true and correct copy of the email that Mr. Lawlor forwarded me on March 8, 2010, as well as the contact webpage for Arms Reach Concepts, Inc. which lists the corporation's address as 2081 N Oxnard Blvd. PMB #187, Oxnard, CA 93030."

19.    It is my understanding that Foundations has conducted business with the buyers for Disney's California properties, the Head of Standards for Disney's California properties, and the Head of Procurement for Disney's California properties are all located in California.

20.    Exhibits I and J of the First Amended Complaint contain screenshots of Foundations' website, in which COVERPLAY's "Billy" slipcover is shown with an "X" placed on it under the heading "Safe."  I recognize the "Billy" slipcover, and our website currently features the "Billy" slipcover.  Attached hereto as **Exhibit F** is a true and correct copy of screenshots of COVERPLAY's website featuring the "Billy" slipcover.

21.    COVERPLAY's slipcover is not placed in the correct position in the Exhibits I and J of the First Amended Complaint.  Because our product is not placed correctly, it is causing the COVERPLAY slipcover to not fit properly. Foundations knows how to properly place a COVERPLAY slipcover on a play yard.  Attached hereto as **Exhibit G** is a true and correct copy of screenshots of

Page 4
DECLARATION OF AMY FELDMAN IN SUPPORT OF
PLAINTIFF OLIVER & TATE ENTERPRISES, INC.'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

A134

1   COVERPLAY's website featuring directions on how to properly place

2   COVERPLAY's slipcovers.

3

4

5      I declare under penalty of perjury under the laws of the United States that the

6   foregoing is true and correct.  Executed in Los Angeles, California on this 20th day

7   of May, 2013.

8

9

10                      Amy Feldman

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF AMY FELDMAN IN SUPPORT OF**
**PLAINTIFF OLIVER & TATE ENTERPRISES, INC.'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed by Fulwider Patton LLP in the County of Los Angeles, State of California.

On July 19, 2013, I served true copies of the following document(s) described as **Petition for Writ of Mandamus** on the interested parties in this action as follows:

> **Marc E. Hankin**
> **Kevin Schraven**
> **Nima Darouian**
> **HANKIN PATENT LAW, APC**
> **12400 Wilshire Boulevard, Suite 1265**
> **Los Angeles, CA 90025**
> **Telephone:(310) 979-3600**
> **Facsimile:  (310) 979-3603**

> **The Honorable R. Gary Klausner**
> **United States District Court**
> **Central District of California**
> **Courtroom 850**
> **255 East Temple Street**
> **Los Angeles, CA 90012**
> **Telephone: (213) 894-2649**

**BY FEDERAL EXPRESS:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed above.

Executed on July 19, 2013, at Los Angeles, California.

_Kathleen Gaines_
Kathleen Gaines

127396.1

**RECEIPT FOR PAYMENT**
# United States Court of Appeals
# For The Federal Circuit
### OFFICE OF THE CLERK

Received From _Fulwider Patton LLP_
(NAME)

(ADDRESS)

_M159_ _____ _7/22/13_
(CASE NO.)          (SHORT TITLE)          (DATE)

| ACCOUNT | AMOUNT |
|---|---|
| Clerk's Fee for docketing case _Writ_ | 450 00 |
| Certificate of membership | |
| Certified copy of | |
| | |
| | |
| | |
| Copy of opinion | |
| Copy of documents | |
| Reimbursement fees | |
| | |
| | |

Deputy Clerk _____          TOTAL _450 00_

Credit Card ☐   Cash ☐   Check ☒   MONEY ORDER ☐